UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WISCONSIN

KATHLEEN McHUGH, and DEANNA      )
SCHNEIDER, Individually and on   )
behalf of all persons similarly  )
situated,                        )
                                 )
          Plaintiffs,            )
                                 )
     vs.                         ) CASE No.: 11-CV-724
                                 )
MADISON-KIPP CORPORATION,        )
CONTINENTAL CASUALTY COMPANY,    )
UNITED STATES FIRE INSURANCE     )
COMPANY and ABC INSURANCE        )
COMPANIES 1 - 50,                )
                                 )
          Defendants.            )
                                 )
     and                         )
                                 )
MADISON-KIPP CORPORATION         )
                                 )
          Cross-Claimant,        )
                                 )
     vs.                         )
                                 )
CONTINENTAL CASUALTY COMPANY,    )
COLUMBIA CASUALTY COMPANY and    )
UNITED STATES FIRE INSURANCE     )
COMPANY,                         )
                                 )
          Cross-Claim Defendants,)
                                 )
(Caption Continued)


DEPOSITION OF LORNE G. EVERETT, Ph.D.

SANTA BARBARA, CALIFORNIA

THURSDAY, FEBRUARY 14, 2013

---

1     and                             )
                                      )
2     CONTINENTAL CASUALTY COMPANY    )
      and COLUMBIA CASUALTY COMPANY   )
3                                     )
           Cross-Claim defendants     )
4                                     )
      and                             )
5                                     )
      LUMBERMENS MUTUAL CASUALTY      )
6     COMPANY, AMERICAN MOTORISTS     )
      INSURANCE COMPANY, and JOHN DOE )
7     INSURANCE COMPANIES 1-20,       )
                                      )
8          Third-Party Defendants.    )
                                      )
9     _____)

10

11

12

13

14

15

16

17

18    REPORTED BY:  JOAN L. PARKER, CSR 12912

19

20

21

22

23

24

25



---

1     DEPOSITION OF LORNE G. EVERETT, Ph.D., TAKEN ON BEHALF

2     OF THE DEFENDANT, ON THURSDAY, FEBRUARY 14, 2013,

3     COMMENCING AT 9:01 A.M., AT 633 EAST CABRILLO BOULEVARD,

4     SANTA BARBARA, CALIFORNIA, BEFORE JOAN L. PARKER,

5     CSR NO. 12912, CERTIFIED SHORTHAND REPORTER FOR THE

6     STATE OF CALIFORNIA, PURSUANT TO NOTICE.

7

8     APPEARANCES OF COUNSEL:

9

10         APPEARING FOR PLAINTIFF:

11         VARGA BERGER LEDSKY HAYES & CASEY
           BY:  NORMAN B. BERGER, ATTORNEY AT LAW
12         125 South Wacker Drive
           Suite 2150
13         Chicago, Illinois  60606
           (312) 341-9400
14         nberger@vblhc.com

15         APPEARING FOR MADISON-KIPP COMPANY:

16
           MICHAEL BEST & FRIEDRICH
17         BY:  JOHN A. BUSCH, ATTORNEY AT LAW
           100 East Wisconsin Avenue
18         Suite 3300
           Milwaukee, Wisconsin  53202
19         (414) 271-6560
           jabusch@michaelbest.com
20
                       and
21
           MICHAEL BEST & FRIEDRICH
22         BY JOHN C. SCHELLER, ATTORNEY AT LAW
           One South Pinckney Street
23         Suite 700
           Madison, Wisconsin  53701
24         (608) 257-3501
           jcscheller@michaelbest.com
25

---

1     APPEARANCES OF COUNSEL (continued):

2          APPEARING FOR CONTINENTAL CASUALTY COMPANY AND

3          COLUMBIA CASUALTY COMPANY:

4          TROUTMAN SANDERS
           BY:  REBECCA L. ROSS, ATTORNEY AT LAW
5          55 West Monroe Street
           Suite 3000
6          Chicago, Illinois  60603
           (312) 759-1921
7          becky.ross@troutmansanders.com

8          APPEARING FOR UNITED STATES FIRE INSURANCE COMPANY:

9
           MEISSNER TIERNEY FISHER & NICHOLS
10         BY:  MICHAEL J. COHEN, ATTORNEY AT LAW
           111 East Kilbourn Avenue
11         19th Floor
           Milwaukee, Wisconsin  53202
12         (414) 273-1300
           mjc@mtfn.com
13

14         APPEARING FOR AMERICAN MOTORISTS INSURANCE:

15         WEISS LAW OFFICE
           BY:  MONTE E. WEISS, ATTORNEY AT LAW
16         1017 West Glen Oaks Lane
           Suite 207
17         Mequon, Wisconsin  53092
           (262) 240-9663
18         monte.weiss@mweisslaw.com

19

20

21     ALSO PRESENT:

22         HEIDI FIELDING, VIDEOGRAPHER

23         THOMAS M. JOHNSON

24

25

```
1                         I N D E X

2

3    WITNESS              EXAMINATION           PAGE

4    LORNE G. EVERETT, Ph.D.

5                         MR. BUSCH          9, 109

6                         MS. ROSS              132

7                         MR. COHEN             171

8                         MR. BERGER            191

9

10

11

12                     E X H I B I T S

13   MARKED FOR IDENTIFICATION                 PAGE

14   1     Expert Report of Lorne G. Everett, PhD   9

15   2     Documents provided after the export     24
           report

16

17   2A    2010 deep groundwater PCE isocontours   26

18   2B    Addendum to the Final Revised Work Plan  38
           for PCB Recommended

19   2C    Wellhead Protection Plan Unit Well 8,    41
           City of Madison, Wisconsin

20

21   2D    PCB Base map:  MK023913                  45

22   2E    Benzo(a)pyrene Base map:  MK023913       46

23   2F    PCE Base Map:  MK023913                  47

24   2G    MW 13 multiport sample intervals         49
           recommendation memo; 10/31/12

25
```

```
1                     E X H I B I T S

2    MARKED FOR IDENTIFICATION                 PAGE

3    2H    MW 17 screen interval recommendation    49
           memo; 12/18/12

4

5    2I    MW 15 multiport sample interval         49
           recommendation memo; 12/18/12

6    2J    MW 14 well sample interval              49
           recommendation memo; 12/19/12

7

8    2K    MW 16 well sample interval              49
           recommendation memo; 12/19/12

9    2L    Handbook of Vapor Degreasing by ASTM,   59
           1962

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
08:53   1    SANTA BARBARA, CALIFORNIA; THURSDAY, FEBRUARY 14, 2013

08:53   2              9:01 A.M.

09:00   3

09:01   4         THE VIDEOGRAPHER:  Good morning.  My name is

09:01   5    Heidi Fielding.  I'm a certified legal video specialist

09:01   6    here on behalf of Kusar Court Reporters & Legal

09:01   7    Services.

09:01   8         Today's date is February 14th of the year

09:01   9    2013.  And the time on the monitor is 9:02 a.m.

09:02  10         This is the video deposition of

09:02  11    Lorne G. Everett, M.D., in the matter of "Kathleen

09:02  12    McHugh, et al., verus Madison-Kipp Corporation, et al.,"

09:02  13    and a cross-complaint located in the U.S. District

09:02  14    Court, Western District the Wisconsin.  The case number

09:02  15    is 11-CV-724.

09:02  16         This deposition is taking place at

09:02  17    Pess Parker's Doubletree Resort, 63 Cabrillo Boulevard,

09:02  18    Santa Barbara, California and is being taken on behalf

09:02  19    of the defendants.

09:02  20         Please note:  Audio and video recording will

09:02  21    take place, and unless all parties agree to go off the

09:02  22    record, it will continue.

09:02  23         The microphones are very powerful.  They

09:02  24    pick up whispers, private conversations, and cell

09:02  25    conversations.
```

```
09:02   1         Counsel, will you please state your

09:02   2    appearances for the record.

09:02   3         MR. BERGER:  Norman Berger on behalf of the

09:02   4    plaintiffs.

09:03   5         And just for the record, Dr. Everett is

09:03   6    Ph.D., not M.D.

09:03   7         THE VIDEOGRAPHER:  Thank you.

09:03   8         MR. BUSCH:  John A. Busch, B-u-s-c-h,

09:03   9    Michael Best & Friedrich, appearing on behalf of the

09:03  10    defendant, Madison-Kipp Corporation.

09:03  11         MR. SCHELLER:  John Scheller, Michael Best &

09:03  12    Friedrich, also on behalf of the defendant Madison-Kipp

09:03  13    Corporation.

09:03  14         MR. BUSCH:  Appearing with us is Tom Johnson

09:03  15    of ARCADIS.

09:03  16         MR. COHEN:  Michael Cohen Meissner Tierney

09:03  17    Fisher & Nichols on behalf of U.S. Fire Insurance

09:03  18    Company.

09:03  19         MR. WEISS:  Monte Weiss, Weiss Law Office,

09:03  20    on behalf of defendants American Motorists Insurance.

09:03  21         MS. ROSS:  Rebecca Ross, on behalf of

09:03  22    Columbia Casualty Company and Continental Casualty

09:03  23    Company.

09:03  24         THE VIDEOGRAPHER:  Our court reporter today

09:03  25    is Joan Parker from Kusar Court Reporters & Legal
```

09:03  1    Services.

09:03  2              If you would please swear the witness.

09:03  3

09:03  4              LORNE G. EVERETT, Ph.D.,

09:03  5    having been first duly sworn by the Certified Shorthand

09:03  6    Reporter, was examined and testified as follows:

09:04  7

09:04  8              THE VIDEOGRAPHER:  Please begin.

09:04  9

09:04  10             EXAMINATION

09:04  11   BY MR. BUSCH:

09:04  12    Q.  Please state your name.

09:04  13    A.  My name is Lorne Gordon Everett.

09:04  14             (Exhibit 1 was marked for identification.)

09:04  15    Q.  BY MR. BUSCH:  And Dr. Everett, I'm showing you

09:04  16   what's been marked as Exhibit 1.  I represent to you

09:04  17   that that is a copy of the report that you committed in

09:04  18   this matter.  I believe it's dated December 3rd of 2012.

09:04  19             If you'd take a moment and see, just upon your

09:04  20   review, whether that looks like a complete report.

09:04  21    A.  It looks like it is, yes, sir.

09:04  22    Q.  Were you retained by someone to provide opinions

09:04  23   in this matter?

09:04  24    A.  Yes, sir.

09:04  25    Q.  By whom were you retained?

09:04  1    A.  I was retained by the law firm that Mr. Berger is

09:04  2   a partner in.

09:04  3             And I was retained by the Collins Law Firm where

09:05  4   a gentleman by the name of Shawn Collins works.

09:05  5    Q.  Is this the first engagement you've had on behalf

09:05  6   of Mr. Berger or Mr. Collins or their law firms serving

09:05  7   as an expert witness?

09:05  8    A.  It's not the first time, no, sir.

09:05  9    Q.  Can you list for me the times you've been

09:05  10  retained by them to obtain expert opinions.

09:05  11   A.  I believe so.  I can, sir.

09:05  12   Q.  Okay.

09:05  13   A.  I worked with Mr. Berger on a site in next to the

09:05  14  Burbank Airport referred to as the Hawker-Pacific site.

09:05  15             I worked with Mr. Berger and Mr. Collins on a

09:05  16  site in the Mallard Lake area outside of Chicago.

09:06  17             Um, there may be another one that may have

09:06  18  escaped my mind.  If you could refresh my mind.

09:06  19   Q.  Did you work at all in the Kraft case?  Is that

09:06  20  the one in Mallard lake or is that another one?

09:06  21   A.  Thank you, sir.  No, that's the different one.

09:06  22   Q.  Okay.

09:06  23   A.  And I did work in that one.

09:06  24   Q.  Okay.  And as you sit here today, is that your

09:06  25  best recollection that those are the three with which

09:06  1   you were engaged -- for which you were engaged?

09:06  2    A.  As I said, that's the best that I can recall.

09:06  3    Q.  Is there -- I believe there's a list in Exhibit 1

09:06  4   of the matters for which you've served as an expert

09:06  5   witness, at least for a period of time.  And if you

09:06  6   could take a look at that.  I believe it's on page --

09:07  7             Have you found it?

09:07  8    A.  I believe I have, sir.

09:07  9    Q.  What page is it on?

09:07  10   A.  I believe it's page 3 of my biography, sir.

09:07  11   Q.  All right.  And take a look at that list and if

09:07  12  there are others for which you have worked with either

09:07  13  Mr. Berger or Mr. Townsend or their firms, can you

09:07  14  please identify those the best you can.

09:07  15   A.  I believe you mean Mr. Collins.

09:07  16   Q.  Mr. Collins; that's right.  Or Mr. Berger.

09:07  17             (Pause in proceedings.)

09:09  18             THE WITNESS:  Um, there's a couple that I

09:09  19  would bring to your attention, sir.

09:09  20   Q.  BY MR. BUSCH:  Okay.

09:09  21   A.  There are two representations of work with Hawker

09:09  22  Pacific.

09:09  23   Q.  All right.

09:09  24   A.  And those were both with Mr. Berger.

09:09  25             There's also a second reference to a case in

09:09  1   DuPage County.

09:09  2             MS. ROSS:  Excuse me.  Keep your voice up a

09:10  3   little bit more.

09:10  4             THE WITNESS:  Thank you.

09:10  5             MS. ROSS:  Thank you.

09:10  6             THE WITNESS:  Second case is in DuPage

09:10  7   County.  I referred to that as the Mallard Lake case,

09:10  8   but there appears to be two parts to that, sir.

09:10  9    Q.  BY MR. BUSCH:  All right.  And can you -- which

09:10  10  ones were those?

09:10  11   A.  Um, the second Hawker-Pacific is this one here,

09:10  12  sir.

09:10  13   Q.  Yes, I see that.

09:10  14   A.  And then 2009, Perez --

09:10  15   Q.  Yes, I see that.

09:10  16   A.  -- Forest Preserve is the second reference to

09:10  17  DuPage County.  And I believe that would have been with

09:10  18  Mr. Berger and perhaps with --

09:10  19   Q.  Mr. Collins?

09:10  20   A.  -- Mr. Collins.

09:10  21   Q.  Can you briefly describe for me the -- what your

09:10  22  engagement was in regard to the Burbank Airport?

09:10  23   A.  Yes, sir.  The --

09:11  24             MR. BERGER:  And you can give him a general

09:11  25  description.  I don't want you to disclose any




```
09:11   1    privileged matters but --
09:11   2         MR. BUSCH:  I want to know generally.
09:11   3         MR. BERGER:  -- a general description.
09:11   4         MR. BUSCH:  Yes.
09:11   5         THE WITNESS:  The issue at hand, sir, was a
09:11   6    large groundwater contamination problem.  Much of the
09:11   7    problem was associated with chlorinated hydrocarbons.
09:11   8         Q.  BY MR. BUSCH:  Any particular chlorinated
09:11   9    hydrocarbon?
09:11  10         A.  Mostly tetrachloroethylene and trichloroethylene,
09:11  11    sir.
09:11  12         Q.  Okay.  Do those have initials that they're
09:11  13    commonly used -- that are commonly used?
09:11  14         A.  Yes, sir.  They're often referred to as PCE and
09:11  15    TCE chemical.
09:11  16         Q.  So we use the -- if I use term PCE and TCE in
09:11  17    this deposition, we'll have a common understanding as to
09:11  18    what they mean based upon how you described them?
09:11  19         A.  Yes, sir.
09:11  20         Q.  And did you, to your knowledge, as you recall,
09:12  21    did you represent plaintiff or defendant or some other
09:12  22    entity in regard to the Burbank Airport?
09:12  23         A.  I believe I represented the owner of the
09:12  24    property, so that would be a defendant, sir.
        25              (Pages 15 through 17 contain confidential
```

```
        1    material and are bound separately.  The
        2    nonconfidential portion of this deposition
        3    continues on page 18.)
        4    ///                                         ///
```

```
09:15   1         Q.  BY MR. BUSCH:  What was your engagement in the,
09:15   2    for lack of a better term, the Mallard Lake, which I
09:15   3    believe you said is also the Forest Preserve District;
09:15   4    is that correct?
09:15   5         A.  I believe so, sir.
09:16   6         Q.  Can you describe for me what your engagement was
09:16   7    and what your opinion was?
09:16   8         A.  My engagement was to look at contamination
09:16   9    originating from an, in effect, a landfill and looked at
09:16  10    the geology and the hydrogeology and the flow path
09:16  11    associated with the contamination and concluded that
09:16  12    there was sufficient evidence to opine that there was a
09:16  13    source in the landfill and had made
09:16  14    it all the way to homes that were being impacted, sir.
09:16  15         Q.  And was there a, um -- was this also a PCE issue
09:16  16    or was it some other chemical?
09:16  17         A.  Um, well, the parent compounds were PCE or TCE in
09:17  18    the landfill.  But it was the degradation of products
09:17  19    going all the way down to cis-1,2-DCE to final chloride.
09:17  20    It was really a final chloride which is a daughter
09:17  21    products of the PCE degradation.
09:17  22         Q.  Is the Hawker-Pacific matter the Burbank Airport
09:17  23    matter?
09:17  24         A.  Yes, sir.
09:17  25         Q.  Can you describe for me -- and you've described
```

```
09:17   1    for me just now the work that you did and the toxin at
09:17   2    issue in regard to the Mallard Lake/DuPage County
09:17   3    matter; correct?  That's what we just spoke about.
09:17   4         A.  Yes, sir.
09:17   5         Q.  Can you describe for me the work you did in
09:17   6    regard to what we'll shorthand call the "Kraft" matter?
09:17   7         A.  Yes, sir.  I looked at the operational activity
09:17   8    at the Kraft facility.  I looked at the distribution of
09:18   9    the chlorinated hydrocarbons, PCE and TCE, that you and
09:18  10    I've shared.
09:18  11         Q.  Yes.
09:18  12         A.  I looked at it with respect to soil
09:18  13    contamination, soil and gas contamination, groundwater
09:18  14    contamination.  And I concluded that the Kraft facility
09:18  15    was, in fact, the source of the chlorinated hydrocarbon
09:18  16    impacts that we're seeing in that area.
09:18  17         Q.  What is the business of L. Everett & Associates?
09:18  18         A.  L. Everett & Associates and environmental
09:18  19    consulting firm.  And the breadth of our business ranges
09:18  20    from site characterization and remediation through
09:19  21    litigation support, sir.
09:19  22         Q.  How many employees does L. Everett & Associates
09:19  23    have?
09:19  24         A.  There -- in addition to myself, sir, there
09:19  25    are -- there are currently three full-time employees.
```

09:19  1    Q.  And can you describe for me -- I don't need their
09:19  2    names.  What are their job duties?
09:19  3    A.  The -- the job of Dr. Wells is kind of the
09:19  4    operations manager.  He's kind of the lead project
09:19  5    manager, lead technical person.
09:19  6        And the other person is my senior engineer
09:19  7    Mr. Jorge Matos.
09:19  8        And the third individual is kind of an office
09:19  9    assistant.  Her name is Jill Beniak.
09:19 10    Q.  If you can, can you provide for me on a
09:19 11    percentage basis how much of your time is spent in
09:20 12    litigation support or how much of the business of
09:20 13    L. Everett & Associates is litigation support?
09:20 14    A.  Of course, it's always going to vary some.  But
09:20 15    last year -- it could be around 50, 50 percent, sir.  I
09:20 16    don't have those numbers memorized.  But we have a very
09:20 17    large remediation projects for a small company, so I
09:20 18    think 50-50 is reasonable.
09:20 19    Q.  In rendering the opinion that is set forth in
09:20 20    Exhibit 1, did you rely on the expertise and/or
09:20 21    knowledge and/or work of any of these other employees
09:20 22    which you mentioned?
09:20 23    A.  I -- I did, sir.  And perhaps one further
09:20 24    individual that I had expected by now to be on staff
09:20 25    with us.

---

09:20  1    Q.  All right.
09:20  2    A.  But we haven't signed the letter yet.
09:21  3    Q.  And how much in total in hours, if that's how you
09:21  4    keep track from an office perspective, how many hours
09:21  5    work did you put in or your company put into the
09:21  6    creation of Exhibit 1?
09:21  7    A.  I couldn't even make a guess to that without
09:21  8    having the timesheets in front of me.  I really
09:21  9    couldn't --
09:21 10    Q.  Do you --
09:21 11    A.  -- feel comfortable.
09:21 12    Q.  Do you bill based upon the hour?
09:21 13    A.  We do, sir.
09:21 14    Q.  And from time to time do you bill your clients?
09:21 15    A.  We do, sir.
09:21 16    Q.  And with which frequency?
09:21 17    A.  We have annual -- not annual.  We have monthly
09:21 18    invoices, sir.
09:21 19    Q.  But as you sit here today you don't know.  You
09:21 20    cannot even give an educated as to how much time was
09:21 21    logged by your company in preparing Exhibit 1?
09:21 22    A.  Off the top of my head, I could not, sir.
09:22 23    Q.  As of the date of this report --
09:22 24    A.  Yes, sir.
09:22 25    Q.  -- which is December 3, 2012, does Exhibit 1, the

---

09:22  1    totality of the opinions that you were -- that you were
09:22  2    prepared to render as of that date?
09:22  3    A.  As of that date, yes, sir.
09:22  4    Q.  Yes.
09:22  5        Since that date, have you been asked to render
09:22  6    any other opinions?
09:22  7    A.  I have a number of thoughts about the -- about
09:22  8    the new data that has, in my estimation, confirmed my
09:23  9    earlier opinions but have also shown -- I'll use the
09:23 10    term "shocking" levels of contamination at the site that
09:23 11    I don't think anybody appreciated.
09:23 12        And those very high new numbers now throw this
09:23 13    site into being one of the most contaminated sites that
09:23 14    I've ever worked with.  And it completely changes the
09:23 15    risks associated with this particular site, sir.
09:23 16        And so I do have further thoughts about what we
09:23 17    know now and what we need to do now.  But, Mr. Berger
09:23 18    and Mr. Collins haven't asked for specific
09:23 19    recommendations, but they asked me what these new data
09:23 20    mean.
09:24 21        MR. BUSCH:  Mr. Berger, do you -- do you
09:24 22    intend to, um, supplement Mr. Everett's report with his
09:24 23    new thoughts and observations?
09:24 24        MR. BERGER:  I don't know at this point.  I
09:24 25    definitely -- he's prepared to give you what his new

---

09:24  1    thoughts are today.  And, you're welcome to inquire as
09:24  2    to what those additional thoughts are.
09:24  3        MR. BUSCH:  Are you going to proffer them as
09:24  4    part of his opinion?
09:24  5        MR. BERGER:  I believe so.
09:24  6    Q.  BY MR. BUSCH:  Do you have --
09:24  7        MR. BERGER:  And that's why I've -- just so
09:24  8    the record reflects:  What I handed you before the
09:24  9    deposition today was a folder containing some documents
09:24 10    which have data that is produced by Madison-Kipp to us
09:25 11    since the creation of Dr. Everett's report and has --
09:25 12    he's made some handwritten notations on some preexisting
09:25 13    maps and created a couple other maps based upon this
09:25 14    data.  And I specifically gave you those because I
09:25 15    thought he may be referring to them --
09:25 16        MR. BUSCH:  Right.
09:25 17        MR. BERGER:  -- in his testimony.  So feel
09:25 18    free to inquire about that.
09:25 19        MR. BUSCH:  Under the local rules, any
09:25 20    supplementation of a report is to be done five days in
09:25 21    advance of the -- of the deposition.  Um, reserving my
09:25 22    rights in regard to making objection, I'm going to make
09:25 23    an inquiry because I don't want to come back here if I
09:25 24    don't have to.  But I do reserve all rights that I
09:26 25    have in regard to that.




```
09:26  1            MR. BERGER:  You can reserve rights.
09:26  2        I mean, among the things that Dr. Everett
09:26  3   has looked at was data submitted to us by your office at
09:26  4   6:00 a.m. this morning.
09:26  5            MR. BUSCH:  I understand.
09:26  6            MR. BERGER:  Western time.  So we're
09:26  7   doing -- we've been pushing hard to get data as soon as
09:26  8   you have data.
09:26  9        And I will say there was a substantial delay
09:26 10   in getting data to us based upon the date of the data,
09:26 11   with respect to, at least, the subslab sampling.  And
09:26 12   we're doing the best we can.
09:26 13        So I understand you're reserving your
09:26 14   rights.  Dr. Everett's prepared to tell you what he can
09:26 15   tell you based upon what his thoughts are.
09:26 16            MR. BUSCH:  All right.  Would you mark this,
09:26 17   please.
09:27 18            (Exhibit 2 was marked for identification.)
09:27 19            MR. BERGER:  And just for now, Norm, what
09:27 20   we'll do is I'll mark the entire folder, I think it's
09:27 21   the easiest way to do it, as Everett Exhibit 2.  I'll
09:27 22   take this back with me, I'll have it Bates stamped, and
09:27 23   I'll distribute to everyone.
09:27 24        Or you can take it and Bates stamp it.
09:27 25            MR. BERGER:  I've distributed to
```

```
09:27  1   every-- -- I've given everybody here today a copy of that
09:27  2   same folder.
09:27  3            MR. BUSCH:  Okay.  But --
09:27  4            MR. BERGER:  And, um --
09:27  5            MR. BUSCH:  -- just so we -- for
09:27  6   identification purposes, I'll probably Bates stamp it
09:27  7   and --
09:27  8            MR. BERGER:  I have no problem with that.
09:27  9            MR. BUSCH:  Okay.
09:27 10            MR. BERGER:  That makes sense.
09:27 11     Q.  BY MR. BUSCH:  Dr. Everett, let me show you
09:27 12   what's been marked as Exhibit 2 and ask if you can
09:27 13   identify that, please.
09:27 14            (Pause in the proceedings.)
09:27 15            THE WITNESS:  This is material that I put
09:27 16   together subsequent to my report, sir, and is based on
09:27 17   some very recent data that I received, sir.
09:28 18     Q.  BY MR. BUSCH:  And does that, does Exhibit 2
09:28 19   relate in any way to the number of thoughts about which
09:28 20   you spoke relating to the new data?
09:28 21     A.  It -- it does, sir.  But it goes -- my thoughts
09:28 22   are going to be beyond this because of what I just
09:28 23   learned 45 minutes ago about even newer data, sir.
09:28 24     Q.  Okay.  Why don't we inquire as to your
09:28 25   observations, opinions and/or thoughts that have arisen
```

```
09:28  1   since December 3, 2012, if you can enumerate them for
09:28  2   me.
09:28  3        And you can handle it any way you want to.  You
09:28  4   can list them or we can take them one at a time and
09:28  5   inquire, whichever's easier for you.
09:28  6     A.  Well, if I could begin with the -- this figure
09:28  7   here.
09:28  8     Q.  Yes.  And if you could identify it by reading off
09:29  9   the top the system record.
09:29 10     A.  Yes, sir.
09:29 11            MR. BERGER:  You want to call that, maybe,
09:29 12   2A.
09:29 13            MR. BUSCH:  Yes.
09:29 14            MR. BERGER:  Why don't we do that.
09:29 15            (Exhibit 2A was marked for identification.)
09:29 16            (Discussion held off the record.)
09:29 17     Q.  BY MR. BUSCH:  Showing you what's been marked as
09:29 18   Exhibit 2A, how does that impact upon your new thoughts
09:29 19   subsequent to December 3, 2012?
09:29 20     A.  Well, first of all, the four new wells
09:29 21   represented in this figure show concentrations of PCE
09:29 22   that are, I'll say, more than double that we've ever
09:30 23   witnessed on this site.  So it is a much, much larger
09:30 24   problem.
09:30 25        Secondly --
```

```
09:30  1     Q.  And can -- and did you make a -- the wells to
09:30  2   which you refer, can you just name the wells.  Do they
09:30  3   have an MW name --
09:30  4     A.  Yeah.
09:30  5     Q.  -- next to them?
09:30  6     A.  They do, sir.
09:30  7     Q.  And what are the four of which you speak?
09:30  8     A.  The four that I speak to are Monitoring Well 15,
09:30  9   Monitoring Well 14, Monitoring Well 17, and Monitoring
09:30 10   Well 16.
09:30 11     Q.  Thank you.
09:30 12            MR. BERGER:  13.
09:30 13            THE WITNESS:  And Monitoring Well 13.
09:30 14   Forgive me.
09:30 15     Q.  BY MR. BUSCH:  And are those deep, shallow, or
09:30 16   combined; do you know?
09:30 17     A.  These were all directed to be deep wells.
09:30 18     Q.  And that's deep groundwater wells; correct?
09:30 19     A.  That's correct, sir.
09:30 20        And Monitoring Well 13 has 9,400 parts per
09:31 21   billion PCE.  And that is, in my estimation, several
09:31 22   times the 1 percent rule for PCE, which to me says and
09:31 23   to DNAPL site and it is a DNAPL site with DNAPLs down in
09:31 24   the 120 to 140 foot depth range in fractured rock.
09:31 25        And what that says is that based on what we know
```




| | |
|---|---|
| 09:31 | 1 |
| 09:31 | 2 |
| 09:32 | 3 |
| 09:32 | 4 |
| 09:32 | 5 |
| 09:32 | 6 |
| 09:32 | 7 |
| 09:32 | 8 |
| 09:32 | 9 |
| 09:32 | 10 |
| 09:32 | 11 |
| 09:33 | 12 |
| 09:33 | 13 |
| 09:33 | 14 |
| 09:33 | 15 |
| 09:33 | 16 |
| 09:33 | 17 |
| 09:33 | 18 |
| 09:33 | 19 |
| 09:33 | 20 |
| 09:33 | 21 |
| 09:33 | 22 |
| 09:34 | 23 |
| 09:34 | 24 |
| 09:34 | 25 |

in America, DNAPL sites in fractured rock have never
been cleaned up to MCLs anywhere in America.  And that
flies in the face of what Mr. Johnson says that the site
will be cleaned up in two decades.  This groundwater
resource has been hugely damaged and for the foreseeable
future, I don't see it ever getting cleaned up to MCL.
And this groundwater resource is the water supply for
the folks that live in that area; and therefore, I
believe they have been hugely damaged in that way.
        Secondly, the Monitoring Well 15 is about 440 or
more feet north of the site.  It has concentrations of
3,600 parts per billion.  And Monitoring Well 15 is
located in the area noted as 5 parts per billion.
        So what that says is that very, very high
groundwater contamination is going to be going a large
distance offsite to the north and to the south and to
the east and to the west.  And therefore, Mr. Johnson's
position that the maximum distance that the groundwater
contamination could go -- I believe his number is
540 feet -- is simply incorrect.
        Further, I think what has real significance here
is that the southern well, Monitoring Well 17, has
1700 parts per billion in an area where the regulator
felt that the concentration was only 5.  And that well,
Monitoring Well 17, is, I'll say, within a thousand feet

---

| | |
|---|---|
| 09:34 | 1 |
| 09:34 | 2 |
| 09:34 | 3 |
| 09:34 | 4 |
| 09:34 | 5 |
| 09:34 | 6 |
| 09:34 | 7 |
| 09:34 | 8 |
| 09:34 | 9 |
| 09:34 | 10 |
| 09:35 | 11 |
| 09:35 | 12 |
| 09:35 | 13 |
| 09:35 | 14 |
| 09:35 | 15 |
| 09:35 | 16 |
| 09:35 | 17 |
| 09:35 | 18 |
| 09:35 | 19 |
| 09:35 | 20 |
| 09:35 | 21 |
| 09:35 | 22 |
| 09:35 | 23 |
| 09:35 | 24 |
| 09:36 | 25 |

of the city drinking water well, No. 8.
        And the Madison-Kipp site is in direct hydraulic
connections with Monitoring Well 8, the city's drinking
water well.  When they turn on this Monitoring
Well No. 8, the water goes down under Madison-Kipp so
it's a direct feed.
        So what that says to me is that the City of
Madison already thinks that there is a high risk
associated with the Madison-Kipp site to their drinking
water well.  I think that they will be highly, highly,
agitated when they find out these huge concentrations
that are right next to their drinking water supply.
That drinking water supply is now compromised for the
foreseeable future.
    Q.  And you're talking about the drinking source, in
your opinion, that's compromised is Well 8?
    A.  Yes, sir.
        Also I think that the -- the fact that we
have -- I use the word shocking; I might call it
surprising.  But since 1974, what we're finding is that
each time we put in a new well, we get shockingly new
numbers that say this site has not been -- this hasn't
been characterized for over 19 years.
        In 1974, the State said to Madison-Kipp you need
to, in all due haste --

---

| | |
|---|---|
| 09:36 | 1 |
| 09:36 | 2 |
| 09:36 | 3 |
| 09:36 | 4 |
| 09:36 | 5 |
| 09:36 | 6 |
| 09:36 | 7 |
| 09:36 | 8 |
| 09:36 | 9 |
| 09:36 | 10 |
| 09:36 | 11 |
| 09:36 | 12 |
| 09:36 | 13 |
| 09:36 | 14 |
| 09:36 | 15 |
| 09:36 | 16 |
| 09:36 | 17 |
| 09:36 | 18 |
| 09:37 | 19 |
| 09:37 | 20 |
| 09:37 | 21 |
| 09:37 | 22 |
| 09:37 | 23 |
| 09:37 | 24 |
| 09:37 | 25 |

        They didn't use the word but that was the
notes -- the notation.
        In all due haste, you need to characterize the
horizontal and vertical distribution of the
contamination.
        And this newest data shows that ARCADIS, albeit
being the new player on the block, absolutely had not
characterized this site.
        And so if you don't know the sources and you
don't know the direction of the groundwater, you really
can't be talking about risk.
        What I think is unconscionable that we have these
reports coming out saying there is no risk to these
families and the new data shows very high risk.
    Q.  The risk of which you speak is the risk --
        MR. BERGER:  Just for --
        MR. BUSCH:  Yeah.
        MR. BERGER:  I think you said 1974.
        THE WITNESS:  Oh, no.  1994.  I'm sorry.
        MR. BERGER:  Why don't you correct that for
the record.
        THE WITNESS:  Yeah, forgive me.
        The -- the State of Wisconsin sent a letter
to Madison-Kipp in 1994 requiring that they evaluate the
vertical and horizontal distribution of the

---

| | |
|---|---|
| 09:37 | 1 |
| 09:37 | 2 |
| 09:37 | 3 |
| 09:37 | 4 |
| 09:37 | 5 |
| 09:37 | 6 |
| 09:37 | 7 |
| 09:37 | 8 |
| 09:37 | 9 |
| 09:38 | 10 |
| 09:38 | 11 |
| 09:38 | 12 |
| 09:38 | 13 |
| 09:38 | 14 |
| 09:38 | 15 |
| 09:38 | 16 |
| 09:38 | 17 |
| 09:38 | 18 |
| 09:38 | 19 |
| 09:38 | 20 |
| 09:38 | 21 |
| 09:38 | 22 |
| 09:38 | 23 |
| 09:38 | 24 |
| 09:38 | 25 |

contamination.  And they made the comment that you need
to do it in all due haste because this contamination is
going to continue migrate.
        Well, 19 years later the State couldn't have
been more correct because now we have a huge groundwater
problem.
    Q.  BY MR. BUSCH:  Have you come to an opinion as to
when -- or have you done any work to ascertain when the
readings at wells 15, 14, 17, 16, and 13, when they
would have first shown contamination?
        MR. BERGER:  Object to the form of the
question.
    Q.  BY MR. BUSCH:  Go ahead.
        MR. BERGER:  You can answer the question if
you can.
        THE WITNESS:  If I understand the question
correctly, sir, I had the reports when the samples were
taken.
    Q.  BY MR. BUSCH:  I don't mean the samples.  You've
indicated that currently the readings -- and you've
marked or indicated what the readings were -- and those
readings are from wells that were recently sunk;
correct?
    A.  That's correct, sir.
    Q.  Have you formed any opinion as to when those

| 09:38 | 1 | levels at those locations were attained, first attained? |
|---|---|---|
| 09:38 | 2 | A. Um, I have, sir. |
| 09:38 | 3 | Q. Okay. And what is your opinion? |
| 09:38 | 4 | A. My opinion is that, that there was clear evidence |
| 09:39 | 5 | of -- of pure product PCE, the DNAPL. |
| 09:39 | 6 | There's clear evidence and repeated evidence and |
| 09:39 | 7 | a few decades of intentional dumping, literally pouring |
| 09:39 | 8 | of free product PCE onto gravel surfaces. And the PCE |
| 09:39 | 9 | in that form behaves as a DNAPL with a specific gravity |
| 09:39 | 10 | of about 1.6. |
| 09:39 | 11 | And what that means is it behaves like molasses. |
| 09:39 | 12 | It's heavier than water. And so as these buckets were |
| 09:40 | 13 | being thrown out the door, this PCE would migrate down, |
| 09:40 | 14 | based on its own weight, and it would migrate into the |
| 09:40 | 15 | fractured rock. And once it was in the fractured rock, |
| 09:40 | 16 | it would follow the fractures and not the groundwater |
| 09:40 | 17 | flow. And therefore, we now have DNAPL in fractured |
| 09:40 | 18 | rock, which is the most complex and the most expensive |
| 09:40 | 19 | of the sites to clean up. |
| 09:40 | 20 | So in terms of my time frame, sir, that would be |
| 09:40 | 21 | when they started dumping free product out the door, |
| 09:40 | 22 | which would be in the '70s -- in the 1940s. |
| 09:40 | 23 | Q. And I believe, just to clarify, that the, the |
| 09:40 | 24 | DNAPL of which you speak in this supplemental report is |
| 09:41 | 25 | a function of migration through fractured rock and not |

| 09:41 | 1 | migration through groundwater; correct? |
|---|---|---|
| 09:41 | 2 | A. Oh, I definitely think there is a component that |
| 09:41 | 3 | is dissolved in the groundwater. But it's called a |
| 09:41 | 4 | DNAPL because it's dense and it's nonaqueous. And |
| 09:41 | 5 | nonaqueous means that it doesn't like. So it dissolves |
| 09:41 | 6 | very, very slowly. But the little bit that dissolves is |
| 09:41 | 7 | huge relative to the action though. |
| 09:41 | 8 | And so what that says is that the DNAPL lasts |
| 09:41 | 9 | decades and decades. It just doesn't want to dissolve. |
| 09:41 | 10 | Q. The impact of which you speak is in regard to the |
| 09:42 | 11 | readings at Wells 15, 14, 17, 16, and 13 is deep water; |
| 09:42 | 12 | correct? |
| 09:42 | 13 | A. Yes, sir. |
| 09:42 | 14 | Q. And the threat, for lack of a better term, is |
| 09:42 | 15 | associated with its impact on Madison City Well No. 8? |
| 09:42 | 16 | A. At least that, sir. |
| 09:42 | 17 | Q. Is there any other potential impact? |
| 09:42 | 18 | A. Oh, I believe that there is because Monitoring |
| 09:42 | 19 | Well 13, for example, that DNAPL got down there from the |
| 09:42 | 20 | land surface. And to this day, the Madison-Kipp site |
| 09:42 | 21 | has not been characterized to show where that source is. |
| 09:42 | 22 | They have no idea where that DNAPL is coming from. |
| 09:43 | 23 | Because for 19 years they didn't look for it. |
| 09:43 | 24 | So these fractures can go in any direction that |
| 09:43 | 25 | the fracture pattern will take. And since you don't |

| 09:43 | 1 | know that direction, you do not know where the DNAPL is, |
|---|---|---|
| 09:43 | 2 | so the site has to be characterized as a DNAPL site. |
| 09:43 | 3 | And ARCADIS is on record saying, We don't think it's a |
| 09:43 | 4 | DNAPL site. |
| 09:43 | 5 | Well, I don't think you would be saying that now, |
| 09:43 | 6 | sir. |
| 09:43 | 7 | Q. What impact in regard to the materials set forth |
| 09:43 | 8 | in your report, Exhibit 1, does the facts of which we |
| 09:43 | 9 | spoke relating to Exhibit 2A, what impact does it have? |
| 09:43 | 10 | A. The impact is that it corroborates what I was |
| 09:43 | 11 | saying in my report, which is there hasn't been a source |
| 09:44 | 12 | investigation done to determine where these contaminants |
| 09:44 | 13 | are coming from. There hasn't been a source evaluation |
| 09:44 | 14 | for PCE. There hasn't been a source evaluation for PCB. |
| 09:44 | 15 | There hasn't been a source evaluation for PAHs. And so |
| 09:44 | 16 | we're getting all these surprises because no one has |
| 09:44 | 17 | been characterizing this site in a systematic way to |
| 09:44 | 18 | understand where the sources are. |
| 09:44 | 19 | Q. How else, if any? |
| 09:44 | 20 | A. Well, you can't find DNAPL if you're not looking |
| 09:44 | 21 | for it. I have a couple of papers on how you report. |
| 09:44 | 22 | And there simply hasn't been any characterization for |
| 09:44 | 23 | the real problem at the site there. In fact, there's |
| 09:44 | 24 | been -- there's been a history of denial, denial, denial |
| 09:45 | 25 | for the last 19 years. And with the current set of |

| 09:45 | 1 | consultants there's continued to be denial. It's just |
|---|---|---|
| 09:45 | 2 | simply unscientific, sir. |
| 09:45 | 3 | Q. How would your recent -- or the facts as |
| 09:45 | 4 | described in Exhibit 2A impact at all in regard to |
| 09:45 | 5 | remediation? |
| 09:45 | 6 | A. It's substantially reduces the options to |
| 09:45 | 7 | remediate this site. And it dramatically increases the |
| 09:45 | 8 | cost with, for example, Monitoring Well 15, with very |
| 09:45 | 9 | high concentrations 400 feet to the north. It means |
| 09:45 | 10 | that the remediation strategy now must go offsite. |
| 09:45 | 11 | They're going to have to cut off this contamination at |
| 09:46 | 12 | some place to the north of the facility which is not |
| 09:46 | 13 | even on their own facility. That's going to have huge |
| 09:46 | 14 | implications. |
| 09:46 | 15 | Q. In what regards, sir? |
| 09:46 | 16 | A. The regard is that they're going to have to get |
| 09:46 | 17 | approvals from their neighbors to put in long-term |
| 09:46 | 18 | treatment systems that will do a number of things. |
| 09:46 | 19 | One, it'll make it very clear to the community |
| 09:46 | 20 | that their homes -- home values are being damaged by |
| 09:46 | 21 | badly contaminated water now flowing under their |
| 09:46 | 22 | facilities. |
| 09:46 | 23 | And the other issue is that in fractured rock at |
| 09:46 | 24 | these kinds of depths, the technologies that were |
| 09:46 | 25 | originally proposed, which was an ISCO permanganate |

09:47 1 oxidation technology, which may not be as effective as
09:47 2 we thought because we don't know the distribution of the
09:47 3 DNAPL, and therefore, we don't have a mass number.
09:47 4     When you use an oxidation technology, you have to
09:47 5 use a certain amount of oxidant for a certain amount of
09:47 6 the PCE. If you don't know how much massive PCE is
09:47 7 there, then you don't get the dose right, and you don't
09:47 8 get the cleanup that you want.
09:47 9     And so when you're faced with that, you then have
09:47 10 to turn to techniques that are not mass dependent. And
09:47 11 in this case the technique, in all probability would be
09:47 12 six-phase heating where you simply have to cook the
09:47 13 subsurface. And that becomes very expensive in such a
09:47 14 large area at such a depth.
09:48 15   Q. Directing your attention again to Exhibit 2, are
09:48 16 there any -- does anything contained in Exhibit 2, other
09:48 17 than 2A, impact upon the report that you drafted on
09:48 18 December 3, 2012?
09:48 19   A. What I learned 45 minutes ago is that there is
09:48 20 PCE contamination directly under Madison-Kipp, and so we
09:48 21 have it in the shallow groundwater.
09:48 22     And what that says to me is they need to, once
09:48 23 again, figure out the sources under Madison-Kipp.
09:49 24     Secondly, we know that in the groundwater under
09:49 25 Madison-Kipp we now have PCBs, PCBs in the groundwater.

---

09:49 1 PCBs are extremely difficulty to remediate.
09:49 2     And we also know what we have PAHs under there.
09:49 3     So what we have under Madison-Kipp now is
09:49 4 information that completely contradicts ARDADIS's PAH
09:49 5 report, for example. Completely contradicts opinions
09:49 6 that site has been characterized. It's -- ties in
09:49 7 Monitoring Well No. 8 now because Monitoring Well No. 8
09:49 8 has in it cis-1,2-DCE. And underneath Madison-Kipp we
09:50 9 have PCE that breaks down to TCE that breaks down to
09:50 10 cis-1,2-DCE. So now we have cis-1,2-DCE under
09:50 11 Madison-Kipp and we have it in Monitoring Well 8.
09:50 12     So the new data kind of confirms all the things
09:50 13 that I had said earlier: They don't know the direction
09:50 14 of the groundwater flow. They don't know what the
09:50 15 sources are. They have no conceptual model. They have
09:50 16 no plan to clean up the site. And therefore to conclude
09:50 17 that there's no risk to the immediate neighbors to this
09:50 18 facility is unconscionable.
09:50 19   Q. Is there anything else in Exhibit 2 that impacts
09:50 20 upon your report, or otherwise, that you've recently
09:51 21 learn learned that impacts upon your report in
09:51 22 Exhibit 1?
09:51 23   A. I don't think so.
09:51 24     MR. BERGER: You're talking about the whole
09:51 25 folder?

---

09:51 1     MR. BUSCH: Yeah.
09:51 2     THE WITNESS: Oh, the whole folder.
09:51 3   Q. BY MR. BUSCH: Yeah.
09:51 4   A. Or excuse me. I'm talking 2A.
09:51 5   Q. No, Exhibit 2.
09:51 6   A. If I could go on to the next --
09:51 7   Q. Yes.
09:51 8   A. -- item.
09:51 9     And that would be this one, sir.
09:51 10   Q. Okay. And what's the date of that?
09:51 11   A. This is --
09:51 12     2B.
09:51 13     (Exhibit 2B was marked for identification.)
09:51 14     MS. ROSS: John, what's the cover part of
09:51 15 that say?
09:51 16     MR. BERGER: There's a Bates number of
09:51 17 MK024111. I believe this is an excerpt from the PCB
09:51 18 cleanup report that was submitted in December.
09:52 19     MR. WEISS: We're marking this as
09:52 20 exhibit...?
09:52 21     MR. BUSCH: 2B.
09:52 22     MR. WEISS: Thank you.
09:52 23   Q. BY MR. BUSCH: How does Exhibit 2B impact upon
09:52 24 the report previously submitted as Exhibit 1?
09:52 25   A. If I could turn, sir, to this figure here --

---

09:52 1   Q. Yes.
09:52 2   A. -- in that report.
09:52 3   Q. The map?
09:52 4   A. There's actually two of them but --
09:52 5   Q. Right.
09:52 6   A. -- but this particular one, sir, which is
09:52 7 entitled Proposed Excavation Areas.
09:52 8   Q. Yes.
09:52 9   A. And this is going to be for PCE -- no, for PCBs.
09:52 10   Q. Right.
09:52 11   A. And the point that I want to make is that this
09:52 12 figure put together by ARCADIS indicates that along the
09:52 13 complete extent of the Waubesa side of the Madison-Kipp,
09:52 14 they're going to be digging up contaminated soil PCBs
09:52 15 they're going to be digging it up.
09:53 16     Now, my point is that we have clients adjacent to
09:53 17 Madison-Kipp in unbelievable proximity. I could
09:53 18 probably reach over the fence at Madison-Kipp and touch
09:53 19 these homes.
09:53 20     But my point is that along this area here, which
09:53 21 is in the backyards of our clients, 241 Waubesa,
09:53 22 245 Waubesa, and all the way down there. What we have
09:53 23 is the ARCADIS folks are going to come in and they're
09:53 24 going to start digging up these peoples' backyards
09:53 25 because of the PCB. In each of the yards, they're going

| | |
|---|---|
| 09:54 | 1 |

09:54  1  to 20 dig slogs that are 40 feet long, 10 feet wide, and

09:54  2  4 feet deep.  That is a huge excavation in the

09:54  3  backyard of these homes.  Now, they're doing that

09:54  4  because of the risk.

09:54  5       And the part that bothers me a lot is that in

09:54  6  each case, the digging in each one of these folks' homes

09:54  7  stops where the last two borings are; which begs the

09:54  8  question:  If they'd put another boring in, would they

09:54  9  be digging more?

09:54  10       So these homes have not been characterized and

09:54  11  therefore basing this huge amount of excavation on

09:54  12  obviously incomplete data doesn't make sense to me.  The

09:54  13  homes need to be characterized more.

09:55  14       The other point that I want to make is that the

09:55  15  PCBs, that was the question:  How did they get there?

09:55  16  And we're saying that the PCBs were included in the

09:55  17  hydraulic fluids.  I think everybody's agreed with that.

09:55  18  Nobody's disagreed with that.

09:55  19       So if the PCBs got there, why aren't they looking

09:55  20  at the hydraulic fluids, rather than looking at

09:55  21  hydraulic fluids, called the PAHs, ARCADIS is saying

09:55  22  they're not ours.  So it's completely illogical to say

09:55  23  the PCBs got there from hydraulic fluids and the

09:55  24  hydraulic fluids are not ours.  Much that's illogical.

09:55  25       I walked that area.  I took pictures in that

Page: 40

---

09:55  1  area.  I concluded that up at the north here were huge

09:56  2  fans that were absolutely black with tars, i.e., these

09:56  3  hydraulic fluids.  These fans kicked out this

09:56  4  contamination.  And as a result, the source, in my mind,

09:56  5  is clear.  And the source is not just for PCBs but for

09:56  6  PAHs that ARCADIS is completely denying is associated

09:56  7  with Madison-Kipp.

09:56  8       Q.  Directing your attention again to Exhibit 2, are

09:56  9  there other matters on there, in there, that impact upon

09:56  10  your opinion set forth in Exhibit 1?

09:56  11       A.  Just taking these, sir, in no particular order,

09:56  12  the next item is --

09:56  13       Q.  Why don't you give it to me and I'll --

09:56  14       A.  Yes, sir.

09:57  15       MR. BUSCH:  Would you mark as Exhibit 2C.

09:57  16       (Exhibit 2C was marked for identification.)

09:57  17       Q.  BY MR. BUSCH:  Let me show you what's been marked

09:57  18  Exhibit 2C and ask you how that -- first of all, can you

09:57  19  identify; and second of all, how does that impact upon

09:57  20  the report that you rendered on December 3rd?

09:57  21       A.  I identified this item, sir, as a document that

09:57  22  we put together, and we put it together in concert with

09:57  23  personal phone calls with folks from the Madison Water

09:57  24  Utility.  And it speaks to the location of Monitoring

09:57  25  Well 8 in the location of Madison-Kipp.  And it clearly

Page: 41

---

09:57  1  shows that Monitoring Well 8 is pulling water from

09:57  2  Madison-Kipp.  We already know that Monitoring Well 8

09:58  3  has cis-1,2-DCE.

09:58  4       Further, in discussions with the Madison Water

09:58  5  Utility, we know that there was high concern based on

09:58  6  the old numbers that we had for PCE.

09:58  7       And this figure right here, which is Table 4-1,

09:58  8  site map number 18, which is Madison-Kipp, the threat of

09:58  9  the water supply is seen as high based on the old data.

09:58  10  I don't know how much superlatives you could put on

09:58  11  there now, but it's going to be a very, very high

09:58  12  concern.

09:58  13       And so I know that Madison-Kipp wants to turn on

09:59  14  that well.  They're not turning on the well because of

09:59  15  risk with this new data.  I think that risk will be

09:59  16  there for the foreseeable future.

09:59  17       MR. BERGER:  You said Madison-Kipp wants to

09:59  18  turn on that well.

09:59  19       THE WITNESS:  Forgive me.  The --

09:59  20       Q.  BY MR. BUSCH:  -- City of --

09:59  21       A.  Yeah, City of Madison.  Thank you, John.

09:59  22       Q.  Directing your attention, again, to Exhibit 2,

09:59  23  are there items in there that further impact upon your

09:59  24  opinion set forth in Exhibit 1?

09:59  25       MR. BERGER:  Back on this stack.

Page: 42

---

09:59  1       MR. BUSCH:  Yeah.

09:59  2       Q.  BY MR. BUSCH:  Have you finished your discussion

09:59  3  in regards to 2C, how it impacted your opinion?

09:59  4       A.  Only with respect that this figure here, sir,

09:59  5  which shows the depth of Monitoring Well 8 which --

09:59  6       Q.  Yes.

09:59  7       A.  -- 250 feet.  And we know that the contamination

09:59  8  is getting down 250 feet.  But we know that, at least I

09:59  9  don't recall any of the ARCADIS'S wells getting down

10:00  10  that far.  So it's clear to me that the bottom of the

10:00  11  contamination has not been determined at Madison-Kipp in

10:00  12  the four new wells.

10:00  13       Below about 120 to 150 feet, there was, again,

10:00  14  reduction in the concentration.  But I don't believe any

10:00  15  of those wells got to a point where the contamination

10:00  16  was not a factor.

10:00  17       (Interruption at the door.)

10:00  18       Q.  BY MR. BUSCH:  Do you have any -- are there other

10:00  19  items contained in the large Exhibit 2 that impact upon

10:00  20  or otherwise relate to a supplementation to your

10:00  21  December 3rd, 2012 opinion?

10:00  22       A.  Yes, I do, sir.

10:01  23       And I was wondering if this would be a good time

10:01  24  to take a break.

10:01  25       MR. BUSCH:  You control it.

Page: 43



| | | |
|---|---|---|
| 10:01 | 1 | THE WITNESS: Thank you, John. |
| 10:01 | 2 | THE VIDEOGRAPHER: Just a minute, please. |
| 10:01 | 3 | We are off the record at 10:01 a.m. |
| 10:01 | 4 | (Recess taken: 10:01 a.m. to 10:12 a.m.) |
| 10:12 | 5 | THE VIDEOGRAPHER: We are back on the record |
| 10:12 | 6 | in the continuing deposition of Lorne G. Everett, Ph.D. |
| 10:12 | 7 | at 10:12 a.m. |
| 10:12 | 8 | Q. BY MR. BUSCH: Dr. Everett, referencing again |
| 10:13 | 9 | Exhibit 2C, I believe you stated that you worked with |
| 10:13 | 10 | persons at the Madison Water Utility in regard to |
| 10:13 | 11 | that -- did you work with them in regard to the creation |
| 10:13 | 12 | of 2C? |
| 10:13 | 13 | A. Working is too strong. I called them. |
| 10:13 | 14 | Q. And with whom did you speak? |
| 10:13 | 15 | A. A guy by the name of, I believe it was Grand or |
| 10:13 | 16 | Grande. And I believe his name is in my documents |
| 10:13 | 17 | there. |
| 10:13 | 18 | But there's been a number of discussions with |
| 10:13 | 19 | Madison Water Utility, in fact, the City of Madison both |
| 10:13 | 20 | through Jorge Matos and, I believe, Dr. Wells. But |
| 10:13 | 21 | there's been a number of inquiries made to the City of |
| 10:13 | 22 | Madison on this particular well. |
| 10:13 | 23 | Q. Okay. Directing your attention again to the |
| 10:13 | 24 | large group of documents set forth in Exhibit 2, are |
| 10:14 | 25 | there any -- do any of the other documents contained in |

| | | |
|---|---|---|
| 10:14 | 1 | Exhibit 2 impact the opinions rendered in Exhibit 1? |
| 10:14 | 2 | A. Yes, sir. And paragraph inaudible paragraph. |
| 10:14 | 3 | Um... |
| 10:14 | 4 | The figure entitled PCB, sir. |
| 10:14 | 5 | MR. BUSCH: Thank you. |
| 10:14 | 6 | We will mark that. |
| 10:14 | 7 | (Exhibit 2D was marked for identification.) |
| 10:15 | 8 | Q. BY MR. BUSCH: Let me show you what's been marked |
| 10:15 | 9 | as Exhibit 2D which you referenced as having an impact |
| 10:15 | 10 | upon your opinions set forth in Exhibit 1. |
| 10:15 | 11 | A. Okay. |
| 10:15 | 12 | Q. Will you please identify that and explain to me |
| 10:15 | 13 | that how, if at all, it impacts upon your opinions set |
| 10:15 | 14 | forth in Exhibit 1. |
| 10:15 | 15 | A. Yes, sir. This is a kind of a hand-drawn |
| 10:15 | 16 | super-position of PCB results and their locations on an |
| 10:15 | 17 | ARCADIS map, sir. |
| 10:15 | 18 | Q. Okay. |
| 10:15 | 19 | A. And what it shows is that PCB at very high |
| 10:15 | 20 | concentrations are found at multiple locations |
| 10:15 | 21 | underneath Madison-Kipp. |
| 10:15 | 22 | And to put this in perspective, of all the |
| 10:15 | 23 | chemicals that we'll be talking about today, PCBs has |
| 10:15 | 24 | the highest risk. The -- for example, contact number, |
| 10:16 | 25 | human health contact number for PCB is .7; 7. And under |

| | | |
|---|---|---|
| 10:16 | 1 | this facility we have concentrations of 20,000; 10,000; |
| 10:16 | 2 | 12,000. So we have huge PCB contamination under |
| 10:16 | 3 | Madison-Kipp. And it's in the water. So it's got all |
| 10:16 | 4 | the way down to the water. My point is that PCBs, |
| 10:16 | 5 | because of their very nature, can only be remediated -- |
| 10:16 | 6 | I shouldn't say can only be -- most often remediated by |
| 10:17 | 7 | excavation. And I don't think that Madison-Kipp is |
| 10:17 | 8 | going to dig up their facility. And as a result, these |
| 10:17 | 9 | concentrations say to me that Madison-Kipp will have a |
| 10:17 | 10 | deed restriction on that property forever. And that |
| 10:17 | 11 | means that there is going to be a high source of a very |
| 10:17 | 12 | toxic material at this facility forever. |
| 10:17 | 13 | Q. Directing your attention again to Exhibit 2, the |
| 10:17 | 14 | large exhibit. |
| 10:17 | 15 | A. Yes, sir. |
| 10:17 | 16 | Q. Is there -- are there other documents that impact |
| 10:17 | 17 | upon the opinion that you gave in Exhibit 1? |
| 10:17 | 18 | A. Yes, sir. Number one, identified benzo(a)pyrene. |
| 10:17 | 19 | (Exhibit 2E was marked for identification.) |
| 10:18 | 20 | Q. BY MR. BUSCH: Let me show you what's been marked |
| 10:18 | 21 | as Exhibit 2E and ask if you can identify that. |
| 10:18 | 22 | A. Yes, sir. |
| 10:18 | 23 | Q. And how does Exhibit 2E impact on your opinion? |
| 10:18 | 24 | A. Exhibit 2E is a hand drawn representation of the |
| 10:18 | 25 | more recent benzo(a)pyrene samples underneath |

| | | |
|---|---|---|
| 10:18 | 1 | Madison-Kipp facility. And the significance is that in |
| 10:18 | 2 | the PAH document put together by ARCADIS, they said that |
| 10:18 | 3 | there isn't any evidence of benzo(a)pyrene in any of the |
| 10:18 | 4 | productions used at Madison-Kipp and therefore, |
| 10:19 | 5 | Madison-Kipp cannot be the source of the contamination |
| 10:19 | 6 | in these folks' yards. |
| 10:19 | 7 | In every one of the Class yards there's |
| 10:19 | 8 | benzo(a)pyrene. And what this map shows is clearly it's |
| 10:19 | 9 | underneath Madison-Kipp. So it means that ARCADIS's |
| 10:19 | 10 | position is wrong. |
| 10:19 | 11 | Secondly, the ARCADIS PAH study said that |
| 10:19 | 12 | Madison-Kipp is an naphthalene site. Some of this data |
| 10:19 | 13 | doesn't show naphthalene. So that means that principal |
| 10:19 | 14 | component analysis, the fingerprinting, is completely |
| 10:19 | 15 | wrong, analysis and that is here to show that. |
| 10:20 | 16 | Q. Is there -- are there other documents contained |
| 10:20 | 17 | in Exhibit 2 that impact upon your opinion as set forth |
| 10:20 | 18 | in Exhibit 1? |
| 10:20 | 19 | A. Yes, sir. There is the hand drawn figure |
| 10:20 | 20 | referred to as PCE. |
| 10:20 | 21 | (Exhibit 2F was marked for identification.) |
| 10:20 | 22 | Q. BY MR. BUSCH: Let me show you what's been marked |
| 10:20 | 23 | as Exhibit 2F and ask if you can identify that and |
| 10:20 | 24 | explain to me how that impacts upon your opinions set |
| 10:20 | 25 | forth in Exhibit 1? |




```
10:20   1      A.  Yes, sir.  The hand drawn numbers are simply the
10:20   2   PCE concentrations in the soil.  And what shows is that
10:20   3   there is PCE under the Madison-Kipp building.  But it
10:21   4   is -- I would say, high but not that high, meaning that
10:21   5   the DNAPL condition is huge and the PCE concentrations
10:21   6   under the building are not that huge.
10:21   7      And therefore, what it says to me is that the
10:21   8   PCE contamination in the deep groundwater was caused by
10:21   9   employees dumping PCE by buckets out the door and by
10:21  10   leakage from the PCE aboveground storage tank.
10:21  11      And so what it says that it really wasn't leakage
10:22  12   that caused the problem, it was intentional dumping that
10:22  13   caused the problem.
10:22  14      Q.  Anything else in Exhibit 2 which impacts upon the
10:22  15   opinion you gave in Exhibit 1?
10:22  16      A.  Yes, sir.  If I could show this grouping of
10:22  17   documents that speak to the backup for the four wells
10:22  18   that we've been discussing, sir.
10:23  19      (Discussion held off the record.)
10:23  20      THE WITNESS:  So if we could begin with this
10:23  21   one, sir, Monitoring Well 13.
10:23  22      Q.  BY MR. BUSCH:  Why don't we mark them all at the
10:23  23   same time.
10:23  24      A.  Yes, sir.
10:23  25      Q.  That way you can go uninterrupted.
```

```
10:23   1      A.  Thank you.
10:24   2      MR. BUSCH:  2G is MW13; 2H is MW17; 2I is
10:24   3   MW15; 2J is MW14; and 2K is MW16.
10:24   4      (Exhibit 2G through 2K were marked for
10:24   5      identification.)
10:24   6      MR. WEISS:  Could you run by those one more
10:24   7   time a little slower.
10:24   8      MR. BUSCH:  Yes.  G is 13.
10:24   9      MR. WEISS:  Okay.
10:24  10      MR. BUSCH:  H is 17.
10:24  11      I is 15.
10:24  12      Excuse me.
10:24  13      I said G.
10:24  14      H is 17.
10:24  15      I is 15.
10:24  16      J is 14.
10:25  17      And K is 16.
10:25  18      MR. BERGER:  I is 15?
10:25  19      MR. BUSCH:  I is 15.
10:25  20      MR. BERGER:  J is 14?
10:25  21      MR. BUSCH:  J is 14.
10:25  22      MR. BERGER:  K is 16?
10:25  23      MR. BUSCH:  K is 16.
10:25  24      Q.  BY MR. BUSCH:  Let me show you exhibits 2G
10:25  25   through 2K.
```

```
10:25   1      A.  Yes, sir.
10:25   2      Q.  Would you identify generally what those documents
10:25   3   are and how they impact upon the opinions set forth in
10:25   4   Exhibit 1.
10:25   5      A.  These are a series of five documents that talk in
10:25   6   terms of the five wells that were drilled to depth.
10:25   7      It talks in terms of general site.
10:25   8      It talks in terms of groundwater results.
10:25   9      It talks about the geophysical logging tools.
10:26  10      And it describes what -- what, at least, ARCADIS
10:26  11   feels is what's going on at each one of these wells.
10:26  12      And since the -- each one of these -- well, not
10:26  13   each one of them but the majority of them, I'm going to
10:26  14   be talking about DNAPL.
10:26  15      I would make the comment that I'm on the
10:26  16   Interagency DNAPL Consortium board made up of NASA, made
10:26  17   up of the Department of Defense, and the Department of
10:26  18   Energy, and EPA.  And at the Interagency DNAPL national
10:26  19   test site, we've looked at all of the technologies that
10:26  20   one would consider in cleaning up sites like this.  So
10:27  21   I'm very familiar with the DNAPL.
10:27  22      Secondly, I've written some of the seminal papers
10:27  23   on DNAPL characterization.
10:27  24      And third, I've run a laboratory for 15 years
10:27  25   where I've looked at my creation of these contaminants.
```

```
10:27   1   So I feel comfortable talking about these results, sir.
10:27   2      Beginning with Exhibit 2G, which refers to
10:27   3   Monitoring Well 13, which was the well onsite, what is
10:27   4   important, first of all, in this document, is the very
10:27   5   first bullet point.  And I would indicate that that very
10:27   6   first bullet point we see in every one of these
10:27   7   documents.
10:27   8      What it says -- and I will read it:  "There is
10:27   9   not a consistent groundwater flow direction in the
10:27  10   bedrock."
10:27  11      And so what that says is that at every one of
10:28  12   these sites, all five of them, they don't know where the
10:28  13   groundwater's flowing.
10:28  14      Q.  What's the date of that document?
10:28  15      A.  It's dated, sir, October the 31st.
10:28  16      Q.  Of what year?
10:28  17      A.  2012.
10:28  18      Q.  Okay.
10:28  19      A.  And so what it says is 19 years after
10:28  20   Madison-Kipp was required to show the vertical and
10:28  21   horizontal distribution of contamination and the
10:28  22   groundwater flow, 19 years later, at every one of these
10:28  23   new wells which are highly contaminated they have no
10:28  24   idea what the direction is.
10:28  25      Secondly what it says is that this very high --
```



```
10:28    1      Q.  Let me stop you right there.  Do you have -- as
10:28    2    you sit here today, do you have an opinion as to the
10:28    3    direction?
10:28    4      Or have you done any to work ascertain the
10:28    5    direction?
10:28    6      A.  What I would have done is I would have done a
10:28    7    number of things related to looking for DNAPL.  I would
10:29    8    have done a fracture analysis.  That has been proposed;
10:29    9    no one seems to want to talk about it.
10:29   10      I would have put in more wells down at the depths
10:29   11    of where this high contamination is.  These are deep
10:29   12    wells.  The earlier deep wells didn't go in deep, so
10:29   13    they've missed the contamination.
10:29   14      So the hottest well appears to be right
10:29   15    in -- right in Madison-Kipp's property which was a
10:29   16    complete surprise I would think to them because they
10:29   17    haven't characterized it.
10:29   18      But my point is that the highest PCE
10:29   19    concentration was reported from 80 to 90 feet below the
10:29   20    ground surface at 5,700 micrograms per liter, and from
10:29   21    120 to 130 feet below the land surface at
10:30   22    9,400 micrograms per liter.  So that's very deep in my
10:30   23    opinion.  Those are twice as high as everything we've
10:30   24    ever seen at the site.
10:30   25      But more important, it says that the high
```

```
10:30    1    concentration is moving in certain zones.  So that says
10:30    2    you not only have to figure out where the general
10:30    3    groundwater is flowing but where the flow is taking
10:30    4    place in each one of these zones.  And that's a complex
10:30    5    thing to do.  And certainly hasn't been done to date.
10:30    6      Q.  Have you done any work to ascertain the flow?
10:30    7      A.  I have not, sir.
10:30    8      Q.  Okay.  I didn't mean to interrupt.
10:30    9      Are there other, um, aspects of those exhibits I
10:31   10    recently handed you, which are 2G through K that impact
10:31   11    upon your opinions set forth in Exhibit 1?
10:31   12      A.  Yes, sir.  It's just that these wells really
10:31   13    aren't quite deep enough.  They've got to go deeper.
10:31   14      The next exhibit would be 2H, Exhibit 2H.  And
10:31   15    this is all the backup information for Monitoring
10:31   16    Well 17.
10:31   17      The first bullet says "There is not a consistent
10:31   18    groundwater flow in the bedrock," which means at the
10:31   19    southern most well, they don't know the water flow
10:31   20    direction.  And this is off site, under neighboring
10:32   21    properties, and leading to where the City's Monitoring
10:32   22    Well 8 is.  So they don't know the flow direction.
10:32   23      Secondly, it says that the contamination is, once
10:32   24    again, distributed.  And that the highest PCE
10:32   25    concentration is in the bedrock, which is fractured
```

```
10:32    1    bedrock -- and that's important -- was observed from
10:32    2    120 to 170 feet.  And that's almost offsite, 170 feet.
10:32    3    And the concentrations, the highest concentrations were
10:32    4    reported from 120 to 130 feet at 750 micrograms per
10:32    5    liter.
10:33    6      And then they had another high pulse at a 140 to
10:33    7    150 feet at 810 micrograms per liter, which means it is
10:33    8    getting more and more concentrated depth.
10:33    9      And third it says that from 160 to 170 feet, the
10:33   10    concentration is 1,700 micrograms per liter.  And that's
10:33   11    going off -- that's off site.  That is off site.
10:33   12      Now, the MCL for PCE at Monitoring Well 8 is
10:33   13    going to be 5.  The MCL for PCE is 5.  And going off
10:33   14    site, we're at 1,700 micrograms per liter.
10:33   15      The reason this is important is that Mr. Johnson
10:33   16    said that the groundwater -- that the PCE concentrations
10:33   17    as you go deeper get less and less and less.
10:34   18    Well, this data completely refutes that.  That's simply
10:34   19    wrong.  As we can see here.  Concentration as you go
10:34   20    deeper is getting higher.  And I don't think they've
10:34   21    even got to the bottom of it.
10:34   22      The next one, if I may, sir.
10:34   23      Q.  Yes, please.
10:34   24      A.  Is 2I.  And it speaks to a Monitoring Well 15,
10:34   25    and Monitoring Well 15 is to the north.  And Monitoring
```

```
10:34    1    Well 15 is located in the 5 parts per billion range.
10:34    2      However, this recent data says that the
10:35    3    concentration from 80 to 90 meters is 3,600 micrograms per
10:35    4    liter and continues to go down.
10:35    5      So my point is that this well is hugely more
10:35    6    contaminated then was expected to be in the past and
10:35    7    will result in completely redrawing these figures and
10:35    8    completely --
10:35    9      Q.  And you're referring to Exhibit 2A?
10:35   10      A.  Yes, sir.
10:35   11      And clearly shows that very high concentrations
10:35   12    at a very deep depth are now on the other side of the
10:35   13    Goddard Community Center, on the other side of the
10:35   14    community center.  And it says that there is going to
10:35   15    have to be, in my estimation, cut-off barriers or
10:36   16    injection wells pump and treat to control the plume.  A
10:36   17    number of things now need to be done way to the north
10:36   18    under private property.  That's going to be expensive
10:36   19    and very controversial.
10:36   20      Q.  When you say cut-off, do you have a particular
10:36   21    technology in mind in regard to the cut-off of which you
10:36   22    speak?
10:36   23      A.  I do, sir.
10:36   24      Q.  And what is that?
10:36   25      A.  I believe that the cut-off technology that we've
```

| | |
|---|---|
| 10:36 | 1 |
| 10:36 | 2 |
| 10:36 | 3 |
| 10:36 | 4 |
| 10:37 | 5 |
| 10:37 | 6 |
| 10:37 | 7 |
| 10:37 | 8 |
| 10:37 | 9 |
| 10:37 | 10 |
| 10:37 | 11 |
| 10:37 | 12 |
| 10:37 | 13 |
| 10:37 | 14 |
| 10:37 | 15 |
| 10:37 | 16 |
| 10:37 | 17 |
| 10:37 | 18 |
| 10:37 | 19 |
| 10:37 | 20 |
| 10:38 | 21 |
| 10:38 | 22 |
| 10:38 | 23 |
| 10:38 | 24 |
| 10:38 | 25 |

1  seen in the past will either be a pump and treat, which
2  is only a containment technology, to keep it from, the
3  plume, from going further and further and further.
4      Q.  And is pump and treat -- when you say it's
5  a -- it's a, I believe you said cut-off, is it in
6  conjunction with another remediation technique?
7      A.  I think very much.
8      Q.  And what would that remediation technique be?
9      A.  There are different ones that are out there.  But
10  in all probability, they will try to burn all this
11  contamination out of the fractured rock.  And as I've
12  indicated, that's a difficult thing to do at these
13  depths and in these areas.
14      Q.  And that tech- -- you mentioned that technology
15  previously in the deposition.  Can you -- does that have
16  a name other than burning the contaminate in the
17  fractured rock?  Does it have a recognized name?
18      A.  It does.
19      Q.  And what is name again?
20      A.  Institute chemical oxidation using in all
21  probability, potassium permanganate, sir.
22      Q.  And that's currently in the pilot program;
23  correct?
24      A.  I believe that is it post.  And I believe that
25  that is a reasonable technology, sir.

1      Q.  So the impact of the migration north in the deep
2  groundwater, my terms --
3      A.  Yes.
4      Q.  -- and in the fractured rock, as you see it, is
5  that the pumping would be used as a blockage while the
6  in-situ chemical technique was used to address the PCE?
7      A.  I would agree with half of that, sir.
8      Q.  Okay.
9      A.  I guess I'll agree with the cut-off wells being
10  the blockage.
11      Q.  Okay.
12      A.  But the in-situ chemical oxidation, I believe,
13  would mostly be to knock the mass down to try to get the
14  concentrations down, because they're so very high.
15      Do I think that that will be successful, that
16  they will get those concentrations down to MCLs?  It's
17  never happened in America to get it down to MCLs when
18  you have a DNAPL.
19      So I think it's a good idea.  But I think that
20  this groundwater resource is damaged for the foreseeable
21  future.
22      Q.  Okay.
23      A.  The next one, sir, is Exhibit 2K, and it speaks
24  to Monitoring Well 16.  And Monitoring Well 16 is
25  located over in the Class Area.

1      And what this well says to me is that --
2      Q.  Monitoring Well 17, that's a deep groundwater
3  monitoring well?
4      A.  Yes, sir.
5      Q.  Okay.
6      A.  It's location is on the eastern side of the Class
7  Area, so it is beyond the Class Area.  And so this well
8  represents contamination that is below all of these
9  families' homes.  And the concentration in Monitoring
10  Well 16 is 430 parts per billion at 120 feet.
11      Now, I will read to you what it says.  It says,
12  (as read):  "The highest PCE concentration was reported
13  from 90 to a hundred -- from 90 to 100 at 140 micrograms
14  per liter and 110 to 120 feet at 430,000 parts per
15  liter."  Now, what that says is that it's almost three
16  times as contaminated as you go down.
17      That's completely opposite to what Mr. Johnson
18  said.  Mr. Johnson said that the concentration gets
19  smaller and smaller, the problem gets smaller and
20  smaller as you go down.  This clearly shows that's
21  wrong.
22      Further, I would indicate in that, the number one
23  bullet, at the top and I'll read it.  It says, "There is
24  not a consistent groundwater flow direction in the
25  bedrock."

1      What that says is that underneath the Class Area
2  homes, ARCADIS has no idea what direction the
3  contamination is going.  And therefore, I think that's
4  shocking to find out, you know, 19 years after they were
5  supposed to have done this.
6      Q.  Are there other documents in Exhibit 2 which
7  impact upon your opinion as set forth in Exhibit 1?
8      A.  There are, sir.
9          (Exhibit 2L was marked for identification.)
10      Q.  BY MR. BUSCH:  Let me show what's been
11  marked as Exhibit 2L.  Ask you to identify, please.
12      A.  Yes, sir.  Exhibit 2L is a Handbook of Vapor
13  Degreasing put together by ASTM of the American Society
14  for Testing and Materials.
15      I should mention that I was on the board of
16  directors of ASTM.  I've been a chairman of an ASTM
17  committee on groundwater and vapors monitoring for
18  15 years.  My committee is D18.21.02.  I'm a fellow of
19  ASTM, which is the highest honor they bestow.
20      And the reason that I am showing this is because
21  this is a reference that was made by Mr. Johnson who
22  completely misinterpreted the ASTM document.
23      Q.  How so?
24      A.  Mr. Johnson expressly said that it was perfectly
25  acceptable for these maintenance employees at

```
10:43   1   Madison-Kipp to take these buckets of free product, or
10:43   2   liquid PCE, and throw it out the door.
10:44   3        I stood in that doorway. I don't know if others
10:44   4   have. But, I could take a glass of water and throw it
10:44   5   out and hit the house next door. That's how close it
10:44   6   is.
10:44   7        When you stand in that doorway, the ground
10:44   8   clearly slopes into the backyard of these homes. So
10:44   9   every time it rains all the water by that backdoor goes
10:44  10   right into the neighbors' yards.
10:44  11        So I think it is highly irresponsible for anyone
10:44  12   to take a very toxic material and throw it out as a free
10:44  13   product in a backdoor as supported by Mr. Johnson.
10:44  14        And so once again, he said it was standard
10:44  15   practice. But I would like to actually read the
10:45  16   document to show you where he's coming from.
10:45  17        And if I could, on the last page, which is
10:45  18   page 33, it says (as read): "If there are no local
10:45  19   regulations forbidding it, the sludge may be poured on
10:45  20   the dry ground at a safe distance from buildings and
10:45  21   allowed to evaporate. If the sludge is
10:45  22   free-flowing -- "
10:45  23        Meaning it's in the bucket; it's a liquid; it's
10:45  24   free flowing.
10:45  25        " -- and can soak into the ground -- "
```

```
10:45   1        Well, it's a ground surface, so clearly it's
10:45   2   going to soak in the ground.
10:45   3        " -- before the solvent evaporates, it may be
10:45   4   poured into shallow containers to permit the solvent to
10:45   5   evaporate before dumping."
10:45   6        So the standard said if you're going to dump free
10:45   7   product in an area where it's going to go down really
10:45   8   fast, you need to put it on a pan so it will evaporate.
10:46   9        What actually happened is they took the free
10:46  10   product, they dumped it on the gravel, it went straight
10:46  11   down, and that's the reason we're here today.
10:46  12        So Mr. Johnson's interpretation of his own
10:46  13   reference is simply wrong.
10:46  14   Q.  Is there anything else in Exhibit 2 that impacts
10:46  15   upon the opinion you rendered in Exhibit 1?
10:46  16   A.  I don't believe so, sir.
10:46  17   Q.  Now, in addition to the materials that were
10:46  18   contained in Exhibit 2, you stated there are, I think
10:46  19   you said there were observations or thoughts.
10:46  20        Have we exhausted those in regard to the
10:46  21   discussions associated with Exhibit 2?
10:46  22   A.  I would like to bring up a couple of things, if I
10:46  23   might, sir.
10:46  24        And, um, in this exhibit here, which is
10:47  25   Exhibit 2B, as I'd mentioned I walked this area and I
```

```
10:47   1   took these pictures and I did my own calculations. And
10:47   2   what it shows is that Madison-Kipp is going to be
10:47   3   digging up a large part of these peoples' backyard.
10:47   4   It's 40 feet long, 10 feet wide, and 4 feet deep. Those
10:47   5   are enormous holes in folks' backyard.
10:47   6        And I believe that I'm correct that this came
10:47   7   from the big fans up here. And I took pictures of those
10:47   8   big fans. They're all big -- they're covered in tar
10:47   9   from this material coming up through those vents. And
10:47  10   that means that it's air blown particulates.
10:48  11        And I think, at the minimum, we need to start
10:48  12   looking inside these homes for the particulates. I
10:48  13   mean, if it's contaminating the soil down 4 feet, I'm
10:48  14   sure it's going in the windows. So I think there needs
10:48  15   to be a much more intensive characterization program of
10:48  16   the soil and what might be in the houses that these
10:48  17   folks would be exposed to.
10:48  18        The other comment that I would make, sir, has to
10:48  19   do with what I learned this morning, and that is there
10:48  20   are wells that I didn't know about that are underneath
10:48  21   Madison-Kipp. And it shows that the PCE is degrading.
10:48  22   It shows that PCE is degrading from PCE to TCE to
10:49  23   cis-1,2-DCE.
10:49  24        It says that it is doing it because the PCE is
10:49  25   associated with petroleum hydrocarbons, and that's
```

```
10:49   1   evidenced by the benzene concentrations underneath the
10:49   2   building. Under anaerobic conditions, microbes will
10:49   3   co-metabolize PCE in the presence of petroleum
10:49   4   hydrocarbons, i.e., benzene.
10:49   5        What that says is the logical progression now is
10:49   6   PCE, TCE, cis-1,2-DCE, and then final chloride. Final
10:49   7   chloride is a human carcinogen. No one argues against
10:49   8   that. If these chemicals go to final chloride, the
10:50   9   risks will go through the roof.
10:50  10        The obvious question is, then, why didn't anybody
10:50  11   do a human health risk assessment in Madison-Kipp? I
10:50  12   think it is a complete red herring to do a risk
10:50  13   assessment in the homes and use the terminology "eminent
10:50  14   and substantial risk to human health and the
10:50  15   environmental." To use that terminology in the homes is
10:50  16   completely misplaced, and I've never seen that done in
10:50  17   my career. That terminology is for Madison-Kipp. That
10:50  18   is the source of the contamination. That's where the
10:50  19   risk is. That's where that terminology makes sense.
10:50  20        Yet, when Dr. Beck did her analysis, didn't even
10:51  21   look at the risks associated with Madison-Kipp. And
10:51  22   Madison-Kipp hasn't done a thing, in my estimation, to
10:51  23   protect their own employees.
10:51  24   Q.  Anything else, um, that -- observations and
10:51  25   thoughts which can -- which you have in regard to
```

10:51  1   supplementation of Exhibit 1?

10:51  2       A.  I don't believe so, sir.

10:51  3       Q.  Okay.  Directing your attention to page 1 of

10:51  4   Exhibit 1.

10:51  5       Um, you at the second paragraph you indicate that

10:52  6   in drafting this report you relied upon your education

10:52  7   expertise in environmental science and hydrology.

10:52  8       Do you see that?

10:52  9       A.  I do, sir.

10:52 10       Q.  What is hydrology?

10:52 11       A.  Hydrology is the study of water, including the

10:52 12   biological chemical and physical attributes of water as

10:52 13   it moves along the land surface and in the

10:52 14   subsurface -- and in the subsurface.

10:52 15       Q.  Is -- is hydrology a discipline separate from

10:52 16   hydrogeology?

10:52 17       A.  I believe it is, sir.

10:52 18       Q.  And what is hydrogeology?  And if you can, in so

10:52 19   discussing it, can you differentiate between

10:52 20   hydrogeology and hydrology.

10:52 21       A.  I believe hydrology deals with the attributes of

10:53 22   water at the land surface and in the subsurface but

10:53 23   hydrogeology focuses on the subsurface.

10:53 24       Q.  Do you, um, consider yourself an expert in

10:53 25   hydrogeology?

---

Lorne G. Everett, Ph.D. - 2/14/2013 - McHugh vs. Madison-Kipp Corporation          1070481

10:53  1       A.  I'm a registered hydrogeologist by the American

10:53  2   Institute the Hydrology.  I have been on the board of

10:53  3   registration for the American Institute of Hydrologists.

10:53  4   So I personally have, responsible for evaluating

10:53  5   hydrogeologists who want to get registered.

10:53  6       I am formally a professor of hydrology at the

10:53  7   University of Arizona where I taught hydrology and

10:53  8   hydrogeology.

10:53  9       I have been the director of Vadose bore

10:54 10   monitoring at the University of California for over

10:54 11   15 years where the total focus was on hydrogeology.

10:54 12       I've written extensively on hydrogeology.

10:54 13       And so I have a, 40 years of working in the arena

10:54 14   of hydrogeology, sir.

10:54 15       Q.  But do you consider yourself an expert in

10:54 16   hydrogeology?

10:54 17       A.  I do, sir.

10:54 18       Q.  Do you hold any certifications by any state

10:54 19   licensing authorities in hydrogeology?

10:54 20       A.  I have a national registration as I mentioned

10:54 21   with the American Institute of Hydrology.

10:54 22       I'm a certified groundwater professional by the

10:54 23   National Association of Groundwater Scientists and

10:54 24   Engineers.  Um, the highest registration in California

10:55 25   is an REA II which I held.  And that deals with

---

Lorne G. Everett, Ph.D. - 2/14/2013 - McHugh vs. Madison-Kipp Corporation          1070481

10:55  1   sensitive sites such as hospitals, schools, daycare

10:55  2   centers, where I have that registration that was

10:55  3   bestowed by the State of California.

10:55  4       So I do have state registration, sir.

10:55  5       Q.  Do you have state registration as a

10:55  6   hydrogeologist?

10:55  7       A.  I do not have state registration as a

10:55  8   hydrogeologist; that's correct.

10:55  9       Q.  Do you have state registration as a geologist?

10:55 10       A.  I do not.

10:55 11       Q.  Did you render the opinion set forth in Exhibit 1

10:55 12   in the state of California?

10:55 13       A.  I did.

10:56 14       Q.  You did?

10:56 15       A.  Yes.

10:56 16       Q.  Are you -- do you consider yourself an expert in

10:56 17   toxicology?

10:56 18       A.  I deal with toxicological issues and have for

10:56 19   decades.  Whether we're talking toxical impacts of

10:56 20   benzene or PCE, I have some insights into that.  And

10:56 21   that comes into almost daily discussions in my

10:56 22   profession.  But I would not say that I'm a

10:56 23   toxicologist, sir.

10:56 24       Q.  Do you consider yourself an expert in

10:56 25   epidemiology?

---

Lorne G. Everett, Ph.D. - 2/14/2013 - McHugh vs. Madison-Kipp Corporation          1070481

10:56  1       A.  I would not say that, sir.

10:56  2       I would qualify my response, if I might, by

10:56  3   saying that, as I'd indicated earlier, this was a team

10:57  4   effort, and that team effort included Dr. Jim Wells who

10:57  5   is a state registered geologist.

10:57  6       As I indicated, it included Mr. Jorge Matos who

10:57  7   is a state registered professional engineer.

10:57  8       So all of the opinions in here are the result of

10:57  9   better than a year's collaboration with my team center.

10:57 10       Q.  Okay.  Do you believe that PAH contamination at

10:58 11   the site is impacting groundwater in any respect?

10:58 12       MR. BERGER:  You mean in addition to what

10:58 13   he's just testified about?

10:58 14       MR. BUSCH:  I don't know if he testified to

10:58 15   that.

10:58 16       MR. BERGER:  I disagree.  But he can --

10:58 17   Q.  BY MR. BUSCH:  Go ahead.

10:58 18       MR. BERGER:  -- answer.

10:58 19       THE WITNESS:  I believe that the PCBs are in

10:58 20   the hydraulic oils and the PCBs are in the groundwater,

10:58 21   so the answer is, it is the vehicle of the hydraulic

10:58 22   oils that is getting the PCBs down there, sir, so the

10:59 23   answer is yes.

10:59 24   Q.  BY MR. BUSCH:  That the PAHs are contributing

10:59 25   to -- are the PAHs contributing to the contamination of



10:59  1   the groundwater?

10:59  2       A.  Only in the sense that they're providing the

10:59  3   vehicle for the PCBs to get down there, sir.

10:59  4       Q.  And which PAH do you believe is responsible for

10:59  5   that transport?

10:59  6       A.  Oh, I think that the PCBs are mixed into the PAHs

10:59  7   so the complex of the PCB and whatever one of the PAHs

10:59  8   is complexing what it is a -- is an appreciation of

10:59  9   chemistry that goes beyond me.

10:59  10      Q.  The -- at page 12 --

11:00  11      A.  Yes, sir.

11:00  12      Q.  You state that the contaminated groundwater which

11:00  13  then migrated from Madison-Kipp site and spread

11:00  14  throughout the Class Area contains PCE concentrations as

11:00  15  high as 4,600.

11:00  16          That's micrograms per liter, sir --

11:00  17      A.  Uh...

11:00  18      Q.  -- is that right?

11:01  19          Is that how that's expressed?

11:01  20      A.  That's correct, sir.

11:01  21      Q.  And it says, This contaminated groundwater then

11:01  22  contaminated the, soil, soil vapor and air above it,

11:01  23  including air beneath and inside the homes, in the Class

11:01  24  Area in two ways.  First, fine-grained sands caused --

11:01  25  sediments caused the contaminating groundwater to "wick

---

11:01  1   up," similar to an ink blotter wicking up ink.

11:01  2           Is the contaminated groundwater of which you

11:01  3   speak at page 12, is that groundwater at any given -- at

11:01  4   a depth?  And by that I mean, is that the shallow

11:01  5   groundwater?

11:01  6       A.  The number 4,600 micrograms per liter, sir, is an

11:01  7   expression of the deep groundwater contamination.  And

11:01  8   the comment related to wicking would be related to the

11:01  9   shallow groundwater contamination that we know exists at

11:02  10  Madison-Kipp.

11:02  11      Q.  And is the shallow -- is it -- what I'm getting

11:02  12  to is, is it your opinion that a source of subslab

11:02  13  vapor, PCE vapor, is the shallow groundwater?

11:02  14          MR. BERGER:  Can we have a reference?  Are

11:02  15  you talking about in the -- under the residences as --

11:02  16          MR. BUSCH:  Under the residence.

11:02  17          MR. BERGER:  -- or just the building.

11:02  18          MR. BUSCH:  Yeah, under the residence.

11:02  19          MR. BERGER:  Okay.

11:02  20          THE WITNESS:  My position on that, sir, is

11:02  21  that we have PCE indoors.  We have PCE in the subslab.

11:02  22  We have PCE in the soil gravel.  We have PCE in the

11:02  23  groundwater.  And so we have a completed pathway.  The

11:02  24  pathway clearly shows that it got from Madison-Kipp into

11:03  25  the houses.

---

11:03  1           Now ARCADIS will argue that those numbers

11:03  2   are low.  That argument simply makes our point.  The

11:03  3   pathway is complete.

11:03  4           My -- But that's not my point.  My point is

11:03  5   that as a part of any investigation, you need to do a

11:03  6   conceptual model about how things are happening,

11:03  7   especially with respect to the sources are that driving

11:03  8   things to happen.

11:03  9           So with respect to the PCE under these

11:03  10  homes, as Ms. Trask has indicated, she doesn't know if

11:03  11  it came from the soil; she doesn't know if it comes from

11:03  12  the groundwater; she doesn't know if it's coming from

11:03  13  the soil and gas coming off the operation; she doesn't

11:03  14  know if it was caused by the venting that went on for

11:03  15  all those years that caused this stuff to be

11:04  16  distributed.

11:04  17          She doesn't know where the sources are.  And

11:04  18  she freely admitted that.  And that's exactly my point.

11:04  19  It doesn't make sense to do a risk analysis when you

11:04  20  don't even know the source of the contamination or the

11:04  21  source of the problem.

11:04  22      Q.  BY MR. BUSCH:  In your opinion, is the deep

11:04  23  groundwater a source of subslab vapor in the homes --

11:04  24  under the homes in the Class Area?

11:04  25      A.  It depends on what you mean by "deep," sir.  I

---

11:04  1   think that as you get deeper, there is a less likelihood

11:04  2   that you would get vapor instrumentation, for example,

11:04  3   100 or 120 feet.

11:04  4       Q.  Anything -- do you believe that, um, groundwater

11:05  5   above 120 feet is a source of vapor at the subslab in

11:05  6   the Class Area?

11:05  7       A.  I really don't think so, sir.  But my point is

11:05  8   that we simply don't know what the concentrations are.

11:05  9       Q.  But what -- at what depth do you believe, at its

11:05  10  lowest, the groundwater contributes to the vapor in the

11:05  11  subslabs in the homes in the Class Area?

11:05  12      A.  Well, the work hasn't been done to show that.

11:05  13  And Ms. Trask readily admits that.

11:05  14      Q.  So you don't have an opinion on that?

11:05  15      A.  Without having the data to -- without having a

11:06  16  correct characterization, I don't have an opinion on

11:06  17  what that depth would be because I don't have the data.

11:06  18          MR. BUSCH:  We are at 11:00 o'clock.  She

11:06  19  has about five minutes left on her tape she needs to

11:06  20  change.

11:06  21          Is that fine with you?

11:06  22          THE WITNESS:  Fine.

11:06  23          THE VIDEOGRAPHER:  End of disk number one of

11:06  24  volume number one of the deposition of Lorne G, Everett,

11:06  25  Ph.D. on February of 14th of the year 2013.  We are off



11:06   1   the record at 11:06 a.m.

11:18   2          (Recess taken:  11:06 a.m. to 11:18 a.m.)

11:18   3          THE VIDEOGRAPHER:  This is the beginning of

11:18   4   media number two of volume one of the deposition of

11:18   5   Lorne G. Everett, Ph.D. on February of 14th of the year

11:18   6   2013.  The deposition continues at 11:18 a.m.

11:18   7       Q.  BY MR. BUSCH:  Directing your attention to

11:18   8   page 12.

11:18   9       A.  Yes, sir.

11:18   10      Q.  At the end of the first paragraph, you indicate

11:18   11  that PCBs and metals now being found in neighbors' soil

11:19   12  has migrated from a highly contaminated soil on

11:19   13  Madison-Kipp property and/or has been discharged

11:19   14  directly from P- -- Madison-Kipp's vents and stacks and

11:19   15  contaminated particulate matter subsequently settled out

11:19   16  of the air onto the neighbors' yards.

11:19   17          Do you see that, sir?

11:19   18      A.  I do, sir.

11:19   19      Q.  And directing your attention to the stacks, are

11:19   20  you talking about the stacks that are on the roof of the

11:19   21  building, that project off the roof of the building?

11:19   22      A.  I am.  There are stacks that come off the roof of

11:19   23  the building and then there are stacks that go off the

11:19   24  side of the building and go up.

11:19   25      Q.  All right.

---

11:19   1       A.  But for the most part, they're the stacks on the

11:19   2   building, yes, sir.

11:19   3       Q.  All right.  And have you done any studies to

11:19   4   determine the air deposition of the particulates that

11:19   5   emanate from the stacks?

11:19   6       A.  I have, sir.

11:19   7       Q.  And when did you do that?

11:20   8       A.  In preparation for my expert report, sir.

11:20   9       Q.  And can you describe for me what you did.

11:20   10      A.  Um, well, I read about the stacks and the

11:20   11  controversy associated with them over the years, and how

11:20   12  there was a requirement for Madison-Kipp to get a permit

11:20   13  for one of their tall stacks for air pollution issues.

11:20   14          And what Madison-Kipp did was to ask that that

11:20   15  permit request be rescinded because their solution was a

11:20   16  whole bunch of smaller stacks to get around that permit

11:20   17  requirement.  So their approach was to skirt the issue

11:20   18  and come up with a whole bunch of stacks.  That's why we

11:20   19  see the stacks, to satisfy the permit requirements.

11:21   20          Further, as I walked around, I noticed these

11:21   21  vents that clearly had tar associated with them.  Took

11:21   22  pictures of it.

11:21   23          Went back to the office and then looked at this

11:21   24  PAH numbers, concluded that the PAHs along Waubesa and

11:21   25  those back yards were caused by those vents.  I stand by

---

11:21   1   that.

11:21   2          And the fact that Madison-Kipp and ARCADIS is now

11:21   3   going to go out and dig up these folks' backyards

11:21   4   because of the PCB numbers that were associated with the

11:21   5   vents confirms that that was the source.

11:21   6          Further, I recognized that this facility is

11:21   7   started in the late 1800s when there wasn't any air

11:22   8   pollution concerns, and for decades they burnt coal.

11:22   9   And so it's my expectation that there would be

11:22   10  substantial particulate issues associated with

11:22   11  Madison-Kipp for all these many, many, many decades,

11:22   12  sir, of releases.

11:22   13      Q.  Have you done anything else in -- in conjunction

11:22   14  with any opinion you may have with regard to air

11:22   15  deposition from the stacks?

11:22   16      A.  Just through my experience which says that one

11:22   17  needs to approach the particulate problem by looking at

11:22   18  what's commonly called the bulls-eye; meaning if

11:23   19  Madison-Kipp is the source, you need to look at the

11:23   20  particulate distribution away from Madison-Kipp.  And

11:23   21  the approach that was used by ARCADIS was to say okay.

11:23   22          Everywhere we look, we see PAHs; therefore, it is

11:23   23  a aqueous problem throughout the whole area.  Well, they

11:23   24  only looked one street away.  If they'd looked two,

11:23   25  three, four, five streets away, they might have seen the

---

11:23   1   concentrations went down as you away from

11:23   2   Madison-Kipp.  That kind of work was not done.

11:23   3       Q.  My question is did you -- did you do anything --

11:23   4       A.  No.

11:23   5       Q.  -- in regard to air deposition other than what

11:23   6   you just stated in the bulls-eye?

11:23   7       A.  No, sir.  My recommendation was that it had to be

11:24   8   characterized.  It should have been characterized and it

11:24   9   still hasn't been characterized.  But I didn't go out

11:24   10  and do that kind of analysis.

11:24   11      Q.  And do you consider yourself an expert in air

11:24   12  deposition and flow patterns?

11:24   13      A.  We've done that kind of work, sir, but I wouldn't

11:24   14  call myself an expert.

11:24   15      Q.  And no one in your group performed any expert

11:24   16  work in regard to studying the air deposition of

11:24   17  Madison-Kipp; correct?

11:24   18      A.  Members of my staff have testified in cases on

11:24   19  those subjects, but they didn't go out and take any

11:24   20  samples.  But they certainly collaborated with what my

11:24   21  thoughts were, which was this wasn't the correct way to

11:24   22  characterize it.

11:24   23      Q.  So your opinion is that -- is not that the PAHs

11:24   24  on every one of the properties is necessarily from

11:24   25  Madison-Kipp, it's just that there's not been

| | | |
|---|---|---|
| 11:24 | 1 | appropriate characterization? |
| 11:25 | 2 | A. No. My thoughts are is that there's a high |
| 11:25 | 3 | likelihood that the PAHs on these Class homes which are |
| 11:25 | 4 | directly adjacent to Madison-Kipp does come from |
| 11:25 | 5 | Madison-Kipp primarily. |
| 11:25 | 6 | Could there be a regional contribution? I think |
| 11:25 | 7 | so. |
| 11:25 | 8 | But does contamination primarily come from |
| 11:25 | 9 | Madison-Kipp. They're sitting next to a smoke stack |
| 11:25 | 10 | for, I'll say, 70 years, burnt coal. And you're right |
| 11:25 | 11 | next door. There's going to be an impact, sir. |
| 11:25 | 12 | Q. But you've not done any studies of air |
| 11:25 | 13 | depositions at the Madison-Kipp? |
| 11:25 | 14 | A. No, sir. |
| 11:25 | 15 | Q. And you do not consider yourself an expert in air |
| 11:25 | 16 | deposition? |
| 11:25 | 17 | A. We do that kind of work, but I wouldn't call |
| 11:25 | 18 | myself an expert, sir. |
| 11:26 | 19 | (Pause in the proceedings.) |
| 11:26 | 20 | THE WITNESS: I'm allowed to qualify my |
| 11:26 | 21 | response in terms. PAH distribution over 30 percent of |
| 11:26 | 22 | the PAH samples showed non-detected for PAHs. So if it |
| 11:26 | 23 | was a regional problem and 30 percent of the sites |
| 11:26 | 24 | didn't have any PAHs in them, you wouldn't call that a |
| 11:26 | 25 | regional problem. |

---

| | | |
|---|---|---|
| 11:26 | 1 | So my point is that it is a source-directed |
| 11:26 | 2 | problem from Madison-Kipp. |
| 11:27 | 3 | Q. BY MR. BUSCH: If it were established that the |
| 11:27 | 4 | have vapor degreaser at Madison-Kipp had a condenser, |
| 11:27 | 5 | would that impact at all on your opinion? |
| 11:27 | 6 | A. I think it would impact my opinions about the |
| 11:27 | 7 | degree of contribution from the vents. But it wouldn't |
| 11:28 | 8 | impact my opinions about the dumping of buckets of free |
| 11:28 | 9 | product, which I think is one of the main sources of the |
| 11:28 | 10 | DNAPL. |
| 11:28 | 11 | (Pause in the proceedings.) |
| 11:28 | 12 | Q. BY MR. BUSCH: Directing your attention to |
| 11:28 | 13 | page 19. |
| 11:29 | 14 | A. Yes, sir. |
| 11:29 | 15 | Q. You reference standards of conduct, at the last |
| 11:29 | 16 | two sentences, in regard to PCE, is the standard of |
| 11:29 | 17 | conduct -- |
| 11:29 | 18 | What are the standards of conduct specifically to |
| 11:29 | 19 | which you refer? |
| 11:29 | 20 | A. And which sentence are you referring to, sir? |
| 11:29 | 21 | Q. The last two sentences of -- the last two lines |
| 11:29 | 22 | of page 19. |
| 11:29 | 23 | A. The standards of conduct that I'm referring to |
| 11:29 | 24 | are related to industrial chemicals and that it was a |
| 11:29 | 25 | well-known, back in that time frame, that dumping |

---

| | | |
|---|---|---|
| 11:30 | 1 | industrial chemicals would cause groundwater |
| 11:30 | 2 | contamination. Papers such as Harvey Banks, the first |
| 11:30 | 3 | civil engineer for the state of California referred to |
| 11:30 | 4 | that -- there's a whole sequence of papers that says |
| 11:30 | 5 | it's bad practice to take industrial chemicals and to |
| 11:30 | 6 | dump them. |
| 11:30 | 7 | And -- |
| 11:30 | 8 | Q. And what was Mr. Bank's paper? |
| 11:30 | 9 | A. I shouldn't guess, but I think it was in the |
| 11:30 | 10 | '40s, sir. |
| 11:30 | 11 | Q. Okay. |
| 11:30 | 12 | A. But further than that, what's the real issue is |
| 11:30 | 13 | it shouldn't take hazardous indust- -- hazardous |
| 11:30 | 14 | industrial chemicals and dump them right next to |
| 11:30 | 15 | someone's home. And I'm talking within a couple feet of |
| 11:31 | 16 | someone's yard. So what's egregious about that is not |
| 11:31 | 17 | just that they were dumped but they were dumped next to |
| 11:31 | 18 | peoples' yards where kids play in. |
| 11:31 | 19 | Q. Is PCE commercially available today? |
| 11:31 | 20 | A. I think PCE is commercially available today |
| 11:32 | 21 | because I -- I know, for example, they use it in |
| 11:32 | 22 | spotting fluid in a number of dry cleaners. So if you |
| 11:32 | 23 | wanted to get PCE, I believe you could, sir. |
| 11:32 | 24 | Q. Have you taken any positions in regard to whether |
| 11:32 | 25 | PCE should be a banned substance? |

---

| | | |
|---|---|---|
| 11:32 | 1 | A. I actually have followed the evolution of PCE and |
| 11:32 | 2 | TCE as manmade industrial solvents. And I think that |
| 11:32 | 3 | they are very good at what they do. But there's a |
| 11:32 | 4 | recognized -- recognition -- folks now recognize that |
| 11:32 | 5 | they are increasingly hazardous. |
| 11:33 | 6 | So should they be banned? I don't think so. |
| 11:33 | 7 | Should they be highly controlled? I think they |
| 11:33 | 8 | should. |
| 11:33 | 9 | MS. ROSS: Would you speak una little bit. |
| 11:33 | 10 | THE WITNESS: I'm sorry, Becky. |
| 11:33 | 11 | MS. ROSS: Thank you. |
| 11:33 | 12 | Q. BY MR. BUSCH: In your opinion, is PCE a threat |
| 11:33 | 13 | to human health at any level or its contamination? |
| 11:33 | 14 | A. On that, I will take my cue from the |
| 11:33 | 15 | United States Environmental Protection Agency which has |
| 11:33 | 16 | set a maximum contaminant level goal for PCE of zero. |
| 11:33 | 17 | So the EPA's position is that zero is what they would |
| 11:33 | 18 | like to see. |
| 11:33 | 19 | But as we know, PC -- as we know, EPA sets their |
| 11:34 | 20 | standards based on cost benefit. So the cost to clean |
| 11:34 | 21 | up these sites down to zero is prohibitive. And |
| 11:34 | 22 | therefore, we have an MCL, a maximum contaminant level |
| 11:34 | 23 | above that threshold of zero. And for PCE, that |
| 11:34 | 24 | threshold is 5. |
| 11:34 | 25 | So EPA's position is the goal is zero, but we can |

```
11:34   1    live with 5 because it would cost too much to try to get
11:34   2    below that.
11:34   3        Q.  That's with respect to groundwater; correct?
11:34   4        A.  Oh, that's correct, sir.  I'm sorry.
11:34   5        Q.  What about with respect to vapor?  Are you aware
11:34   6    of any -- of what the EPA's position is in regard to
11:34   7    vapor exposure?
11:34   8        A.  Well, I believe EPA's position with respect --
11:34   9    with respect to vapor exposure is that within the house,
11:34  10    the concentration the EPA is now talking about is
11:35  11    41 micrograms per meter cubed.
11:35  12        And with respect to the concentrations the EPA is
11:35  13    looking at the subsurface, that concentration would be
11:35  14    410 micrograms per meter cubed.
11:35  15        Q.  And is that -- can you make that -- or can you
11:35  16    translate that in parts per billion by volume?
11:35  17        A.  It would probably be 6, sir, 6 parts per billion
11:35  18    volume.
11:35  19        Q.  For indoor air?
11:35  20        A.  For indoor air, yeah.
11:35  21        Q.  And for subslab?
11:35  22        A.  Not sure.
11:35  23        Q.  If I used the term 62 parts per billion by
11:35  24    volume, would that equate to 410?
11:35  25        A.  It -- it very well could.
```

```
11:35   1        Q.  It's a factor of 10 no matter how you read it;
11:35   2    correct?
11:35   3        A.  For these gasses, it would be, sir.
11:36   4        Q.  Okay.  Now, to your knowledge in the 34 homes
11:36   5    that are in the Class Area, are any of those people
11:36   6    currently, to your knowledge, in -- drinking any water
11:36   7    that has detectible levels of PCB -- excuse me, PCE?
11:36   8            MR. BERGER:  Right now?
11:36   9            MR. BUSCH:  Right now.
11:36  10        Q.  BY MR. BERGER:  Do you know?
11:36  11        A.  I'm not aware of any.
11:36  12        However, my experience is that with such a
11:36  13    shallow depth to water, it's not uncommon for people to
11:36  14    sink very shallow wells to get water for irrigation, for
11:36  15    example, for sprinkler systems, for that kind of use.
11:36  16        And one of the issues we often do is to set up
11:36  17    ordinances to make sure the people don't sink shallow
11:36  18    wells because that -- the water is contaminated.
11:37  19        Q.  Do you know if any shallow wells or irrigation
11:37  20    exist in the Class Area?
11:37  21        A.  For home use in the Class Area?  I'm not aware of
11:37  22    that, sir.
11:37  23        Q.  Okay.
11:37  24        A.  But, who's to say what'll happen in the future.
11:37  25        Q.  Do you know if shallow wells for irrigation are
```

```
11:37   1    permitted under the ordinance of the City of Madison?
11:37   2        A.  That's just the point.  They typically do not
11:37   3    allow them.  But the shallow depth of the water, that's
11:37   4    what people do.
11:37   5        Q.  Are you aware of any homes within the Class Area
11:37   6    that have an indoor air reading in excess of six parts
11:37   7    per billion by volume?
11:37   8        A.  I'm not aware of any at the moment, sir.
11:37   9        Q.  And absent a reading in excess of 6 parts per
11:38  10    billion by volume, those homes, at least according to
11:38  11    the EPA, would be protective of human health; correct?
11:38  12            MR. BERGER:  Objection to the form of the
11:38  13    question.
11:38  14        Q.  BY MR. BUSCH:  Go ahead and answer.
11:38  15        A.  I don't agree with that at all, sir.
11:38  16        Q.  Well, that's a -- that's a toxilogical [sic]
11:38  17    opinion, is it not?
11:38  18        A.  I don't believe it is, sir.
11:38  19        Q.  What kind of opinion is it?
11:38  20        A.  It's an opinion based on data.  And I'm of the
11:38  21    opinion that the data is not representative of the
11:39  22    conditions.
11:39  23        For example, in terms of the number of samples of
11:39  24    soil gas or subslab have been taken, we're talking about
11:39  25    one or two or three samples.  And I'm talking about
```

```
11:39   1    families that have lived there for generations.  And so
11:39   2    I do not believe that the samples that have been taken
11:39   3    are representative.
11:39   4        And that comes from my experience two weeks ago
11:39   5    where, because of a growing appreciation of the
11:39   6    variability of soil gas, I chaired an international
11:39   7    committee.  I chaired an international symposium of the
11:39   8    dynamic behavior of soil gas.  And at that meeting there
11:39   9    were representatives from Germany and Brazil and Canada
11:40  10    and United Kingdom and a number of Americans.  And the
11:40  11    consensus was that these gasses vary substantially.  And
11:40  12    so the notion of simply taking two samples and saying
11:40  13    there's no risk, I don't think is defensible.
11:40  14        Q.  So you do not believe that the extent of PCE
11:40  15    vapor intrusion health risk to the residents in the
11:40  16    Class Area has been defined?
11:40  17        A.  Absolutely not.  They haven't found the source.
11:40  18    They don't know if it's coming from the soil or the soil
11:40  19    gas.  They don't know if it's coming from the shallow
11:40  20    groundwater.  They don't know where it's coming from.
11:40  21        Ms. Trask was very clear on this.  She doesn't
11:40  22    know where it's coming from.
11:40  23        My position is you need to know the source of the
11:40  24    contamination before you make that determination.  And
11:40  25    then further, you needed to have taken enough samples to
```




```
11:41   1   show that these dynamic gasses aren't behaving radically
11:41   2   differently than the numbers that you're proposing to
11:41   3   protect these families.
11:41   4       Q.  Do you disagree that the health risk from vapor
11:41   5   intrusion in the 34 homes due to PCE contamination of
11:41   6   soil and shallow groundwater has been quantified?
11:41   7       A.  I do.  I believe that it has not been quantified
11:41   8   for the reasons that I stated earlier, that it is source
11:41   9   dependent; they have no idea where the sources is; if
11:41  10   it's groundwater dependent, they have no appreciation
11:41  11   for the groundwater flow directions.  And so one can't
11:41  12   base that kind of opinion on very, very poor data.
11:41  13       Q.  I believe -- is it your testimony that the
11:41  14   shallow groundwater, that the flow direction of the
11:41  15   shallow groundwater has not been defined?
11:42  16       A.  I don't believe that the, a complete appreciation
11:42  17   of the shallow groundwater flow direction has been fully
11:42  18   defined.
11:42  19       Q.  And it is the shallow groundwater that is the
11:42  20   source, if any, of the vapors; correct?
11:42  21       A.  Yes, sir.
11:42  22           And can I make that point by simply using one of
11:42  23   my figures?
11:42  24       Q.  Yes.
11:42  25       A.  In my report, I have Exhibit No. 3.
```

```
11:42   1       Q.  Yes.
11:42   2       A.  And Exhibit No. 3 shows concentrations of PCE in
11:42   3   the shallow groundwater ranging from 500 down to 5.  And
11:42   4   the only thing that is certain on that figure is that
11:42   5   the 500 contour, which happens to be on the Madison-Kipp
11:42   6   property, is a solid figure.  All of the other contours,
11:43   7   the 50 parts per billion contour, the 5 parts per
11:43   8   billion contour, all of those are dotted lines.  And
11:43   9   dotted lines says, We don't know the extent of this
11:43  10   contamination.
11:43  11           So this is the State of Wisconsin, Department of
11:43  12   Natural Resources saying, We don't know the extent of
11:43  13   the shallow contamination.  And that's why they're
11:43  14   representing it this way.
11:43  15           If you look, for example, at north of Monitoring
11:43  16   Well 1, where you see these 5 parts per billion contour,
11:43  17   and you see all these dashed lines, there's no wells out
11:43  18   there.  No idea how far that goes.  And so my position
11:43  19   is, which is simply a representation of the State of
11:43  20   Wisconsin, is they don't know.
11:44  21       Q.  In regard the 34 homes within the Class Area,
11:44  22   the -- do you believe that the PCE soil issue or
11:44  23   contamination has been addressed adequately?
11:44  24       A.  I don't think so.  And the example that I will
11:44  25   use will be the PCB characterization.  In terms of the
```

```
11:44   1   PCB, they've only taken a couple samples.  So PCBs,
11:45   2   they've only couple samples, yet they were willing to
11:45   3   dig up the whole backyard of these folks' home.
11:45   4           I don't think that these soils have been
11:45   5   characterized correctly, bearing in mind that the
11:45   6   contamination in the soils came from run-off, came from
11:45   7   this historical events, came from gas migration.  All
11:45   8   these sources contributed to the off-site problem.  And
11:45   9   no one has quantified them yet.  And Ms. Trask stated
11:45  10   that in her deposition:  She doesn't know.
11:45  11       Q.  So in regard to soil, again, it's the need for
11:45  12   further characterization of the soil; is that what your
11:46  13   opinion is?
11:46  14       A.  I think there needs to be further
11:46  15   characterization of the soil, yes.
11:46  16       Q.  As you sit here today, based upon the knowledge
11:46  17   that is available in regard to soil contamination, do
11:46  18   you believe that the soil contamination issue has been
11:46  19   appropriately addressed?
11:46  20       A.  I don't believe that it has, sir.
11:46  21       Q.  And can you elaborate on this.
11:46  22           MR. BERGER:  Just asked and answered.
11:46  23       Q.  BY MR. BUSCH:  Oh, it's because of lack of
11:46  24   characterization; correct?
11:46  25       A.  That's correct, sir.
```

```
11:46   1       Q.  But beyond, other than lack the characterization,
11:46   2   to your knowledge is there any other deficiency in your
11:46   3   opinion in regard to the soil contamination remediation
11:46   4   of PCE?
11:46   5       A.  Well, the vapors coming up from the shallow
11:46   6   groundwater is one of the sources.  And as we see in
11:47   7   Exhibit 3, in my report, they're not quite sure what the
11:47   8   direction of the shallow groundwater is.  So if you
11:47   9   don't know the direction, it's pretty hard to make a
11:47  10   determination as to what the concentration's going to be
11:47  11   in the soil.
11:47  12           What typically would happen is you would figure
11:47  13   out where the plume is going and then you would look at
11:47  14   the contamination above that plume.  Well, both the shallow
11:47  15   and deep groundwater has not been fully characterized.
11:47  16           And further, EPA requires that at every site that
11:47  17   you're characterizing and evaluating, you develop a
11:47  18   conceptual model.  A conceptual model tells you how the
11:48  19   water is moving, where it's coming from, what the
11:48  20   concentrations are.  That's always the starting point.
11:48  21           ARCADIS doesn't even have a conceptual model.
11:48  22           When the regulator, Mr. Schmoller, was asked,
11:48  23   "Did you have a conceptual model?  Do you know what's
11:48  24   going on here?"
11:48  25           He said, "Oh, I have a conceptual model."
```



11:48  1        And so when he was asked where it is, he says,

11:48  2  "It's in my head."

11:48  3        So this is not a standard protocol.  Standard

11:48  4  protocol is working from a conceptual model and as you

11:48  5  get more information, improve the model.

11:48  6        ARCADIS does not have a conceptual model.  That's

11:48  7  why we're getting all these surprises.

11:48  8     Q.  Do you have an opinion as to whether the lateral

11:48  9  extent, by that I mean the outward movement of the

11:48  10  shallow groundwater contamination, is continuing to, um,

11:49  11  grow?

11:49  12        MR. BERGER:  We're talking PCE here?

11:49  13        MR. BUSCH:  Yeah, PCE.

11:49  14        THE WITNESS:  I think it's clear that there

11:49  15  are, is a contamination onsite, there's contamination in

11:49  16  the soil, there's contamination in the shallow

11:49  17  groundwater.  That water is continuing to move.  ARCADIS

11:49  18  says it moves in every direction including down.

11:49  19        And so is there a higher -- is there a

11:49  20  likelihood that that contamination will continue to

11:49  21  move?  I think that that needs to be characterized and

11:49  22  it has not.

11:49  23     Q.  BY MR. BUSCH:  Have you done any work

11:49  24  characterizing it?

11:49  25     A.  No, my position is that the site has been very

---

11:49  1  poorly characterized.  In fact, I think that it is -- it

11:50  2  is hard to fathom that 19 years after they were asked to

11:50  3  do this, they haven't done it.

11:50  4        ARCADIS is embarked upon a multi million dollar

11:50  5  characterization to do this.  And it's 19 years too

11:50  6  late.

11:50  7        But for Mr. Johnson to say that Madison-Kipp was

11:50  8  doing a great job over all these decades, they were

11:50  9  doing a fine job, everything was totally acceptable;

11:50  10  yet, however, when ARCADIS came along, all of a sudden

11:50  11  we've got a multi million dollar characterization in

11:50  12  remediation program.

11:50  13        Madison-Kipp absolutely was -- had the position

11:50  14  of deny, deny, deny and do very little.  And that's

11:51  15  fully been documented by the Wisconsin regulator,

11:51  16  Mr. Schmoller.

11:51  17     Q.  Other than vapor intrusion, to your knowledge,

11:51  18  are the 34 members of the Class subject to any direct

11:51  19  impact with PCE as of today?

11:51  20        MR. BERGER:  In addition to what he's

11:51  21  testified to?

11:51  22        MR. BUSCH:  I don't think he's testified

11:51  23  yet.

11:51  24        MR. BERGER:  I think it has.

11:51  25        MR. BUSCH:  Well, then he can answer it.

---

11:51  1        THE WITNESS:  Well, I think that the PCE at

11:52  2  extremely high concentrations is clearly on its way to

11:52  3  Monitoring Well 8.  I think that Monitoring Well 8

11:52  4  provides the drinking water for all of the folks in the

11:52  5  Class Area.  I think that the resource, that aquifer in

11:52  6  that area is hugely compromised and will be for the

11:52  7  foreseeable future.

11:52  8        So has PCE impacted these people?  I think

11:52  9  it's impacted them in terms of their water supply.

11:52  10        I think it's impacted them in terms of -- I

11:52  11  can't imagine anybody buying a house over this kind of

11:52  12  contamination in this close proximity to contamination.

11:53  13  I just can't imagine anybody buying that house.

11:53  14        So I think that there is a long-term,

11:53  15  ongoing damage associated with PCE to these families.

11:53  16     Q.  BY MR. BUSCH:  Have you told the residents

11:53  17  that -- have you had a direct conversation with them in

11:53  18  regard to this opinion?

11:53  19     A.  I have --

11:53  20     Q.  Go ahead.

11:53  21     A.  I have met with the residents.  I have walked

11:53  22  throughout their houses and down in their basements.  I

11:53  23  was in an observational mode.  It -- I would hardly be

11:53  24  making comments like that at that stage.  I was simply

11:53  25  observing what was going on in each of their homes.

---

11:54  1     Q.  I want to know, sir:  Did you tell these people

11:54  2  they couldn't sell their homes?

11:54  3     A.  No.

11:54  4     Q.  You told these peoples they should leave their

11:54  5  homes?

11:54  6     A.  I did not make any kind of -- any kind of

11:54  7  recommendation like that.

11:54  8     Q.  Do you believe they should leave their homes?  Do

11:54  9  you?

11:54  10     A.  Do I believe it?

11:54  11     Q.  Should they leave their homes right now?

11:54  12     A.  I think these folks living on Maubesa that have

11:54  13  kids in areas with PCBs that are being excavated, I sure

11:54  14  wouldn't let my kids play on that -- in the backyard of

11:54  15  those homes.  'Cause this is surface contamination where

11:54  16  the kids play.  And that is being dug up it's so bad.

11:54  17     Q.  And PCE on Marquette, did you -- have you told

11:54  18  those people they should leave their homes?

11:54  19     A.  As I indicated earlier, sir, I wouldn't say

11:54  20  anything like that to these people.

11:54  21     Q.  Are you of the opinion they should leave their

11:54  22  homes?

11:55  23     A.  That's different.  Um --

11:55  24     Q.  Are you of the opinion?

11:55  25     A.  I'm of the opinion that I have kids and

| | |
|---|---|
| 11:55 | 1 |
| 11:55 | 2 |
| 11:55 | 3 |
| 11:55 | 4 |
| 11:55 | 5 |

11:55 1   grandkids, I would not want them playing anywhere near

11:55 2   that fence, for example.  Along the length of the

11:55 3   Madison-Kipp adjacent to the backyard of these homes --

11:55 4   on Marquette now, not Waubesa, on Marquette -- there's a

11:55 5   huge excavation going on the whole length, right along

11:55 6   the fence line.

11:55 7       They're digging that stuff up, PCBs.  The most

11:55 8   toxic of all the chemicals we're talking about.  And

11:55 9   they're stopping at the fence, which happens to be a

11:55 10  chain link fence.  And the contamination is moving by

11:55 11  water certainly through that fence.

11:55 12      And if I have my kids sitting right next to it --

11:55 13      Where I have pictures of playpens, of slides,

11:55 14  that's where the kids play.  Trampolines.

11:56 15      Would I have my kids there?  I absolutely would

11:56 16  not have them there.  Certainly my grandkids either.

11:56 17      Q.  Do you believe that the residents along Marquette

11:56 18  should evacuate their homes?

11:56 19          MR. BERGER:  I think it's been asked and

11:56 20  answered.

11:56 21          MR. BUSCH:  I just --

11:56 22      Q.  BY MR. BUSCH:  Yes or no.

11:56 23      A.  If it was me, I would definitely not let my kids

11:56 24  in those backyards.

11:56 25      Q.  I'm saying evacuate the home.

11:56 1       A.  Well, what I'm saying:  How can you live in the

11:56 2   house if you can't let anybody go out of the house.

11:56 3       Q.  So it's your opinion that they should evacuate

11:56 4   the home?

11:56 5       A.  My opinion is that I wouldn't let the kids play

11:56 6   in the backyard.

11:56 7       Q.  Can you answer my question?

11:56 8           MR. BERGER:  It's been asked and answered.

11:56 9           MR. BUSCH:  No, it hasn't been.

11:56 10          THE WITNESS:  I believe that the risk of the

11:56 11  PCBs is as high or higher than the PCE.

11:57 12      I believe that the PAHs that were found in

11:57 13  every yard is a risk that ARCADIS is denying.

11:57 14      I think that the arguments made on behalf of

11:57 15  the PAHs is totally indefensible.  And so based on PCBs

11:57 16  we have PAHs, based on PCEs, me, personally, would I let

11:57 17  my kids play in that backyard?  Absolutely not.

11:57 18      Q.  BY MR. BUSCH:  Would you -- have you advised or

11:57 19  are you going to advise the neighbors to evacuate their

11:57 20  home?

11:57 21          MR. BERGER:  I'm going to object.

11:57 22      You don't have to answer that question.

11:57 23      He hasn't expressed an opinion on it.

11:57 24      Q.  BY MR. BUSCH:  So you're not going to express an

11:57 25  opinion as to whether those homes are liveable?

11:57 1       A.  Oh, I don't think they are.  I don't think

11:57 2   they're liveable at all.  But I certainly wouldn't

11:57 3   express that to any of the Class.  It's not my position

11:58 4   to do that.

11:58 5       Mine is an educated opinion.  I understand these

11:58 6   concentrations.  I understand the risks.  Those folks

11:58 7   don't understand any of the stuff, in my opinion, and

11:58 8   they're at a huge disadvantage and are being put at risk

11:58 9   and I don't think that's fair.

11:58 10      Q.  Other than the home over on Waubesa, are you

11:58 11  aware of any concentrations of PCBs found on the

11:58 12  neighbors' properties which are above action levels?

11:58 13      A.  At what location, sir?

11:58 14      Q.  Any of the homes other than Waubesa?

11:58 15      A.  Well, I think Waubesa makes my point that there

11:58 16  wasn't enough samples to -- to make any determination.

11:58 17  What they did is they dug up everything as far as the

11:58 18  samples were.  Had they taken more samples, they

11:58 19  probably would have been doing more digging.

11:59 20      So if you say on Marquette, did they get enough

11:59 21  samples?  I would indicate to you I believe they have.

11:59 22      Q.  Are you aware of any samples that are in excess

11:59 23  of action levels?

11:59 24          MR. BERGER:  You're talking PCBs here?

11:59 25          MR. BUSCH:  PCBs.

11:59 1           THE WITNESS:  Um, I'm -- I'm not, sir, but

11:59 2   it defies logic.  It defies logic to think that

11:59 3   Madison-Kipp would then dig up a huge 10 foot swath of

11:59 4   soil next to the fence and that none of it got through

11:59 5   the fence.  That's illogical, sir.

11:59 6       Q.  BY MR. BUSCH:  Is it your opinion that every

12:00 7   facility that handles hazardous materials needs to have

12:00 8   a trained environmental manager?

12:00 9       A.  My -- there needs to be somebody that has that

12:01 10  training.  That somebody can either be an employee, but

12:01 11  very often what they do is they have outside, other

12:01 12  engineering firms or consulting firms that take on that

12:01 13  responsibility.

12:01 14      Do I think that there should be somebody in

12:01 15  charge of the environmental issues where hazardous waste

12:01 16  is being handled?  Absolutely.  Somebody needs to know

12:01 17  what's going on.

12:01 18      And other than your opinion, are you aware of any

12:01 19  regulations which mandate that?

12:01 20      A.  That's not a subject that I would have ran into

12:01 21  in the past, sir, so I can't speak to that.

12:01 22      Q.  Okay.  Directing your attention to page 40.

12:02 23      A.  Yes, sir.

12:03 24      Q.  You cite the guidance of the use of 7003 of RCRA

12:03 25  for definition of imminent and substantial endangerment.

| | |
|---|---|
| 12:03 | 1            Do you see that? |
| 12:03 | 2     A.  I do, sir. |
| 12:03 | 3     Q.  Is that the sole basis -- sole reference upon |
| 12:03 | 4    which you rely for that definition? |
| 12:03 | 5     A.  No, sir. |
| 12:03 | 6     Q.  What else? |
| 12:03 | 7     A.  I've read a number of positions on what |
| 12:03 | 8    endangerment means.  I've spent a lot of years looking |
| 12:03 | 9    at cleanup orders in California.  They typically use |
| 12:03 | 10   this same -- the same kind of verbiage.  And so for many |
| 12:03 | 11   years, I've -- I've been involved with -- with what this |
| 12:03 | 12   verbiage means, and it goes far beyond RCRA and seems |
| 12:03 | 13   that many states have simply picked it up, sir. |
| 12:03 | 14     Q.  But for purposes of your opinion, you are relying |
| 12:04 | 15   upon the -- this bracketed, I should say the indented |
| 12:04 | 16   language for your definition of imminent and substantial |
| 12:04 | 17   endangerment? |
| 12:04 | 18        MR. BERGER:  Objection to the form. |
| 12:04 | 19     Q.  BY MR. BUSCH:  Go ahead and answer. |
| 12:04 | 20     A.  I'm relying on all of my experience; and the |
| 12:04 | 21   quotes imply that it's representative of the language, |
| 12:04 | 22   yes, sir. |
| 12:04 | 23     Q.  Okay.  You -- on page 41, you rely on the -- at |
| 12:04 | 24   sub (2), you rely on the expert report of David Ozonoff |
| 12:04 | 25   explicitly. |

| | |
|---|---|
| 12:04 | 1            Do you see that? |
| 12:04 | 2     A.  I do see that, sir. |
| 12:04 | 3     Q.  And -- and the -- that portion of -- or that |
| 12:04 | 4   opinion of Dr. Ozonoff is that PCE is dangerous to |
| 12:05 | 5   humans in any concentration. |
| 12:05 | 6          Do you see that? |
| 12:05 | 7     A.  I do see that, sir. |
| 12:05 | 8     Q.  And is it your opinion that PCE in any |
| 12:05 | 9   concentration presents imminent and substantial |
| 12:05 | 10   endangerment to human health? |
| 12:05 | 11     A.  I would respond that EPA's position is that the |
| 12:05 | 12   maximum cleanup goal for PCA is zero -- or PCE is zero. |
| 12:05 | 13   Dr. Ozonoff says that PCE is dangerous at any |
| 12:05 | 14   concentration. |
| 12:05 | 15     Ms. Trask takes that same view and explicitly |
| 12:05 | 16   said that radon is dangerous at any concentration. |
| 12:05 | 17     Your question, however, is that are there |
| 12:06 | 18   acceptable levels for PCE?  And as I indicated to you, |
| 12:06 | 19   these concentrations, these MCLs, are based on cost |
| 12:06 | 20   benefit analysis.  And that says that it just costs more |
| 12:06 | 21   than most industries or people can afford to pay to get |
| 12:06 | 22   those concentrations down.  So that's my position. |
| 12:06 | 23     Q.  How bad with regard to screening levels did |
| 12:06 | 24   screening levels come into play at all in your opinion? |
| 12:06 | 25     A.  I think that screening levels are a very guideway |

| | |
|---|---|
| 12:06 | 1   to characterize sites.  But the reason they call them |
| 12:06 | 2   screening is just that:  Screening levels are typically |
| 12:06 | 3   used to identify sources.  And at this site even a |
| 12:06 | 4   screening level approach has not identified the sources. |
| 12:07 | 5     Q.  Screening levels are also used to ascertain where |
| 12:07 | 6   the concentrations are a threat to human health; |
| 12:07 | 7   correct? |
| 12:07 | 8     A.  Oh, I believe that there are those kind of |
| 12:07 | 9   screening levels, yes, sir. |
| 12:07 | 10     Q.  And if PCE in the vapor is below a screening |
| 12:07 | 11   level, then it does not present a threat to human |
| 12:07 | 12   health, does it? |
| 12:07 | 13     A.  If the PCE data is defensible.  And I don't think |
| 12:07 | 14   this data is defensible. |
| 12:07 | 15     Q.  But if it is defensible, if the level is below |
| 12:07 | 16   the screening level of the PCE, then it is not -- does |
| 12:07 | 17   not present and imminent and substantial threat to human |
| 12:07 | 18   health; is that correct? |
| 12:07 | 19     A.  The answer -- my answer to that is if I believe |
| 12:07 | 20   that the PCE concentration is representative of our |
| 12:08 | 21   understanding of PCE behavior and sampling, I would |
| 12:08 | 22   support it. |
| 12:08 | 23     If the PCE number that is being considered is not |
| 12:08 | 24   consistent with our understanding of PCE behavior, I |
| 12:08 | 25   would not support it. |

| | |
|---|---|
| 12:08 | 1     Q.  Hypothetically, if -- if -- if a sufficient |
| 12:08 | 2   amount of characterization were done, and the results |
| 12:08 | 3   were that the PCE levels in the area, in the vapor, were |
| 12:08 | 4   below the screening levels set by the EPA, you would |
| 12:08 | 5   agree that in that situation an imminent and substantial |
| 12:08 | 6   endangerment does not exist -- |
| 12:08 | 7        MR. BERGER:  Well -- |
| 12:08 | 8     Q.  BY MR. BUSCH:  -- to human health does not exist? |
| 12:08 | 9        MR. BERGER:  I'm going to object. |
| 12:09 | 10        Imminent and substantial endangerment is not |
| 12:09 | 11   presented by the Madison-Kipp site, is that your |
| 12:09 | 12   question? |
| 12:09 | 13        MR. BUSCH:  No.  I had a hypothetical |
| 12:09 | 14   question. |
| 12:09 | 15        MR. BERGER:  Well, you had an incomplete |
| 12:09 | 16   hypothetical. |
| 12:09 | 17        MR. BUSCH:  No, I did not. |
| 12:09 | 18        MR. BERGER:  Okay.  We disagree. |
| 12:09 | 19     Q.  BY MR. BUSCH:  Okay.  Go ahead and answer. |
| 12:09 | 20     A.  Well, the verbiage of imminent and substantial |
| 12:09 | 21   threat is verbiage that is applied in every case that |
| 12:09 | 22   I've seen to an order to cleanup, which means it is |
| 12:09 | 23   applied to the source.  I have not seen that verbiage |
| 12:09 | 24   used, associated with individual homes. |
| 12:09 | 25     Are the individual homes at risk?  The answer is |

12:09  1   absolutely they are at risk if the source hasn't been
12:10  2   characterized and understood.
12:10  3       So my position is that you need to know if the
12:10  4   number that you're dealing with for PCE is defensible.
12:10  5   And my position is that at this site those number are
12:10  6   too few and non-defendedable.
12:10  7       Q.  Without regard to this site, as a general
12:10  8   proposition, if vapor -- defensible vapor data falls
12:10  9   below a screening level, it does not present an imminent
12:10  10  and substantial endangerment to human health, does it?
12:10  11      MR. BERGER:  Same objection.
12:10  12      MR. BUSCH:  Fine.
12:10  13      Q.  BY MR. BUSCH:  Go ahead and answer.
12:10  14      A.  My last paper on the dynamic behavior of the soil
12:10  15  gasses was submitted to the California Department of
12:10  16  Toxic Substances Control.  And within the last month,
12:11  17  the Department of Toxic Substances Control lead guy --
12:11  18      Bless you.
12:11  19      -- lead guy on vapor intrusion took our paper and
12:11  20  sent it to every person within the California water
12:11  21  resources control board and every person within DTSE
12:11  22  saying:  This is what you need to consider relevant to
12:11  23  soil gas in our screening levels.  You need to
12:11  24  understand the dynamic behavior.
12:11  25      And so the dynamic behavior of gasses is not in

---

12:11  1   the regulations as yet.  And the regulations are
12:11  2   changing in response to that, sir.  That's why I'm
12:11  3   having a problem answering your question.
12:11  4       Q.  So you did not answer my question --
12:11  5       A.  I can't answer your question.  I can't -- my
12:11  6   answer is that the regulations at this stage are just
12:11  7   catching up to the science.  And I'm a coauthor on the
12:11  8   changing science.
12:11  9       Q.  So your answer is no?
12:12  10      A.  With all the caveats that I've indicated earlier,
12:12  11  that's my answer.
12:12  12      Q.  And is that -- is that based upon your,
12:12  13  um -- well, that's a toxilogical [sic] opinion, isn't
12:12  14  it?
12:12  15      A.  No, respectfully, it's not based on toxicology at
12:12  16  all.  It's based on the defensibility of the actual data
12:12  17  that was doing those calculations on.
12:12  18      Q.  Try it one more time.  If vapors at a site are
12:12  19  adequately characterized and the levels are below the
12:13  20  EPA recognized screening levels for PCE and the
12:13  21  contaminant of interest is PCE, there is no eminent and
12:13  22  substantial endangerment, is there?
12:13  23      MR. BERGER:  Same objection.  It's been
12:13  24  asked and answered.
12:13  25      MR. BUSCH:  I get a yes or no answer to that

---

12:13  1   and I've not had one.
12:13  2       MR. BERGER:  You can try and get it.  It's
12:13  3   an incomplete hypothetical.  Doesn't say what site --
12:13  4       MR. BUSCH:  If you want to object to the
12:13  5   form, Norm, you can object to the form.  But I will not
12:13  6   have a speaking objection.
12:13  7       MR. BERGER:  I objected to the form.
12:13  8       MR. BUSCH:  That's fine.
12:13  9       MR. BERGER:  This is probably the fourth or
12:13  10  fifth time I
12:13  11      Q.  BY MR. BUSCH:  So go --
12:13  12      MR. BERGER:  -- you have asked the question
12:13  13  and he has answered it.
12:13  14      MR. BUSCH:  Well, he hasn't answer it.  He
12:13  15  answered --
12:13  16      Q.  BY MR. BUSCH:  Can you answer yes or no?
12:13  17      A.  I'll answer it this way.
12:13  18      Q.  No.  Can you answer it "yes" or "no"?  Because if
12:13  19  you can't, then I'll move on.
12:13  20      A.  I can answer it.
12:13  21      Q.  Okay.
12:13  22      A.  The answer is no because the regulations are
12:13  23  changing.  So you can't ask a yes-or-no question on
12:13  24  regulations that are changing.
12:13  25      Q.  And the regulations that are changing, are you

---

12:14  1   talking about the EPA screening levels, those are
12:14  2   changing?
12:14  3       A.  No.  I'm talking about the sample numbers that
12:14  4   those screening are based on.
12:14  5       Q.  You're aware, however, that in February 2012, the
12:14  6   EPA promulgated new screening levels for PCE vapor;
12:14  7   correct?
12:14  8       A.  I quoted them to you.
12:14  9       Q.  And they're not in your paper though, are they?
12:14  10      A.  They're not, no.
12:14  11      Q.  Okay.  Do you, um, do you find fault with those
12:14  12  newly promulgated screening levels by the EPA?
12:14  13      A.  I find fault with the data that goes into those
12:14  14  screening levels.  And the way that that data is
12:15  15  checked, for example, when one takes a soil gas sample.
12:15  16      I'm the chairman of the national committee that
12:15  17  wrote those standards.  I was responsible for developing
12:15  18  the standard on how to take an active soil gas sample,
12:15  19  how to take a passive soil gas sample, how to take a
12:15  20  direct soil gas sample.  And so I'm intimately involved
12:15  21  with these national standards.  And I would indicate to
12:15  22  you that based on the dynamic behavior of soil gasses,
12:15  23  it's all going to change.
12:15  24      And I had a uniform consensus two weeks ago at an
12:15  25  international meeting that one needs to look at the

| | |
|---|---|
| 12:15 | 1 | dynamic behavior of soil gas. |
| 12:15 | 2 | That's why in my report what I recommended was |
| 12:15 | 3 | continuous soil gas measurements. The only example |
| 12:15 | 4 | of -- of measurements for PCE over time was done by |
| 12:16 | 5 | Mr. Nada. And those results showed wild swings in |
| 12:16 | 6 | concentration. So we know what's happening there. |
| 12:16 | 7 | But the results that you're talking about, sir, |
| 12:16 | 8 | are one or two data points. And there's not enough data |
| 12:16 | 9 | over time to -- to -- to make the decision that's being |
| 12:16 | 10 | made here. |
| 12:16 | 11 | Q. Have you ever operated as a remediation manager |
| 12:16 | 12 | where continuous monitoring has been used? |
| 12:16 | 13 | A. I think that the -- whole concept of |
| 12:16 | 14 | continuous monitoring is just coming to light. And I |
| 12:16 | 15 | chaired the first meeting on it, the first international |
| 12:16 | 16 | meeting on it. |
| 12:16 | 17 | Q. And that was two weeks ago? |
| 12:17 | 18 | A. Two weeks ago. I was aware of that earlier. |
| 12:17 | 19 | I've been aware for a long time. |
| 12:17 | 20 | Q. But my point it, have you ever served as an |
| 12:17 | 21 | overseer of a continuous monitoring program with regard |
| 12:17 | 22 | to PCE in the field? |
| 12:17 | 23 | A. I have not, but I have written the fundamental |
| 12:17 | 24 | papers on that subject. |
| 12:17 | 25 | Q. Assuming for the moment that there were a |

| | |
|---|---|
| 12:17 | 1 | condition where the PCE vapor were in excess of the |
| 12:17 | 2 | screening levels, which, I believe, indoor air is |
| 12:18 | 3 | 6 parts per become billion by volume -- |
| 12:18 | 4 | A. Yes, sir. |
| 12:18 | 5 | Q. Assuming that to be the case, what, in your |
| 12:18 | 6 | experience, is the typical remed- -- or remedy? |
| 12:18 | 7 | MR. BERGER: For -- for what? |
| 12:18 | 8 | MR. BUSCH: For -- |
| 12:18 | 9 | MR. BERGER: The source of it or for the |
| 12:18 | 10 | home? |
| 12:18 | 11 | MR. BUSCH: For the home. |
| 12:18 | 12 | THE WITNESS: The typical remedy has a lot |
| 12:18 | 13 | to do with the site that's involved. For example, at |
| 12:18 | 14 | Fort Bragg, what they did was simply to move all the |
| 12:18 | 15 | houses, dig up everything below it. |
| 12:18 | 16 | At other locations what they will do is they |
| 12:18 | 17 | will put some kind of a liner under the bottom of the |
| 12:18 | 18 | facility to preclude the gasses from coming up. |
| 12:18 | 19 | At other facilities what they will do is |
| 12:19 | 20 | they will put in a subslab depressurization system. And |
| 12:19 | 21 | I believe that that's what was attempted at this |
| 12:19 | 22 | location. |
| 12:19 | 23 | Q. BY MR. BUSCH: And is that an adequate remedy -- |
| 12:19 | 24 | A. Ah -- |
| 12:19 | 25 | Q. -- for the home? |

| | |
|---|---|
| 12:19 | 1 | A. That becomes cite specific. |
| 12:19 | 2 | Q. Have you rendered any opinion as to this site |
| 12:19 | 3 | specific as to whether that's an adequate remedy for the |
| 12:19 | 4 | indoor air of the homes? |
| 12:19 | 5 | A. I think this system has been poorly designed. I |
| 12:19 | 6 | was standing next to the homes. I walked into the |
| 12:19 | 7 | basement of the homes to see exactly where the |
| 12:19 | 8 | pressurization system was. |
| 12:19 | 9 | I looked at the downspouts from the homes, where |
| 12:19 | 10 | the water came off the roof. And the downspouts came |
| 12:19 | 11 | down exactly where the pressurization system was. And |
| 12:20 | 12 | anybody that deals with the vadose zone and soil |
| 12:20 | 13 | moisture knows that if you've got high soil moisture, |
| 12:20 | 14 | sometimes called the incubus status of soil moisture, |
| 12:20 | 15 | you're not getting any gas migration; and therefore, |
| 12:20 | 16 | where the pressurization systems are relevant to |
| 12:20 | 17 | downspouts, they're simply not working. That means the |
| 12:20 | 18 | rest of the home is at exposure. |
| 12:20 | 19 | Q. So it's not necessarily a criticism in the Class |
| 12:20 | 20 | Area of a subslab depressurization system, it's the |
| 12:20 | 21 | installation and location that's impacting on its |
| 12:20 | 22 | remedial impact, effect? |
| 12:20 | 23 | A. I think that's part of it, sir, yes. |
| 12:20 | 24 | The other part is that, you know, they've got a |
| 12:20 | 25 | fair amount of soil moisture there. So they've got to |

| | |
|---|---|
| 12:20 | 1 | understand the soil moisture situation in order to |
| 12:20 | 2 | understand where the gasses are coming up. And nobody's |
| 12:21 | 3 | looked at soil moisture and the behavior of the soil |
| 12:21 | 4 | gasses related to this soil moisture. |
| 12:21 | 5 | Q. Had that data been taken into consideration, |
| 12:21 | 6 | would a subslab depressurization system be an |
| 12:21 | 7 | appropriate remedy for the indoor air, assuming it were |
| 12:21 | 8 | above screening levels? |
| 12:21 | 9 | A. I think, sir, if it's done correctly, it's a good |
| 12:21 | 10 | approach, yes. |
| 12:21 | 11 | Q. Okay. If PCE vapor were the only issue in this |
| 12:21 | 12 | matter, and if the PCE subslab depressurization system |
| 12:21 | 13 | were properly installed, then these homes, in your |
| 12:22 | 14 | opinion, would not be subject to or would not present an |
| 12:22 | 15 | imminent and substantial danger to the residents, would |
| 12:22 | 16 | it? |
| 12:22 | 17 | MR. BERGER: Objection to the form. |
| 12:22 | 18 | Q. BY MR. BUSCH: Go ahead and answer. |
| 12:22 | 19 | A. Well, I think it is endangerment to human health |
| 12:22 | 20 | in the environment. |
| 12:22 | 21 | My position is that Madison-Kipp has severely |
| 12:22 | 22 | damaged the groundwater supply to these families. And I |
| 12:22 | 23 | believe that that is an imminent and substantial |
| 12:22 | 24 | endangerment. And I will fully expect that the City of |
| 12:22 | 25 | Madison will agree with me once they realize how bad |



| | |
|---|---|
| 12:22 | 1 | things are. |
| 12:23 | 2 | MR. BUSCH:  We're at 12:20.  I still have |
| 12:23 | 3 | substantial amounts to go.  I recognize I've taken you |
| 12:23 | 4 | 20 minutes beyond the hour. |
| 12:23 | 5 | If you want to break for lunch -- |
| 12:23 | 6 | I don't want to bring food in here.  I think |
| 12:23 | 7 | that -- that becomes a problem.  So if you want to take |
| 12:23 | 8 | a break.  I don't need to take a break for lunch. |
| 12:23 | 9 | I can't tell you how much longer I'm going |
| 12:23 | 10 | to be but I'm going to be more than an hour and I'll |
| 12:23 | 11 | wrap.  And I know these ladies and gentlemen will ask |
| 12:23 | 12 | questions. |
| 12:23 | 13 | So if you want to break for lunch, I think |
| 12:23 | 14 | this would be a good time to do it. |
| 12:23 | 15 | THE WITNESS:  Thank you, sir. |
| 12:23 | 16 | THE VIDEOGRAPHER:  We're off the record at |
| 12:23 | 17 | 12:23 p.m. |
| 01:12 | 18 | (The lunch break was taken at 12:23 p.m.) |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

---

| | |
|---|---|
| | 1 | SANTA BARBARA, CALIFORNIA; THURSDAY, FEBRUARY 14, 2013 |
| | 2 | 1:12 P.M. |
| | 3 | |
| | 4 | (The proceedings reconvened with all |
| | 5 | parties present as before with the exception |
| | 6 | of Mr. Johnson.) |
| | 7 | |
| 01:12 | 8 | THE VIDEOGRAPHER:  We are back on the record |
| 01:12 | 9 | at one 1:12 p.m. |
| 01:12 | 10 | |
| 01:12 | 11 | EXAMINATION (continued) |
| 01:12 | 12 | BY MR. BUSCH: |
| 01:12 | 13 | Q.  Dr. Everett, we have spoken and your report |
| 01:12 | 14 | reflects from time to time a distinction between shallow |
| 01:12 | 15 | groundwater and deep groundwater. |
| 01:12 | 16 | Is there a depth at which -- which determines |
| 01:12 | 17 | what is shallow groundwater? |
| 01:12 | 18 | A.  In this case, shallow groundwater is really |
| 01:13 | 19 | defined by where the shallow well screens are.  So it's |
| 01:13 | 20 | really dictated by what's been put in the ground.  So |
| 01:13 | 21 | shallow to one person might not be shallow to another |
| 01:13 | 22 | person, sir. |
| 01:13 | 23 | Q.  Do you have an opinion, in this case, as to what |
| 01:13 | 24 | the depth is that defines shallow, the differentiation |
| 01:13 | 25 | between shallow and groundwater? |

---

| | |
|---|---|
| 01:13 | 1 | A.  I haven't tried to come up with a depth I would |
| 01:13 | 2 | call shallow and which one was deep.  The obvious |
| 01:13 | 3 | difference being that the -- as you go further into the |
| 01:13 | 4 | fractured rock, you get further into the deep |
| 01:14 | 5 | groundwater. |
| 01:14 | 6 | Q.  But just to follow through, there's no number at |
| 01:14 | 7 | depth -- you do not have an opinion as to a certain |
| 01:14 | 8 | depth at which defines or differentiates shallow from |
| 01:14 | 9 | deep in this case; correct? |
| 01:14 | 10 | A.  I do not.  I am not trying to do that, no, sir. |
| 01:14 | 11 | (Mr. Johnson rejoins the proceedings.) |
| 01:14 | 12 | Q.  BY MR. BUSCH:  Are you familiar with the concept |
| 01:14 | 13 | of background in relation to PCE vapor? |
| 01:14 | 14 | A.  I'm aware of it, yes, sir. |
| 01:14 | 15 | Q.  And did you take the background into |
| 01:14 | 16 | consideration at all in any of your opinions as |
| 01:14 | 17 | reflected in Exhibit 1 as supplemented by Exhibit 2? |
| 01:14 | 18 | A.  In fact, that's my whole argument, that it really |
| 01:14 | 19 | is the background that is the source, background in |
| 01:15 | 20 | terms of the distribution of sources at the surface, the |
| 01:15 | 21 | background in terms of the distribution of sources in |
| 01:15 | 22 | the subsurface, and the background of contributions |
| 01:15 | 23 | from, let's say, household products. |
| 01:15 | 24 | Q.  That your opinion is that a differentiation has |
| 01:15 | 25 | not been made; is that what your opinion is? |

---

| | |
|---|---|
| 01:15 | 1 | A.  That's correct, sir. |
| 01:15 | 2 | Q.  Okay.  Did -- did you take into consideration at |
| 01:15 | 3 | all in your opinion the 2011 EPA study on background |
| 01:15 | 4 | indoor air concentrations of follow-through organic |
| 01:15 | 5 | compounds? |
| 01:15 | 6 | A.  I'm aware of it, yes, sir. |
| 01:15 | 7 | Q.  Did you take it into consideration in your |
| 01:16 | 8 | opinion? |
| 01:16 | 9 | A.  I did, sir. |
| 01:16 | 10 | Q.  How -- how did you do so -- |
| 01:16 | 11 | Excuse me. |
| 01:16 | 12 | In what respect? |
| 01:16 | 13 | A.  In that EPA's preferred vapor intrusion approach |
| 01:16 | 14 | involves multiple lines of evidence.  And one of those |
| 01:16 | 15 | lines of evidence that is often a point to, is the |
| 01:16 | 16 | document that you're speaking to, the line of evidence |
| 01:16 | 17 | of what is in a background conditions in homes across |
| 01:16 | 18 | America and industries across America. |
| 01:16 | 19 | But multiple lines of evidence goes beyond that. |
| 01:16 | 20 | The multiple lines of evidence that I included in my |
| 01:16 | 21 | decisions was the concentrations at Madison-Kipp, the |
| 01:16 | 22 | proximity of the houses to Madison-Kipp, the grading of |
| 01:16 | 23 | the water from Madison-Kipp to the homes.  And so there |
| 01:16 | 24 | was a multiple lines of evidence that I considered in |
| 01:17 | 25 | the, coming up with my position.  But that was one of |

01:17 1 them, sir.

01:17 2 Q. Now, I believe you testified that you had access

01:17 3 to 34 homes at least that are the Class members?

01:17 4 A. If I said that, I perhaps misspoke. I'm sure I

01:17 5 would have had access had I asked. But what I asked for

01:17 6 was homes that really had the depressurization systems.

01:17 7 Q. All right.

01:17 8 A. And those are the ones that I accessed, sir.

01:17 9 Q. Okay. Have you done or did you request a

01:17 10 cataloguing of potentially PCE containing materials for

01:17 11 each of the Class members' homes?

01:17 12 A. I've seen those kinds of lists.

01:17 13 And did I specifically ask for that cataloguing?

01:18 14 I did not, sir.

01:18 15 But I'm well aware that the cataloguing of those

01:18 16 sources, in addition to a number of other things, come

01:18 17 to play in vapor intrusion evaluations.

01:18 18 Q. And at least in this case you have not asked for

01:18 19 that for each of the homes?

01:18 20 A. I have not, sir.

01:18 21 Q. In your report, you note that at some point in

01:19 22 time the employees of Madison-Kipp would use waste oil

01:19 23 as a means of depth suppression.

01:19 24 Do you recall that?

01:19 25 A. Yes, I do, sir.

---

01:19 1 Q. Okay. And as you sit here today, do you know or

01:19 2 do you have a belief as to when that practice stopped?

01:19 3 A. I believe it stopped in the early to mid '70s,

01:19 4 sir.

01:19 5 Q. Okay. Using that as a reference point, do you

01:19 6 have any knowledge?

01:19 7 (Interruption at the door.)

01:19 8 MR. BUSCH: Why don't we just take a timeout

01:20 9 here.

01:20 10 THE VIDEOGRAPHER: Probably take a timeout

01:20 11 because of the sounds.

01:20 12 MR. BUSCH: Yeah. That's what I think.

01:20 13 THE VIDEOGRAPHER: Just a moment, please.

01:20 14 We are off the record at 1:20 p.m.

01:25 15 (Recess taken: 1:20 p.m. to 1:25 p.m.)

01:25 16 THE VIDEOGRAPHER: We are back on the record

01:25 17 at 1:25 p.m.

01:25 18 Q. BY MR. BUSCH: Are you familiar with the

01:25 19 prevalence of the, if at all, of the practice prior to

01:25 20 say 1978, '79, of using waste oil that contained PCBs

01:26 21 and perhaps PCEs as a depth suppressant in Wisconsin?

01:26 22 A. I'm not aware of the history of thus suppression

01:26 23 in Wisconsin. Although kind of growing up in the

01:26 24 country, I recall that oils were used for depth

01:26 25 suppression as well as water as part of my growing up

---

01:26 1 experience.

01:26 2 Q. And to the extent that you testify or that your

01:26 3 opinion is based upon failure to meet a standard in

01:26 4 regard to use of waste oil as a depth suppressant, what

01:26 5 standard are you using below which you believe

01:26 6 Madison-Kipp fell in its use of waste oil as a depth

01:27 7 suppressant?

01:27 8 MR. BERGER: Asked and answered.

01:27 9 You can answer.

01:27 10 THE WITNESS: I'm taking my insights from

01:27 11 both experience and from the environmental manager at

01:27 12 Madison-Kipp who was there for 31 years. And his

01:27 13 position was that it was waste disposal. His position

01:27 14 was that this was a convenient way of getting rid of the

01:27 15 hazardous waste and that when the gravel parking lots

01:27 16 were covered over and Madison-Kipp didn't have the

01:27 17 convenience of dumping it out and of spraying it on the

01:27 18 gravel, that they then wanted to come into compliance

01:28 19 and found a recycler who apparently was the old septic

01:28 20 truck operator, Max. And it was Max that started to

01:28 21 vacuum up this hazardous waste and hopefully dispose of

01:28 22 it reliably.

01:28 23 But the position of the folks at

01:28 24 Madison-Kipp was this was depth suppression and waste

01:28 25 disposal.

---

01:28 1 Q. BY MR. BUSCH: To the extent that it was used as

01:28 2 a depth suppressant, did that fall, in your opinion,

01:28 3 below the standard of care that was used in, prior to

01:28 4 1978?

01:28 5 A. I believe so. And the reason is, through my

01:28 6 experience and familiarity, the oils that are typically

01:28 7 used were petroleum based oils and not hydraulic oils

01:28 8 with PCBs in them. It was really the PCBs that were

01:29 9 unacceptable, in addition to the PAHs in the hydraulic

01:29 10 oils.

01:29 11 Q. So is it your understanding that if the standard

01:29 12 of care as of 1978 or '79 that there was -- that oils

01:29 13 containing PCBs were not used generally as a depth

01:29 14 suppressant?

01:29 15 A. It was my appreciation that industrial chemicals

01:29 16 should not be disposed this way. However, petroleum

01:29 17 based chemicals had been used and -- in the past. So

01:29 18 I'm making the distinction between petroleum based oils

01:29 19 and hazardous waste or industrial chemicals. There was

01:29 20 a distinction there that I was making.

01:29 21 Q. You would acknowledge that -- that PCB containing

01:30 22 materials were used as a depth suppressant generally and

01:30 23 accepted as such at some point in time, would you not?

01:30 24 A. I couldn't speak to that. I just know that it

01:30 25 was done here and resulted in substantial contamination,

```
01:30   1    sir.
01:30   2        Q.  But you don't know as a general proposition PCB
01:30   3    containing materials were used as a depth suppressant
01:30   4    throughout the state of Wisconsin at some point in time?
01:30   5        A.  I don't know the history of use in the state of
01:30   6    Wisconsin to be able to respond to that, sir.
01:30   7        Q.  Do you know the history of the use PCB containing
01:30   8    materials as a depth suppressant throughout the
01:30   9    United States?
01:30  10        A.  I haven't made that evaluation.  But my feelings
01:30  11    are, once again, these are industrial hazardous wastes
01:31  12    and should not be disposed this way.  And that was
01:31  13    recognized back until the, you know, the '50s.  And I
01:31  14    have references to that effect.
01:31  15        Q.  But in regards to PCB containing materials, you
01:31  16    do not -- you don't have knowledge as to whether it was
01:31  17    a common practice to use PCB containing materials as a
01:31  18    depth suppressant up until the mid '70s.  You don't have
01:31  19    any knowledge in respect to that?
01:31  20        A.  I have not seen that in the material I've been
01:31  21    exposed to, no, sir.
01:31  22        Q.  You stated, page 51, that there should be an
01:32  23    investigation of prevailing winds in order to better
01:32  24    understand the potential distribution of contaminants by
01:32  25    airborne deposition.
```

---

```
01:32   1        Do you see that?
01:32   2        And I'm referencing the last full paragraph.
01:32   3        Do you see that second sentence, page 51?
01:32   4        A.  Page 51, second sentence, last full paragraph.
01:32   5        Q.  Starts with This investigation....
01:32   6        A.  I do, sir.  This investigation goes....
01:32   7        Yes, sir.
01:32   8        Q.  And you have not done a assessment -- an
01:32   9    assessment of prevailing winds, have you?
01:32  10        A.  The assessment that I did had to do with the
01:32  11    winds associated with the exhaust fans.  And that showed
01:32  12    me that there was a clear relationship between the
01:32  13    exhaust fans and the distribution of PAHs and the PCBs
01:33  14    along Waubesa, along the backyards of the homes on
01:33  15    Waubesa.
01:33  16        Q.  That's in -- but in regard to the prevailing
01:33  17    winds and air deposition that come through the stacks,
01:33  18    you've not done an investigation of that; correct?
01:33  19        A.  I have not, sir.
01:33  20        Q.  Okay.
01:33  21        A.  We looked at it, we considered it, felt it should
01:33  22    be done, but we didn't do it.
01:33  23        Q.  Okay.  Have you undertaken any study as to what
01:34  24    if any of the PAH found in the soils in the Class Area
01:34  25    are attributable to sources other than Madison-Kipp, if
```

---

```
01:34   1    any?
01:34   2        A.  What I did relevant to that was to review the PAH
01:34   3    document.  And the PAH document said that the
01:34   4    Madison-Kipp facility could be characterized by the
01:34   5    samples which have low molecular weight naphthalene
01:34   6    PAHs.  And I looked at the location of those samples and
01:34   7    they were -- one of the was right in front of the oil
01:35   8    shed.
01:35   9        I then looked at the PAH distribution underneath
01:35  10    Madison-Kipp and I didn't see low molecular weight
01:35  11    naphthalene soils.  So I didn't believe that that
01:35  12    characterization was correct.
01:35  13        What then did was to look at the PAHs on these
01:35  14    folks' backyards.  And I found that in every one of
01:35  15    their yards was benzo(a)pyrene, perhaps the worst of all
01:35  16    the PAHs.  So every of the homes adjacent to
01:35  17    Madison-Kipp, we had benzo(a)pyrene.
01:35  18        And so the PAH document put together by ARCADIS
01:35  19    said, Well, we've got benzo(a)pyrene in all of the homes
01:36  20    around the area, and we don't have any benzo(a)pyrene at
01:36  21    Madison-Kipp; so therefore, Madison-Kipp is not source.
01:36  22        And so now that we have this new data, we have,
01:36  23    you know, lots of benzo(a)pyrene underneath the
01:36  24    foundation.  So the whole premise of the PAH report now
01:36  25    is completely undermined.
```

---

```
01:36   1        Q.  But you yourself have not undertaken to ascertain
01:36   2    if any of the PAH located on the Class member's property
01:36   3    is from the source other than Madison-Kipp?
01:36   4        A.  I've looked at other sources in the area, but I
01:36   5    haven't done that quantitative no, sir.
01:37   6        Q.  Page 55, you reference a pilot program where you
01:37   7    recommend that three to five of the homes with the
01:37   8    highest VOC detection in shallow soil or subslab
01:37   9    vapor -- excuse me -- yeah -- and three to five of the
01:37  10    homes with the lowest VOC detections be equipped be
01:37  11    continuous monitoring equipment.
01:37  12        Do you see that?
01:37  13        A.  I do, sir.
01:37  14        Q.  And what continuous monitoring equipment do you
01:37  15    believe would provide the kind of data that you believe
01:38  16    is important in the program?
01:38  17        A.  I believe that there is equipment out there that
01:38  18    can measure VOCs continuously to look at the change in
01:38  19    concentration over time.  This is very new equipment but
01:38  20    it's, to my delight, available now.
01:38  21        Q.  Can you give me the name of it, the manufacturer?
01:38  22        A.  Yes R.J. Lee, sir.
01:38  23        Q.  L-e-e?
01:38  24        A.  Yes, sir.
01:38  25        Q.  And what -- does the -- does the equipment have a
```

```
01:38   1   common name?
01:38   2       A.  Yes.  It's called a proton transfer capability.
01:39   3       Q.  Have you seen an R.J. Lee proton transfer capable
01:39   4   in action?
01:39   5       A.  Have I physically stood next to it?  No.  But
01:39   6   I've been aware of it now for several months.  And it
01:39   7   was a one of the key papers at my symposium two weeks
01:39   8   ago, sir.
01:39   9       Q.  Are --
01:39  10       A.  That's just one example of how it could be done.
01:39  11       Q.  Are you aware of others?
01:39  12       A.  Oh, yes.  I think there is the ability to take
01:39  13   samples with frequency enough to determine whether there
01:39  14   is any dynamic behavior of these gasses.
01:39  15       Q.  Is the R.J. Lee equipment and/or continuous
01:40  16   monitoring effective in the presence if a subslab
01:40  17   mitigation system?
01:40  18       A.  Depends on where you're taking the samples, sir.
01:40  19   If you were taking it in the house, it would tell you
01:40  20   what the range is, the variations in the house.
01:40  21       If you were to use it to take subslab samples, it
01:40  22   would tell you what the dynamics are in the subslab.
01:40  23       If you were to take a soil gas sample at some
01:40  24   particular depth, it would tell you what the dynamics
01:40  25   are at that particular depth, sir.
```

---

```
01:40   1       Q.  Are the dynamics of which you speak impacted at
01:40   2   all by the presence of a subslab mitigation system, to
01:41   3   your knowledge?
01:41   4       A.  If the system was on, I believe that it would
01:41   5   affect it, sir.
01:41   6       Q.  And how?
01:41   7       A.  Well, it would -- the subslab system is designed
01:41   8   to create a vacuum to aspirate, if you will, the gasses.
01:41   9   And that's going to artificially change the dynamics.
01:41  10       Q.  And how would it artificially change the
01:41  11   dynamics?
01:41  12       A.  It would tend to reduce concentration and alter
01:41  13   the natural behavior of the soil gasses.
01:41  14       Q.  You're aware that there's an S- -- a soil vapor
01:41  15   extraction system that has been installed at
01:41  16   Madison-Kipp?
01:41  17       A.  I am, sir.
01:41  18       Q.  That -- and a term for that, if we used the term
01:42  19   SVE, do you know of which I speak?
01:42  20       A.  Yes, sir.
01:42  21       Q.  Okay.  In your opinion, is the SVE system
01:42  22   installed at Madison-Kipp effective in providing a
01:42  23   remedy to the VOCs in the soil?
01:42  24       A.  I think that the SVE system is a very good system
01:42  25   to reduce the VOCs in soil when you have the appropriate
```

---

```
01:42   1   soil conditions.
01:42   2       And going further, what that means is that the
01:42   3   soil would have to have the capability of allowing
01:42   4   gasses to migrate.  So if you have fine grain soils
01:42   5   salts and clays like we have here and you have high soil
01:43   6   moisture like we have here, SVE would have a very
01:43   7   limited application.
01:43   8       Does SVE help to knock down the mess?  Yes.
01:43   9       But is it going to be the solution at this site?
01:43  10   I don't think so because of the clays and the high soil
01:43  11   moisture contents.
01:43  12       Q.  And so in addition to, or as a substitute for the
01:43  13   SVE in regard to the soil, what's your recommended
01:43  14   remedy?
01:43  15       A.  My recommended remedy would be to figure out
01:43  16   where the DNAPL is in the soil.  Because in order get
01:43  17   these high concentrations at depth, it has to come in
01:44  18   the surface.  So that means there has to be DNAPL in the
01:44  19   soil that hasn't been found yet.
01:44  20       Q.  At a closer to the surface than what has, in your
01:44  21   opinion, been determined heretofore?
01:44  22       A.  Yes, if -- if the facts are correct relative to
01:44  23   Mr. Lenz, they're dumping buckets out the door and it's
01:44  24   going down.
01:44  25       So then the question is:  Where is the DNAPL?
```

---

```
01:44   1   Because the DNAPL will move based on gravity, wherever
01:44   2   it wants to go based on gravity.  So that is very hard
01:44   3   to track.
01:44   4       There hasn't been any DNAPL characterization here
01:44   5   so we don't know the what the source is.
01:44   6       And you would never use SVE to clean up a DNAPL
01:44   7   site.
01:44   8       Q.  Have you evaluated at all the performance of the
01:44   9   SVE system to determine if it's removing soil vapors at
01:45  10   the site?
01:45  11       A.  Oh, I believe it is removing vapors, sir.  And I
01:45  12   think it is knocking down the mask, yes.
01:45  13       MR. WEISS:  I'm sorry.  Could you just
01:45  14   repeat your last answer.
01:45  15       THE WITNESS:  I believe that the soil vapor
01:45  16   extraction system is working and that it is bringing
01:45  17   down the mask for the concentration in question.
01:45  18       And is it going to bring it down far enough
01:45  19   to justify shutting it off, and is it going to be to be
01:45  20   effective at all locations where we have fine grain
01:45  21   materials with a high soil moisture content?
01:45  22       Q.  BY MR. BUSCH:  At Exhibit 10 of your report, you
01:46  23   list the homes that you believe should have a reliable
01:46  24   subslab mitigation system; correct?
01:46  25       A.  That's correct, sir, yes.
```

```
01:46  1    Q.  Have you communicated that fact, that is the fact
01:46  2  contained on Exhibit 10, have you communicated that to
01:46  3  the Class members do you know?
01:46  4    A.  I do know.  And I have not done that and would
01:46  5  not do that.
01:46  6    Q.  Why not?
01:46  7    A.  It's not my place to do that, sir, so I wouldn't
01:46  8  do that.
01:46  9    Q.  Do you know how many of the homes that you've
01:46 10  listed on Exhibit 10 have subslab depressurization
01:47 11  systems?
01:47 12       MR. BERGER:  As right now as of now?
01:47 13       MR. BUSCH:  Yeah.  As of now.
01:47 14       MR. BERGER:  If you know.
01:47 15       THE WITNESS:  Well, the green ones, sir,
01:47 16  would be the ones that have it now, plus the new ones as
01:47 17  I understand it.
01:47 18       So on Exhibit 10, the homes in green have an
01:47 19  existing vapor extraction system.
01:47 20    Q.  BY MR. BUSCH:  Are you aware of the protocol that
01:47 21  the DNR has established the installation of subslab
01:47 22  depressurization systems?
01:47 23    A.  I believe that I read that in Mr. Schmoller's
01:47 24  deposition, yes.
01:47 25    Q.  And do you believe the protocol established by
```

Page: 124

---

```
01:47  1  the DNR is consistent with your opinion as set forth in
01:47  2  page 57 and as demonstrated in Exhibit 10?
01:47  3    A.  I believe that it is, sir, for the following
01:48  4  reasons:  The regulator in this case was of the opinion
01:48  5  that he had multiple lines of evidence to feel
01:48  6  comfortable that these homes were not at risk.
01:48  7       The terms that he used was he wanted to know
01:48  8  where the sources were before he would give up, so to
01:48  9  speak, on these systems.  So as long as there was a lack
01:48 10  of understanding where the sources were, he continued to
01:48 11  use that protocol.
01:48 12       And my position is exactly that:  Even now, we
01:48 13  don't what the sources are.  So if you don't know the
01:48 14  sources, you need to err on the side of families.  And I
01:48 15  think that's the appropriate thing to do.
01:49 16    Q.  Do you believe that the protocol established by
01:49 17  the DNR provides a ten-fold factor of safety above the
01:49 18  2012 screening levels establish by the EPA?
01:49 19    A.  I don't know that because the site hasn't been
01:49 20  characterized in order make that decision, sir.
01:49 21    Q.  So you don't believe that to be the case?
01:49 22    A.  I believe that that kind of decision can only be
01:49 23  made when the site is characterized correctly.
01:49 24    Q.  So the answer is you don't -- you don't agree
01:49 25  with that?
```

Page: 125

---

```
01:49  1    A.  Oh, I don't agree with that, sir.
01:49  2    Q.  I'm sorry my question was not precise.
01:49  3       We spoke at length earlier about the potential
01:50  4  remedies once, in your opinion, the appropriate
01:50  5  characterization has been determine -- made, that long
01:50  6  term, in-situ chemical oxidation is a preferred remedy
01:50  7  but may need to be supplemented with a pumping -- I
01:50  8  don't know whether you call it a blocking mechanism.
01:50  9    A.  Capture zone.
01:50 10    Q.  Capture zone?
01:50 11    A.  Sure.  Yes, sir.
01:50 12       But I wouldn't agree with your characterization,
01:50 13  sir.
01:50 14    Q.  How would you characterize the appropriate remedy
01:51 15  for the deep groundwater?
01:51 16    A.  I think that it'd be ISCO, if I could use the
01:51 17  acronym.
01:51 18    Q.  Yes.
01:51 19    A.  The ISCO approach is fine for unconsolidated
01:51 20  materials.  That means not the bedrock.  The
01:51 21  unconsolidated materials would be where that would be
01:51 22  effective.  If -- if one was able to inject the
01:51 23  oxidizing material into the fine grain salts and clays
01:51 24  to get enough spreading, enough impact in an area that
01:51 25  would clean it up, that kind of appreciation of the
```

Page: 126

---

```
01:51  1  ability to inject material into salts and clays hasn't
01:51  2  been determined yet.
01:51  3       Secondly, when you get into the deep fractured
01:51  4  rock, that's quite difference.  At these kinds of
01:52  5  depths, in my opinion, there will probably be an attempt
01:52  6  at ISCO, and that attempt will result in knocking down
01:52  7  the concentrations of the mass.
01:52  8       But I don't think it will come close to knocking
01:52  9  down the concentrations or the mask to an acceptable
01:52 10  level.  And that means in order to clean up fractured
01:52 11  rock, you need to go to a more expensive technology and
01:52 12  I'm suggesting that that technology is six-phase
01:52 13  heating.
01:52 14    Q.  Describe for me the six-phase heating technology.
01:52 15    A.  At the national test site what was demonstrated
01:52 16  was we would characterize the site to begin with to try
01:53 17  to get a mass number, how much contamination is in a
01:53 18  certain air and then at strategical locations we would
01:53 19  drill down to the depth of concern.  And then we would
01:53 20  introduce, in effect, electrodes over vertical profiles
01:53 21  from in the depth of the land surface.  And then we
01:53 22  would introduce current into each one of these
01:53 23  electrodes.  And what they would do is to heat up the
01:53 24  rock above the vulcanization point of the PCE and TCE.
01:53 25  And that would cause all the gasses to vulcanize and to
```

Page: 127

```
01:53   1   come up.
01:53   2       Q.  Have you seen, other than at the national test
01:53   3   site, have you seen the six-phase heating technique used
01:53   4   in the field?
01:54   5       A.  Oh, yes.  When I was with Shaw, there was a
01:54   6   couple of large projects that we did.
01:54   7       Q.  Do you have an understanding as to what the
01:54   8   cleanup levels will be for the site groundwater as set
01:54   9   by the DNR?
01:54  10       A.  The -- the cleanup number expressed by
01:54  11   Mr. Johnson was the MCL, which is 5 parts per billion
01:54  12   for PCE.  I think that's completely unrealistic and will
01:54  13   not happen.
01:54  14       So at some number above that is where we're going
01:54  15   to wind up being.  The only question is:  How do you
01:54  16   handle that?
01:54  17       Do you have deed restrictions?
01:54  18       Do you have deed restrictions that go beyond
01:54  19   Madison-Kipp?
01:55  20       It's called a site management plan, how do you
01:55  21   handle the situation when you know you are leaving
01:55  22   contamination in the ground.
01:55  23       MR. BUSCH:  Norm, I'm going to have a few
01:55  24   more questions frankly I think I'll be able to
01:55  25   consolidate them as opposed to sitting here turning
```

```
01:55   1   pages.
01:55   2       MR. BERGER:  That's fine.  Thank you.
01:55   3       THE VIDEOGRAPHER:  Just a moment please.  We
01:55   4   are off the record at 1:55 p.m.
02:05   5       (Recess taken:  1:55 p.m. to 2:05 p.m.)
02:05   6       THE VIDEOGRAPHER:  We are back on the record
02:05   7   at 2:05 p.m.
02:05   8       Q.  BY MR. BUSCH:  Dr. Everett, to your knowledge, at
02:05   9   City Well 8 has there been detected any PCB?
02:06  10       A.  I don't believe as yet, sir.
02:06  11       Q.  To your knowledge, at City Well 8 has there been
02:06  12   detected any TCB?
02:06  13       A.  I don't believe there has, sir.
02:06  14       Q.  To your knowledge at City Well 8 there has been a
02:06  15   detection of cis-1,2-DCE?
02:06  16       A.  Yes, sir.
02:06  17       MR. BUSCH:  And that's cis, dash, one, dash,
02:06  18   two, dash, DCE.
02:06  19       Q.  BY MR. BUSCH:  Do you know if within the, I'll
02:06  20   call it a tributary -- and I probably have it wrong --
02:06  21   in the basin from which water drawn by City Well No. 8
02:06  22   whether there are potential sources of cis-1,2-DCE other
02:06  23   than Madison-Kipp?
02:06  24       A.  I don't know for sure, that's but a possibility
02:07  25   some.
```

```
02:07   1       Q.  Have you done any investigation to ascertain
02:07   2   that?
02:07   3       A.  What we did was to look at the tests that were
02:07   4   done relevant to turning on monitoring well, the No. 8,
02:07   5   and putting water level transducers in Monitoring
02:07   6   Well 5D2.  And when it turned on Monitoring Well 8, the
02:07   7   water went down in Well 5D2.  So that shows that there
02:07   8   is a direct hydraulic connection.
02:07   9       Secondly, we talked to the folks at the city and
02:07  10   as my material showed, they have a very high concern
02:07  11   about Madison-Kipp contaminating this well.
02:07  12       Third, they said that they are in the process,
02:08  13   but they're having some difficulty, putting in a
02:08  14   sentinel well.  And a sentinel well, sir, simply means
02:08  15   they are going to put in another well in between a
02:08  16   Madison-Kipp and their well.
02:08  17       I think the location of that well will be
02:08  18   entirely different when they -- when they find out how
02:08  19   high the concentrations are in Madison-Kipp's most
02:08  20   southerly well which is Monitoring Well 17.
02:08  21       Q.  Have you attempted to ascertain whether there are
02:08  22   any sources of cis-1,2-DCE at City Well 8 other than
02:08  23   MKC?
02:08  24       A.  I'm sure that there are other contamination sites
02:09  25   in Madison, but I have not evaluated each of those
```

```
02:09   1   relevant to the hydraulics or relevant to the kind of
02:09   2   contamination that they had or where that contamination
02:09   3   was relevant to the well.
02:09   4       Q.  Have you looked at tests for other cities of
02:09   5   Madison Water Utility wells, look at the data?
02:09   6       A.  I have not, sir.
02:09   7       Q.  Are you aware as to whether there's any well, in
02:09   8   Madison that has detectible levels of PCE?
02:09   9       A.  There may be.
02:09  10       But the City folks are most concerned about
02:09  11   Madison-Kipp relevant to this well, sir.
02:09  12       Q.  Relative to 8.  But I'm talking about other
02:09  13   wells.
02:09  14       Are you aware of any PCE appearing in other city
02:10  15   wells in the city of Madison?
02:10  16       A.  I'm not aware of it.
02:10  17       Q.  Are you aware if there's any TCE in other wells
02:10  18   in Madison?
02:10  19       A.  I'm not aware of it, but I would expect that some
02:10  20   of them would have some below level hits, yes, sir.
02:10  21       Q.  And why is that?
02:10  22       A.  Because these are very, very persistent chemicals
02:10  23   and can be drawn into a large supply well.
02:10  24       Q.  From a variety of sources; correct?
02:10  25       A.  From a variety of sources, yes, sir.
```

02:10 1    Q. What was the level of cis-1,2-DCE that was

02:10 2 reported at City Well 8?

02:10 3    A. Um, it was in the low parts per billion range I

02:10 4 believe, sir.

02:11 5      MR. BUSCH: I have completed my examination.

02:11 6      THE VIDEOGRAPHER: Just a moment, please.

02:11 7      This is the end of disk number two of volume

02:11 8 number one of the deposition of Lorne G. Everett, Ph.D.

02:11 9 on February of 14th of the year 2013. We are off the

02:11 10 record in our continuing deposition at 2:11 p.m.

02:11 11      (Recess taken: 2:11 p.m. to 2:17 p.m.)

02:17 12      THE VIDEOGRAPHER: This is the beginning of

02:17 13 media number three of volume one of the deposition of

02:17 14 Lorne G. Everett, Ph.D. on February the 14th, 2013. We

02:17 15 are continuing our deposition on record at 2:17 p.m.

02:17 16

02:17 17           EXAMINATION

02:17 18 BY MS. ROSS:

02:17 19    Q. Good afternoon, Dr. Everett.

02:17 20    A. Good afternoon.

02:17 21    Q. We introduced ourselves. I'm Rebecca Ross, and I

02:17 22 represent Continental Casualty Company and Columbia

02:17 23 Casualty Company.

02:17 24    A. Counsel, good afternoon.

02:17 25    Q. On Exhibit 2L, which I assume you still have in

---

02:17 1 front of you.

02:17 2    Do you have that document?

02:18 3    A. 2L.

02:18 4    I see it here.

02:18 5    Q. It's the study, I think.

02:18 6    A. Actually, this is 2L.

02:18 7    Q. Right, the handbook.

02:18 8    A. Yes.

02:18 9    Q. Do you know what the date is of that?

02:18 10    A. I do.

02:18 11    Q. What's that?

02:18 12    A. 1962. It's on the back page.

02:18 13    Q. Can you look at page 19 of your report, please.

02:18 14    A. I'm there, yes.

02:18 15    Q. On the bottom of that page, it begins with

02:18 16 Opinion No. 2, and it starts, "As acknowledged by

02:18 17 Madison-Kipp employees and WDNR, the company dumped and

02:18 18 spilled chemicals from the late 1940s until at least

02:19 19 1987."

02:19 20    Do you see that?

02:19 21    A. I do.

02:19 22    Q. Can you tell me where that information came from?

02:19 23 What did you rely on for that statement?

02:19 24    A. For that statement, I relied on the environmental

02:19 25 manager, Mr. James, um...

---

02:19 1    Q. Mr. Lenz?

02:19 2    A. Lenz.

02:19 3    And testimony of Mr. Schmoller.

02:19 4    Q. Do you know where the date of nineteen- -- the

02:19 5 late 1940s comes from?

02:19 6    A. I can't pinpoint that exactly but it was, I

02:19 7 believe, from those two sources.

02:19 8    Q. Do you know when the dumping and spilling of the

02:19 9 chemicals began?

02:20 10    A. I think the spilling of chemicals began very

02:20 11 early in the operation, depending on the chemicals,

02:20 12 meaning that very early in the operation of -- it was a

02:20 13 foundry. And in a foundry one has lubricants, oils, and

02:20 14 at a certain stage they began to bring in hydraulic

02:20 15 fluids. And those fluids had PCB in it.

02:20 16    So I think from the very beginning there was a

02:20 17 leakage, as you would expect, from a highly mechanized

02:20 18 operation.

02:20 19    Q. And then when did the dumping of chemicals, as

02:20 20 you understand it, begin?

02:20 21      MR. BUSCH: Object to the form.

02:20 22      THE WITNESS: I thought that the dumping

02:20 23 began in the late 1940s.

02:21 24    Q. BY MS. ROSS: And the basis -- did you rely on

02:21 25 Mr. Lenz for the late 1940s?

---

02:21 1    A. It was a combination of Mr. Lenz and

02:21 2 Mr. Schmoller.

02:21 3    Q. Now, I believe in Mr. Bush's questioning of you,

02:21 4 he asked you about the next sentence, which was, "As

02:21 5 described in Opinion 2, this disposal behavior violated

02:21 6 applicable standards of conduct which, since the 1940s,

02:21 7 recognized that dumped and spilled chemicals could

02:21 8 contaminate groundwater, and that exposure to PCE could

02:21 9 harm humans."

02:21 10    Is that correct?

02:21 11    A. I believe so, yes.

02:21 12    Q. And this is a place where I had a little trouble

02:21 13 hearing you. I know you indicated that there was a

02:21 14 Banks paper on which you relied for that statement; is

02:21 15 that correct?

02:21 16    A. That would be one of them; that's correct.

02:21 17    Q. Was there anything else that you relied on for

02:21 18 that statement?

02:21 19    A. Yes.

02:21 20    Q. What else did you rely on?

02:22 21    A. There is another reference or two that I relied

02:22 22 on. I want to say the name Conter or Conti.

02:22 23    Q. How do you spell that?

02:22 24    A. C-o-n-t-i. But I'm -- I'm sure I don't have that

02:22 25 quite right. I would check in the references to see if

02:22  1   we have it.

02:22  2       Actually, it's Colten.

02:22  3   Q.  Colten, C-o-l-t-o-n [sic].

02:22  4   A.  That's correct.

02:22  5   Q.  And --

02:22  6   A.  And Colten and Skinner.

02:22  7   Q.  Is that a report or a study or what is that

02:22  8   document?

02:22  9   A.  There's actually two documents there, and they're

02:22 10   like chapters in a document.  So they're, like, review

02:22 11   papers.

02:22 12   Q.  And did those documents deal with applicable

02:23 13   standards of conduct?

02:23 14   A.  They dealt with what we knew and the way we

02:23 15   should behave in that conduct.

02:23 16   Q.  When was the -- when were those chapters written?

02:23 17   A.  Harvey Banks' work was in the 50's, I believe.

02:23 18       Mr. Colten's work was in -- published in 1991,

02:23 19   but it's a historical perspective.

02:23 20       And Colten and Skinner's perspective was written

02:23 21   in 1996.  But once again, it's a historical perspective

02:23 22   as well.

02:23 23   Q.  Did Colten and Skinner indicate any basis for a

02:23 24   belief that the types of action that Madison-Kipp

02:23 25   allegedly undertook from the late 1940s until 1987

---

02:24  1   violated applicable standards of conduct?

02:24  2   A.  I believe that it does, yes.

02:24  3   Q.  Is there anything else that you relied on with

02:24  4   respect to that statement?

02:24  5   A.  Just my experience, which says that industrial

02:24  6   chemical disposal was a major issue because they were

02:24  7   being disposed in landfills and causing lots of problems

02:24  8   in landfills.  And as a result, we saw the emergence of

02:24  9   hazardous waste landfills to handle these industrial

02:24 10   chemicals.

02:24 11       And so the experience over time was that

02:25 12   disposing of industrial chemicals causes harm.

02:25 13   Q.  Did the manufacturers of industrial chemicals

02:25 14   provide information to their customers concerning the

02:25 15   proper disposal of chemicals between the late 1940s and

02:25 16   1987?

02:25 17       MR. BERGER:  I'm sorry.  Could I have that

02:25 18   question read back, please.

02:25 19       (The last question was read by the reporter.)

02:25 20       THE WITNESS:  I haven't tracked that.  But

02:25 21   when one thinks in terms of industry in America, they

02:25 22   typically think of American Society for Testing of

02:25 23   Materials, which develops the standards for industry.

02:25 24       And very clearly, back in 1962, there was

02:26 25   this appreciation that, at least with respect to PCE,

---

02:26  1   you couldn't dump free flowing liquids on the ground.

02:26  2   Q.  BY MS. ROSS:  Other than the documents which

02:26  3   you're referring to which I believe was 12; is that

02:26  4   correct?

02:26  5   A.  That's correct; yes.

02:26  6   Q.  Are there any other ASTM standards that relate to

02:26  7   PCE from the 1950s and the 1960s?

02:26  8   A.  There was a, actually, another document that

02:26  9   Mr. Johnson referred to.  But, I didn't bring that one

02:26 10   with me.  But it was in that same time frame.

02:26 11   Q.  When you talk about violating applicable

02:26 12   standards of conduct, are you talking about written

02:26 13   standards?

02:26 14   A.  I'm talking about written standards, not in the

02:27 15   purest sense of an ASTM standard, which is quite

02:27 16   different, but in terms of a standard of care which is

02:27 17   as written up and is identified as a way to do business

02:27 18   in an acceptable fashion.

02:27 19   Q.  The -- other than the three or four documents

02:27 20   that we have talked about, are there any other documents

02:27 21   that you are aware of in literature or otherwise,

02:27 22   that -- that were written prior to 1970 which stated

02:28 23   that exposure to PCE could harm humans?

02:28 24       MR. BERGER:  Other than the documents cited

02:28 25   in his report?

---

02:28  1       MS. ROSS:  Other than the documents we just

02:28  2   discussed.

02:28  3       MR. BERGER:  Well, there are other documents

02:28  4   cited in the report that we haven't discussed with him.

02:28  5   Q.  BY MS. ROSS:  I think you can answer.

02:28  6       MR. BERGER:  If you're talking about that

02:28  7   one issue.

02:28  8       MS. ROSS:  We're talking about the statement

02:28  9   made at the bottom of page 19 of the report.

02:28 10       THE WITNESS:  -- each of the references

02:28 11   that we have been discussing has a long bibliography

02:28 12   associated with that, and I didn't bring in all those

02:28 13   documents.  I just brought these examples; so...

02:28 14   Q.  BY MS. ROSS:  What --

02:28 15   A.  So these are examples.

02:28 16   Q.  At what point in time would you say it was

02:28 17   well-known that exposure to PCE could cause harm to

02:29 18   humans?

02:29 19       MR. BUSCH:  Object to the form.  Lack of

02:29 20   foundation.

02:29 21       THE WITNESS:  Um, my appreciation of PCE was

02:29 22   as an industrial chemical and so it was lumped into all

02:29 23   of the other industrial chemicals and how they should be

02:29 24   handled and disposed.  So that's the first part.

02:29 25       The second part is that the understanding of




02:29  1   the toxicological problems with the PCE is a -- is a bit
02:29  2   of a moving target.  As we've seen with EPA, they're
02:30  3   actually now relaxing some of the criteria for PCE and
02:30  4   that's been quite recent.  While at the same time, the
02:30  5   degradation product TCE is now proving to be more
02:30  6   onerous.  So the toxicological history of these
02:30  7   chlorinated hydrocarbons has been evolving.
02:30  8      Q.  BY MS. ROSS:  Is there a point in time at which
02:30  9   you can say in your expert opinion that it was
02:30  10  well-known in the United States that exposure to PCE
02:30  11  could harm humans?
02:30  12      MR. BUSCH:  Object to the form.  Lack of
02:30  13  foundation.
02:30  14      MR. BERGER:  Objection to the form.
02:30  15      Other than his report.  His -- in his report
02:30  16  he says it's unknown.
02:31  17      MS. ROSS:  Objection to form is noted.
02:31  18      THE WITNESS:  I personally became more
02:31  19  involved with PCE as an issue in the early '80s.  And so
02:31  20  the concern was whether PCE was a possible carcinogen or
02:31  21  was it a probably carcinogen that's the kind of verbiage
02:31  22  that I saw of all the.
02:31  23      Q.  BY MS. ROSS:  And --
02:31  24      MR. BERGER:  She's not talking about cancer
02:31  25  here; she's talking, as I understand it, any health

---

02:31  1   effects.
02:31  2      Q.  BY MS. ROSS:  Your statement on page 19 --
02:31  3      A.  Yes.
02:31  4      Q.  -- was that exposure to PCE could harm humans --
02:31  5      A.  Yes.
02:31  6      Q.  -- correct?
02:31  7      MR. BERGER:  Let her --
02:31  8      Q.  BY MS. ROSS:  And --
02:31  9      MR. BERGER:  Let her finish the question.
02:31  10     Q.  BY MS. ROSS:  In your opinion, you indicated that
02:32  11  um, the disposal behavior violated applicable standards
02:32  12  of conduct which, since the 1940s, recognized that
02:32  13  dumped and spilled chemicals can contaminate
02:32  14  groundwater.
02:32  15     That's one part.
02:32  16     A.  Yes.
02:32  17     Q.  And that exposure to PCE could harm humans?
02:32  18     A.  Yes.
02:32  19     Q.  And what I'm trying to find out want is I want
02:32  20  you to divide those up.
02:32  21     A.  Yes.
02:32  22     Q.  And I'm looking at exposure to PCE could harm
02:32  23  humans.  And I'm asking you at what point in time was
02:32  24  it -- was it clear that the disposal behavior that you
02:32  25  are talking about could result in exposure to PCE that

---

02:32  1   would harm humans -- or could harm humans.
02:32  2      MR. BERGER:  What I would say is she's
02:32  3   reading a prefatory sentence of your opinion.  And I
02:32  4   would read your pages 19 through whatever it is, 24 or
02:33  5   so, that follow.
02:33  6      MS. ROSS:  And I would ask if you want to
02:33  7   object to form, you object to the form.
02:33  8      Q.  BY MS. ROSS:  And otherwise, I'd like you to
02:33  9   answer the question I asked.
02:33  10     MR. BUSCH:  And I would object to the form.
02:33  11     THE WITNESS:  May I look at the...?
02:33  12     MR. BERGER:  Yes, you may.
02:33  13     Q.  BY MS. ROSS:  Sure.
02:33  14     (Pause in the proceedings.)
02:36  15     THE WITNESS:  Well, on page 23 in the third
02:36  16  paragraph down, there is an example given which I shall
02:36  17  read.  States:  "For example, recognizing the need to
02:36  18  limit workers' exposure, the U.S. Public Health Service
02:37  19  published Maximum Allowable Concentrations for workplace
02:37  20  exposures two PCE and other chemicals or early as 1943."
02:37  21     So there's kind of a historical record where
02:37  22  the public health felt that there was a public health
02:37  23  issue associated with PCE.  So that would be 1943.
02:37  24     Q.  BY MS. ROSS:  Is there any other basis other than
02:37  25  what we've -- we have discussed for your statement

---

02:37  1   concerning knowledge in the 1940s that PCE could harm
02:37  2   humans?
02:37  3      MR. BERGER:  Same objection.  It's been
02:37  4   asked and answered.
02:37  5      THE WITNESS:  Just all the references that
02:38  6   are contained within the references that I provided to
02:38  7   you.
02:38  8      Q.  BY MS. ROSS:  Okay.  On page 20 of your report,
02:38  9   at the very top, you talk about, "...even when strict
02:38  10  environmental protection statutes and regulations were
02:38  11  enacted in the 1970s and 1980s, Madison-Kipp nonetheless
02:38  12  continued to spill and dump these chemicals."
02:38  13     Do you see that?
02:38  14     A.  I do.
02:38  15     Q.  And what strict environmental protection statutes
02:38  16  and regulations are you referring to?
02:38  17     A.  I'm referring to the Safe Drinking Water Act.
02:38  18     Q.  Anything else?
02:38  19     A.  I'm referring to the Resource Conservation
02:38  20  Recovery Act.
02:38  21     I'm referring to Superfund and the Superfund
02:39  22  Amendments as being examples of that.
02:39  23     Q.  Immediately following that, you talk about,
02:39  24  "...applicable standards of conduct violated by
02:39  25  Madison-Kipp included:  containment and capture measures



02:39 1 for vapor degreasers, so that PCE is re-captured for
02:39 2 reuse, and not released to the environment."
02:39 3     Do you see that?
02:39 4 A. Yes, I do.
02:39 5 Q. What are you referring to in terms of applicable
02:39 6 standard of conduct?
02:39 7 A. The standard of conduct that I'm referring to is
02:39 8 the position of the United States Department of Defense
02:39 9 during the Second World War where PCE and TCE were
02:40 10 rationed and very strictly controlled to support war
02:40 11 effort. And that it would have been unacceptable to
02:40 12 simply dispose of PCE without trying recycle it and to
02:40 13 conserve it since it was such a needed part of the war
02:40 14 effort.
02:40 15 Q. And that would be during World War II?
02:40 16 A. That's correct.
02:40 17 Q. And apart from the need in World War II, is there
02:40 18 any other standard of conduct that requires spent PCE to
02:40 19 be recaptured?
02:40 20     MR. BERGER: Well --
02:40 21     THE WITNESS: Just the ASTM requirement that
02:40 22 says -- that was formalized in 1962.
02:41 23     And, as I've mentioned, I've been a chairman
02:41 24 within ASTM for a long time. And sometimes these
02:41 25 standards take as long as six years to get to this

02:41 1 point. Some of my standards took six years.
02:41 2     So although it's published in 1962, what was
02:41 3 known about it was being formalized in this document.
02:41 4 I'm sure was the standard of care several years earlier
02:41 5 than that, and that puts it in the '50's.
02:41 6 Q. BY MS. ROSS: And you're looking at 2L; is that
02:41 7 right?
02:41 8 A. Yes, I am.
02:41 9 Q. Did you have anything to do with the promulgation
02:41 10 of that standard?
02:41 11 A. I'm much too young to have worked on that one.
02:41 12 Q. The second one of the applicable standards that
02:41 13 you said were violated by Madison-Kipp was "containment
02:42 14 for PCE (and other chemical) storage tanks, so that
02:42 15 chemicals escaping the tanks are not released to the
02:42 16 environment."
02:42 17     Do you see that?
02:42 18 A. Yes, I.
02:42 19 Q. And where -- what applicable standards of conduct
02:42 20 are you referring to for that particular --
02:42 21     MR. BERGER: Again, objection to the form.
02:42 22     In addition to the ones he's already
02:42 23 identified?
02:42 24     THE WITNESS: Um, for example, in RCRA,
02:42 25 there's requirements for secondary containment

02:42 1 associated with storage tanks and a particular hazardous
02:42 2 waste or hazardous materials storage tanks. And there
02:42 3 was no secondary containment associated with the PCE at
02:42 4 Madison-Kipp; that, in fact, the releases from that
02:43 5 above ground storage tank contributed to -- contributed
02:43 6 substantially to the contamination at the site.
02:43 7 Q. BY MS. ROSS: With respect to the last statement
02:43 8 that you made that the releases from the above ground
02:43 9 storage tank contributed to contamination, are you
02:43 10 relying on Lenz for that?
02:43 11 A. Partially. What I'm really relying on is the
02:43 12 fact that I walked over to where the tank was.
02:43 13     I looked at the asphalt surface in that area
02:43 14 where the tank was, and it hadn't been characterized.
02:43 15     I looked where the drainage would go from that
02:43 16 area. And the drainage would go into a partially
02:43 17 subsurface sewer. And that subsurface sewer then went
02:43 18 into another sewer and then daylighted into an area on
02:44 19 the northeast of the facility. And so I personally saw
02:44 20 how any leakage from that tank would wind up going right
02:44 21 into the ground.
02:44 22 Q. Were there standards of conduct that prohibited
02:44 23 the dumping and spilling PCE on the bare ground other
02:44 24 than what you have referred to in Exhibit 2L?
02:44 25     MR. BERGER: And otherwise in the report?

02:44 1     MS. ROSS: No. I asked the question I
02:44 2 asked.
02:44 3     MR. BERGER: Okay. Well...
02:44 4     THE WITNESS: The --
02:44 5     MR. BERGER: If she's asking you to memorize
02:44 6 everything in the report, you can just read it to her.
02:44 7     MS. ROSS: Mr. Berger, I would
02:45 8 appreciate --
02:45 9     (Simultaneous colloquy between counsel.)
02:45 10     MS. ROSS: -- this -- I have the right to
02:45 11 ask the questions I want to ask and your commentary is
02:45 12 not necessary.
02:45 13     MR. BERGER: Okay.
02:45 14     You can -- you can...
02:45 15     THE WITNESS: As we just shared earlier,
02:45 16 there are other references that speak to that, and I
02:45 17 think I've shared those with you.
02:45 18 Q. BY MS. ROSS: So you have shared with me all the
02:45 19 references of which you're presently aware?
02:45 20 A. Including this other report, yes.
02:45 21 Q. In the fourth bullet point you refer to disposing
02:45 22 of spent PCE and other dangerous chemical wastes in an
02:45 23 approved facility.
02:45 24     Do you see that?
02:45 25 A. Yes, I do.

Page 148:

```
02:45   1    Q.  What do you -- what are you referring to when
02:45   2   you're talking about an "approved facility"?
02:45   3    A.  The -- evolution of the problem with respect
02:45   4   to industrial wastes as recognized first in the '40's
02:46   5   and '50s was -- '40's and '50s was these industrial
02:46   6   wastes were disposed in landfills to try to address the
02:46   7   issue of not disposing of them in the ground.  So they
02:46   8   were originally disposed of in landfills and these
02:46   9   landfills became badly contaminated.
02:46  10       And so with the realization that landfills were
02:46  11   not -- landfills, the way they were constructed earlier,
02:46  12   were not a good way to dispose of spent PCE.
02:46  13       With the advent of RCRA, we got into more
02:46  14   advanced engineered advanced waste disposal facilities
02:46  15   that were specifically designed to handle PCE and other
02:47  16   high level waste.
02:47  17    Q.  And did those more advanced waste disposal
02:47  18   facilities come about at the same time RCRA did?
02:47  19    A.  They came along shortly after it was passed in
02:47  20   1974, yes.
02:47  21    Q.  At page 21, you indicated that, in the second
02:48  22   paragraph on page 21, that at Madison-Kipp, the PCE
02:48  23   stored above ground storage tanks had no secondary
02:48  24   containment and worse, one tank area was intentionally
02:48  25   sloped to a surface drain that discharged to a garden
```

Page 149:

```
02:48   1   area along the bike path and, unsurprisingly, is now a
02:48   2   serious line source of contamination.
02:48   3       Do you see that?
02:48   4    A.  Yes, I do.
02:48   5    Q.  Is the basis for the factual statements in there
02:48   6   your own observation or something else?
02:48   7    A.  No, it's my own observation that where that tank
02:48   8   was placed, there's a clear slope, even to the degree
02:48   9   that there is a drainage connection that is, in my
02:48  10   estimation, would be an engineered drainage ditch
02:49  11   because of the slope.  Slope goes directly to the
02:49  12   drainage ditch.  And then that drainage ditch runs along
02:49  13   Madison-Kipp's facility and then goes off to the north
02:49  14   east of the Madison-Kipp property.  So that was
02:49  15   intentionally designed that way.
02:49  16    Q.  In the period of time from 1976 through the end
02:49  17   of nineteen-- the end of the 1980s, in your
02:49  18   experience, did most above ground storage tanks holding
02:49  19   chemicals such as a PCE have a secondary containment
02:49  20   system building?
02:49  21    A.  I believe that they moved to that kind of
02:49  22   protection in that time frame, yes.
02:49  23    Q.  Other than when you say they moved into that
02:50  24   during that time period, when did it become common, to
02:50  25   the best of your knowledge, for companies that had PCEs
```

Page 150:

```
02:50   1   stored in above ground storage tanks to have a secondary
02:50   2   containment system?
02:50   3       MR. BUSCH:  Object to the form.  Lack of
02:50   4   foundation.
02:50   5       THE WITNESS:  I believe that much of RCRA
02:50   6   became implementable in the early to mid '80s.
02:50   7    Q.  BY MS. ROSS:  Is it your opinion -- is it your
02:50   8   expert opinion that Madison-Kipp knew that its practices
02:50   9   would cause harm to the environment?
02:50  10       MR. BUSCH:  Object to the form.  Lack of
02:50  11   foundation.
02:50  12       THE WITNESS:  It's my expert opinion that
02:51  13   Madison-Kipp knew there were cost saving advantages to
02:51  14   this kind of disposal, but I don't think that there was
02:51  15   an intent.  I think there was a cost advantage that they
02:51  16   were taking advantage of.
02:51  17    Q.  BY MS. ROSS:  So what you're saying is that they
02:51  18   knew that it could harm the environment but they thought
02:51  19   that it was more important to save costs?
02:51  20       MR. BUSCH:  Object to the form of the
02:51  21   question.  Lacks foundation.
02:51  22       THE WITNESS:  I think that they knew that
02:51  23   disposing of industrial chemicals in this fashion was
02:51  24   not acceptable.
02:51  25       And I think that the reason that they
```

Page 151:

```
02:51   1   continued to do it was because they felt that they
02:51   2   could, one, get away with it, and two, that there was a
02:52   3   cost advantage to do it.
02:52   4    Q.  BY MS. ROSS:  Is it your expert opinion that
02:52   5   Madison-Kipp knew that its practices could cause harm to
02:52   6   people surrounding and homes surrounding the
02:52   7   Madison-Kipp facility?
02:52   8       MR. BUSCH:  Object to the form.  Lack of
02:52   9   foundation.
02:52  10       MR. BERGER:  Yeah.  I don't think
02:52  11   that's -- he hasn't opined on that.
02:52  12       You can answer if you have an opinion on it.
02:52  13       THE WITNESS:  My opinion that Madison-Kipp's
02:52  14   behavior was reckless in light of the closeness of the
02:52  15   homes to where they were dumping free flowing PCE.
02:53  16    Q.  BY MS. ROSS:  Are you aware of what efforts other
02:53  17   companies undertook to prevent chemicals such as PCE
02:53  18   from migrate in soil or soil vapor or groundwater?
02:53  19       MR. BUSCH:  I object.
02:53  20    Q.  BY MS. ROSS:  And we're talking about the period
02:53  21   of time between the 1950s and 1980.
02:53  22       MR. BUSCH:  Object to the form.  Lack of
02:53  23   foundation.
02:53  24       THE WITNESS:  I wrote a book on this
02:53  25   subject.  Just trying to figure out the exact year of
```

02:53 1    it.  So if you could kindly bear with me till I find my
02:53 2    book section here.
02:53 3        Q.  BY MS. ROSS:  Sure.
02:53 4            (Pause in the proceedings.)
02:53 5        THE WITNESS:  Well, I was asked to write a
02:54 6    book on the subject of monitoring RCRA facilities
02:54 7    Subtitle C facilities in 1996.  And so I'd been working
02:54 8    on that for a long time and that's why I was asked to
02:54 9    write that book.
02:54 10       So my thoughts are that, as I mentioned, the
02:55 11   mid 1980s, these activities needed to be kind of
02:55 12   implemented and then they got into, Well, how you going
02:55 13   to monitor them.  And I was asked to write this book how
02:55 14   you monitor them.
02:55 15       Q.  BY MS. ROSS:  Between 1960 and 1980, were there
02:55 16   steps that other companies undertook to prevent
02:55 17   chemicals from getting to the soil and groundwater that
02:55 18   Madison-Kipp did not take to the best of your knowledge?
02:55 19       MR. BUSCH:  Object to form.
02:55 20       THE WITNESS:  Yes.  The best example is the
02:55 21   1962 ASTM guidance upon how to handle vapor degreasers,
02:55 22   which I believe were the main application of PCE in that
02:55 23   time frame.
02:55 24       Q.  BY MS. ROSS:  Are there other things that other
02:55 25   companies did that you're aware of?



---

02:55 1        A.  Well, they would have condensers on their
02:55 2    degreasers to recover the PCE.
02:55 3            They would have stills on their degreasers to
02:56 4    recover the PCE from the stills.  There were ways of
02:56 5    getting rid of the sludge from the stills.  I didn't see
02:56 6    evidence that Madison-Kipp did any of that.
02:56 7        Q.  At the bottom of page 21, you say that you
02:56 8    can -- "In the opinion described in detail below, I
02:56 9    conclude that Madison-Kipp violated applicable standards
02:56 10   of conduct both in its handling and disposal of these
02:56 11   chemicals on the Madison-Kipp site from the 1950s to
02:56 12   1987 and in its failure to adequately address the
02:56 13   problem."
02:56 14       With respect to the last portion of that that
02:56 15   says "adequately address the problem," what are you
02:56 16   talking about?
02:57 17       MR. BERGER:  You can read the report if you
02:57 18   need to refresh.
02:57 19           (Pause in the proceedings.)
02:57 20       MR. BERGER:  There's -- I just want to
02:57 21   object.  There's a 15-page section of the report that
02:58 22   addresses that.  You're pulling off introductory
02:58 23   sentence out of here and --
02:58 24       MS. ROSS:  I'm just asking what he's
02:58 25   referring to.  I think he can answer what he represents.



---

02:58 1        THE WITNESS:  Yes, I'm -- I'm referring to
02:58 2    the long discussion of that theme that followed your
02:58 3    comment.
02:58 4        Q.  BY MS. ROSS:  Can you give me an example of what
02:58 5    you're talking about with respect to its failure to
02:58 6    adequately address the problem.
02:58 7            And let me tell you what my issue is.  Are you
02:58 8    talking about its failure to adequately address the
02:58 9    problem from 1994 forward?
02:58 10       Or are you talking about their failure to address
02:58 11   the problem between the 1950s and 1987?
02:58 12       A.  Actually both.
02:58 13       Q.  Both.
02:58 14       A.  Yes.
02:58 15       Q.  With respect to the period of time between the
02:58 16   1950s and 1987, what are you referring to in terms of
02:58 17   the failure to adequately address the problem?
02:59 18       A.  At the minimum, the Wisconsin statute, the Spill
02:59 19   Law of 1977.
02:59 20       MR. BUSCH:  Move to strike.
02:59 21       Q.  BY MS. ROSS:  What about the Wisconsin Spill Law
02:59 22   from 1977 demonstrates a failure to adequately address
02:59 23   the problem?
02:59 24       MR. BUSCH:  Object to form.
02:59 25       THE WITNESS:  I believe that the Madison



---

02:59 1    statute, called the 1977 Spill Law, required that
02:59 2    Madison-Kipp determine the extent of the contamination
02:59 3    and to clean up and properly dispose of the
02:59 4    contaminants.
02:59 5            So this law is 1977.  And as we've learned
02:59 6    through much of today, the extent of the contamination
03:00 7    is still not understood and only appears to be getting
03:00 8    worse.
03:00 9        MR. BUSCH:  Move to strike.
03:00 10       Q.  BY MS. ROSS:  Do you have any information of any
03:00 11   type that Madison-Kipp knew that its property was
03:00 12   contaminated by 1977 or at any point before 1994?
03:00 13       MR. BUSCH:  Lack of foundation.  Object.
03:00 14       THE WITNESS:  I just know that in the time
03:00 15   frame of when they paved over those parking lots, that
03:00 16   Madison-Kipp began to do the right thing.  And it wasn't
03:00 17   because of goodness of their heart, it was because
03:00 18   they're disposal area had been paved over.
03:00 19       And so the time frame for when that occurred
03:00 20   was somewhere between 1971 or 1976.
03:01 21       Q.  BY MS. ROSS:  On page 22 of your report --
03:01 22       A.  Yes.
03:01 23       Q.  -- you indicated that, "While scientific
03:01 24   knowledge and environmental regulations have evolved in
03:01 25   the last decades, it was widely appreciated at least



```
03:01   1   since the 1950s that dumping such industrial chemicals
03:01   2   on the ground could cause subsurface contamination."
03:01   3       Do you see that?
03:01   4   A.  Yes, I do.
03:01   5   Q.  Other than the things we've talked about, are you
03:01   6   referring to anything else when you talked about it was
03:01   7   widely appreciated?
03:02   8   A.  Um --
03:02   9       MR. BUSCH:  Object to the form.
03:02  10       THE WITNESS:  Just Greg Colten documents;
03:02  11   Colten and Skinner; Harvey Banks.  Those would be three
03:02  12   references that I would submit to you.
03:02  13   Q.  BY MS. ROSS:  The next sentence says, "It was
03:02  14   also widely understood during those years that
03:02  15   chlorinated solvents such as PCE and TCE were especially
03:02  16   persistent in the environment, and that exposure to
03:02  17   these chemicals could cause adverse effects."
03:02  18       Do you see that?
03:02  19   A.  Yes, I do.
03:02  20   Q.  And what is the basis for the statement that is
03:02  21   it was widely understood?
03:02  22       MR. BUSCH:  Object to the form.
03:02  23       THE WITNESS:  The basis for that was the
03:03  24   contamination that these chemicals posed to the
03:03  25   landfills as I mentioned.  And the fact that since they
```

```
03:03   1   were man-caused microbes through evolution, hadn't got
03:03   2   to a point where they would break down because there was
03:03   3   nothing out there that would contribute to their
03:03   4   breakdown.  And so they were persistent.
03:03   5       And then the health effects issue came into
03:03   6   play as represented by the U.S. Public Health Service in
03:03   7   1943.
03:03   8   Q.  BY MS. ROSS:  When you say that it was widely
03:04   9   understood during those years that solvents such as PCE
03:04  10   and TCE were persistent in the environment and could
03:04  11   cause adverse health effects, are you saying that
03:04  12   Madison-Kipp knew that?
03:04  13       MR. BUSCH:  Object to the form.
03:04  14       THE WITNESS:  What I'm saying is that
03:04  15   Madison-Kipp didn't have any technical capability in how
03:04  16   to appreciate this problem.  Their environmental
03:04  17   manager, who had been there a long time, wasn't trained
03:04  18   in any of these -- any of these environmental issues.
03:04  19   Q.  BY MS. ROSS:  Are you saying that a responsible
03:04  20   company would clearly recognize that solvents such as
03:05  21   PCE and TCE could cause adverse health effects?
03:05  22       MR. BUSCH:  Object to the form.
03:05  23       THE WITNESS:  I would expect that a company
03:05  24   of Madison-Kipp's size would either have professional
03:05  25   capability inhouse or would seek it through consulting
```

```
03:05   1   firms.
03:05   2   Q.  BY MS. ROSS:  Are you saying that would be the
03:05   3   responsible thing for a company like Madison-Kipp to do?
03:05   4       MR. BUSCH:  Object to form.
03:05   5       THE WITNESS:  I would say so.
03:05   6   Q.  BY MS. ROSS:  And the next paragraph you start
03:05   7   out by saying Madison-Kipp's improper chemical disposal
03:05   8   practices in the '50s, '60s, '70s and '80s were not
03:05   9   representative of industry standards.
03:05  10       Do you see that?
03:05  11   A.  Yes, I do.
03:05  12   Q.  What industry standards are you referring to in
03:05  13   that sentence?
03:05  14       MR. BUSCH:  Object to the form.
03:06  15       MR. BERGER:  We've been down this road a
03:06  16   number of times.  He's testified a lot.  It's been asked
03:06  17   and sustained -- asked and answered.  And asking the
03:06  18   same question with respect to different pieces of
03:06  19   sentences is not appropriate.
03:06  20       You can --
03:06  21   Q.  BY MS. ROSS:  You can answer the --
03:06  22       MR. BERGER:  -- answer again.
03:06  23   Q.  BY MS. ROSS:  Can you answer the question.
03:06  24   A.  The ASTM 1962 Standard that speaks to this very
03:06  25   issue.  Once again, it's the American Society for
```

```
03:06   1   Testing of Materials, so it's a national body.
03:06   2       Although it's dated 1962, these standards are the
03:06   3   result of several years of understanding.  So that would
03:06   4   put it back into the '50s.
03:06   5   Q.  Okay.  Is there anything else that you're
03:06   6   referring to when you're talking about industry
03:06   7   standards in the '50s, '60s, '70s, and '80s?
03:06   8       MR. BERGER:  Objection.  It's been asked and
03:06   9   answered.  He's made a number of references to a number
03:06  10   of pieces of the report, Ms. Ross.
03:07  11       THE WITNESS:  I have -- my ideas on this
03:07  12   subject are included in my document, and we've shared
03:07  13   some of those references.
03:07  14   Q.  BY MS. ROSS:  I guess what I'm trying to figure
03:07  15   out, throughout your report you talk about applicable
03:07  16   standards.
03:07  17   A.  Yes.
03:07  18   Q.  And you regularly indicate that Madison-Kipp's
03:07  19   actions violated applicable standards --
03:07  20   A.  Yes.
03:07  21   Q.  -- right.
03:07  22       When you use that, are you always referring to
03:07  23   their circumstances to the ASTM report 2L?  Is that what
03:07  24   you're referring to primarily?
03:07  25       MR. BERGER:  Same objection.  He's cited to
```

```
03:07   1   a number of articles in here.  He has references and
03:07   2   standards to state statutes, federal statutes.
03:07   3       MS. ROSS:  He can answer the question.
03:07   4       MR. BERGER:  He has, about a dozen times.
03:07   5   And it's not appropriated to ask the same question with
03:08   6   respect to a different word in the report.  It's
03:08   7   badgering.
03:08   8       MS. ROSS:  Can I ask --
03:08   9       MR. BERGER:  There's thousands of words in
03:08  10   this report.  The fact that you can preface the question
03:08  11   with a different word does not make it appropriate.
03:08  12       MS. ROSS:  Okay.  So your objection to form
03:08  13   was noted.
03:08  14   Q.  BY MS. ROSS:  Can you --
03:08  15       MR. BERGER:  Well, it's --
03:08  16   Q.  BY MS. ROSS:  Can you --
03:08  17       MR. BERGER:  It's not just to form.  It's
03:08  18   harassment.
03:08  19       MS. ROSS:  It's not harassing.
03:08  20       MR. BERGER:  You can take whatever position
03:08  21   you'd like, but this is not going to go on much longer.
03:08  22   Q.  BY MS. ROSS:  Do you need the question asked back
03:08  23   or do you know the answer?
03:08  24       MR. BERGER:  I think he answered the
03:08  25   question.
```

```
03:08   1       THE WITNESS:  My answer's going to be that
03:08   2   you and I are sharing the same documents over and over.
03:08   3   Q.  BY MS. ROSS:  And all I'm trying to do is to find
03:08   4   out whether when you refer to standards throughout this
03:08   5   report, are you referring to those same documents that's
03:08   6   the basis for those standards?
03:08   7   A.  I'm referring to all the documents referenced in
03:08   8   this section, yeah, that's correct.
03:09   9   Q.  I'm on -- one, two, three -- fourth
03:09  10   paragraph, to the 1974 EPA study.
03:09  11       Do you see that?
03:09  12   A.  Yes, I do.
03:09  13       MR. BERGER:  Are you on page 22 still?
03:09  14       MS. ROSS:  Yes.
03:09  15       THE WITNESS:  Yeah.
03:09  16   Q.  BY MS. ROSS:  Prior to the EPA study in 1974, was
03:09  17   there knowledge that practices such as Madison-Kipp's
03:09  18   would cause damage to the environment?
03:09  19       MR. BUSCH:  Object to the form.
03:09  20       THE WITNESS:  Oh, I believe so.
03:09  21   Q.  BY MS. ROSS:  And what such studies are you aware
03:09  22   of that are prior to 1974?
03:10  23       MR. BUSCH:  Same objection.
03:10  24       THE WITNESS:  The document in 1962.
03:10  25   Q.  BY MS. ROSS:  And is that the only one you're
```

```
03:10   1   aware of as you sit here?
03:10   2   A.  No.  There's the Harvey Banks' document.  There's
03:10   3   the Colten document.
03:10   4   Q.  Okay.
03:10   5   A.  The Colten Skinner document.  The ones that we've
03:10   6   shared.
03:10   7   Q.  Okay.
03:10   8       MR. BERGER:  We really need to move on.
03:10   9       MS. ROSS:  You need to quit interrupting my
03:10  10   examination of the witness.
03:10  11       MR. BERGER:  You and I disagree.
03:10  12   Q.  BY MS. ROSS:  On page 23 of your report --
03:10  13       Let's see if I can get the right place.
03:10  14       You say, "The link between industrial waste
03:10  15   disposal and groundwater pollution was widely understood
03:10  16   by the 1950s and synthetic organic chemicals like PCE
03:11  17   were particularly problematic because of the their
03:11  18   persistence in the environment."
03:11  19       Do you see that?
03:11  20   A.  I'm sorry.  I don't see that.
03:11  21   Q.  I'm sorry.  On the page 23, the top --
03:11  22   A.  Yes.
03:11  23   Q.  -- the paragraph, last three lines.
03:11  24       Beginning with "Rather...."?
03:11  25   Q.  Beginning with, "The link...."
```

```
03:11   1   A.  I see.  Thank you.
03:11   2   Q.  That's fine.
03:11   3   A.  Between the industrial...
03:11   4       Yes, I see that.
03:11   5   Q.  Okay.  Other things we have been talking
03:11   6   about, do you rely on anything else with respect to this
03:11   7   sentence?
03:11   8       MR. BUSCH:  Object to the form.
03:11   9       THE WITNESS:  Just all the references that
03:11  10   are in this section.
03:11  11   Q.  BY MS. ROSS:  Okay.  And were there studies of
03:12  12   PCE in the 1950s looking at its potential harm to the
03:12  13   environment?
03:12  14   A.  Oh, there's the work by Lynn McLaughlin in 1944
03:12  15   that speaks to the persistence of these chemicals.
03:12  16   Q.  Is that the only one you're aware of?
03:12  17   A.  That, in addition to the other ones that we've
03:12  18   talked about.
03:12  19   Q.  The other studies that you've talked about were
03:12  20   either studies that were done in the 1990s that had a
03:13  21   historical perspective in it or the ASTM report which is
03:13  22   2L, and I'm looking for ones that were available in the
03:13  23   1950s.
03:13  24   A.  Well, the Public Health Service documents in 1943
03:13  25   were certainly there; so...
```



| | |
|---|---|
| 03:13 | 1 |

03:13  1    Q.  That related to the PCE exposure to employees?

03:13  2    A.  Yes.

03:13  3    Q.  What was the standard that the Public Health

03:13  4  Service established in 1943 as the maximum allowable

03:13  5  concentration for workplace exposures; do you know?

03:13  6         MR. BUSCH:  Object to the form.

03:13  7         MR. BERGER:  To PCEs is the question?

03:14  8         MS. ROSS:  Yes.

03:14  9         MR. BERGER:  If you recall.

03:14  10        THE WITNESS:  I don't recall that number.

03:14  11   Q.  BY MS. ROSS:  On the bottom of page 23, you

03:14  12  reference a 1956 report from the Manufacturer Chemists

03:14  13  Association.

03:14  14        Did that report address environmental

03:14  15  consequences of PCE?

03:14  16        MR. BUSCH:  Object to the form.

03:14  17        THE WITNESS:  I believe it addressed the

03:14  18  issue of persistence and the need to not haphazardly

03:14  19  dispose of the PCE.

03:15  20   Q.  BY MS. ROSS:  Okay.  So -- so you believe it

03:15  21  specifically addressed PCE?

03:15  22        MR. BUSCH:  Object to the form.

03:15  23        THE WITNESS:  Yes.

03:15  24   Q.  BY MS. ROSS:  Page 27 of your report, toward the

03:15  25  bottom, you quote a question and an answer to Mr. Lenz.

---

03:15  1         Do you see that?

03:15  2    A.  Yes, I do.

03:15  3    Q.  And in this you cite that to support your

03:15  4  understanding that Mr. Lenz thinks that Madison-Kipp

03:15  5  hasn't adequately addressed are the PCE contamination;

03:15  6  is that right?

03:16  7    A.  That's correct.

03:16  8    Q.  But on page 24 of your report, you indicate that

03:16  9  Mr. Lenz isn't a licensed engineer, right?

03:16  10   A.  He is not.

03:16  11   Q.  And that he has no environmental training?

03:16  12   A.  That's correct.

03:16  13   Q.  And no environmental courses?

03:16  14   A.  That's correct.

03:16  15   Q.  And no groundwater contamination training?

03:16  16   A.  That's correct.

03:16  17   Q.  And no remediation training?

03:16  18   A.  That's correct.

03:16  19   Q.  And no vapor intrusion testing?

03:16  20   A.  That's correct.

03:16  21   Q.  And no training in PCE handling practices?

03:16  22   A.  That's my understanding.

03:16  23   Q.  But you think that he's capable of making the

03:16  24  decision on whether Madison-Kipp adequately addressed

03:16  25  its contamination problem?

---

03:16  1         MR. BERGER:  Object to the form.

03:16  2         MR. BUSCH:  Join.

03:16  3         THE WITNESS:  I support his statement.  And

03:16  4  the reason is that he did a historical understanding of

03:17  5  what their practices were and was of the opinion that

03:17  6  there was very little being done to address the problem.

03:17  7    Q.  BY MS. ROSS:  Do you think that he is qualified

03:17  8  to make the determination on whether Madison-Kipp has

03:17  9  adequately addressed PCE contamination problem?

03:17  10        MR. BUSCH:  Object to the form.

03:17  11        THE WITNESS:  I think he was the most

03:17  12  knowledgeable individual there.  Mr. Coleman, the head

03:17  13  of the company said that Mr. Lenz was the most

03:17  14  knowledgeable person there.

03:17  15        Was he the best trained person there?  No,

03:17  16  not by any means.

03:17  17        But was he the most knowledgeable person

03:17  18  there?  I would say yes.

03:17  19   Q.  BY MS. ROSS:  On -- let's see.  At the beginning

03:17  20  of that paragraph it says, "Until about one year ago,

03:17  21  the opportunity for any meaningful environmental

03:18  22  investigation had been marred by Madison-Kipp's

03:18  23  inaction...."

03:18  24        Do you see that?

03:18  25   A.  Yes, I do.

---

03:18  1    Q.  And what happened a year ago?

03:18  2    A.  I believe that approximately a year ago a suit

03:18  3  was filed against Madison-Kipp.

03:18  4    Q.  And -- well, is the filing of the suit --

03:18  5         Strike that.

03:18  6         Are you saying in this sentence that beginning

03:18  7  about a year ago Madison-Kipp started acting?

03:18  8    A.  Forgive me.  Acting...?

03:18  9    Q.  Okay.  Resolving the issues concerning the

03:18  10  contamination.

03:18  11   A.  I believe that about a year ago there was a

03:19  12  dramatic shift in Madison-Kipp's behavior, not just in

03:19  13  response to the suit from Mr. Berger and Mr. Collins but

03:19  14  also in response increasing pressure from the State.

03:19  15        And so there they embarked upon a expensive

03:19  16  program of characterization that could and should have

03:19  17  been done 19 years earlier.

03:19  18   Q.  Do you believe that Madison-Kipp was presently

03:19  19  investigating and remediation -- remediating the

03:19  20  contamination at Madison-Kipp's facility?

03:19  21   A.  I believe that they currently are making an

03:20  22  attempt to characterize the site.  However, I think that

03:20  23  the characterization is more in defense of the lawsuit

03:20  24  than a, a defensible characterization program.

03:20  25        For example, it's only at the end of the year

```
03:20   1    that we're even looking at the sources underneath
03:20   2    Madison-Kipp.
03:20   3         It's only as of this morning that we now find out
03:20   4    that they're trying to find out what's going on under
03:20   5    the facility.
03:20   6         They've kind of tried to, I would say, backdoor
03:20   7    it by concentrating on these folks that live in the area
03:20   8    without really addressing the source of the problem.
03:20   9         MR. BUSCH:  Move to strike.
03:20  10    Q.  BY MS. ROSS:  What is your basis for your belief
03:21  11    that their actions were solely in order to defend the
03:21  12    lawsuit?
03:21  13         MR. BUSCH:  Object to form.
03:21  14         MR. BERGER:  Objection to form.
03:21  15         THE WITNESS:  Well, the 1994 letter said you
03:21  16    need to characterize the vertical and horizontal
03:21  17    distribution of the contamination; and that you need to
03:21  18    do that in a timely way to prevent an expansion of the
03:21  19    contaminated area.
03:21  20         And they hadn't done that for 19 years;
03:21  21    therefore, the contamination is much larger than needed
03:21  22    to be.
03:21  23    Q.  BY MS. ROSS:  How many sites have you been
03:21  24    involved with where the contamination was of the kind of
03:21  25    significance that you have claimed with respect to
```

```
03:22   1    Madison-Kipp?
03:22   2         MR. BERGER:  Objection to the form of the
03:22   3    question.
03:22   4         If you understand that.
03:22   5    Q.  BY MS. ROSS:  If you don't understand, tell me
03:22   6    and I'll rephrase it.
03:22   7    A.  This is one of the worse sites that I've seen,
03:22   8    mostly because of the DNAPL level of contamination in
03:22   9    deep fractured rock that has moved so far offsite in
03:22  10    fractured rock.
03:22  11    Q.  With respect to other sites that you have been
03:22  12    involved with that have extensive contamination, what is
03:22  13    the shortest and the longest period of time that it's
03:22  14    taken to obtain an approved remedial plan?
03:22  15         MR. BUSCH:  Object to the form.
03:22  16         THE WITNESS:  The -- I can't give that
03:23  17    because it -- it would involve going through a whole
03:23  18    bunch of projects over my 40 years of involvement.
03:23  19         But I will answer that is that an approved
03:23  20    remedial plan happens after a remedial investigation and
03:23  21    feasibility study to determine what the plan should be.
03:23  22    The remedial investigation is a characterization of the
03:23  23    facility to understand the conceptual model and to
03:23  24    understand the distribution and extent of the
03:23  25    contamination.  We're not there then.  We're not even
```

```
03:23   1    there yet.  So to talk in terms of a real plan is really
03:23   2    jumping the gun I think.
03:23   3    Q.  BY MS. ROSS:  I think what I'm trying to get a
03:23   4    sense of is the length of time, in your experience, it
03:23   5    takes from the first letter to the time that you have an
03:24   6    approved remedial plan.
03:24   7    A.  It varies by site.  But it wouldn't be
03:24   8    unreasonable to be looking at a characterization time
03:24   9    frame of oh, one to three years.  And an approval of a
03:24  10    remedial plan couple years after that.  So we're
03:24  11    probably looking at five, approximately five years, I
03:24  12    would say.
03:24  13    Q.  And there are a number of sites where that
03:24  14    process is taken incredibly longer; isn't that correct?
03:24  15    A.  Depending on the complexity, it could take much
03:24  16    longer.
03:24  17    Q.  And there are sites where it has taken decades;
03:24  18    isn't that correct?
03:24  19    A.  There are increasing realization that some sites
03:24  20    are never going to be cleaned up.  And I think this is
03:24  21    going to be one of them.
03:24  22    Q.  But there are a number of sites throughout the
03:25  23    country where the time frame from the initial letter to
03:25  24    the entity to the time that a remediation plan is
03:25  25    approved is decades long; isn't that correct?
```

```
03:25   1    A.  It could be depending on the complexity; that's
03:25   2    true.
03:25   3         MS. ROSS:  That's all I have.  Thank you.
03:25   4         THE WITNESS:  Thank you.
03:25   5         THE VIDEOGRAPHER:  Just a moment, please.
03:25   6    We are off the record at 3:25 p.m.
03:25   7         (Recess taken:  3:25 p.m. to 3:26 p.m.)
03:26   8         THE VIDEOGRAPHER:  We are back on the record
03:26   9    at 3:26 p.m.
03:26  10
03:26  11              EXAMINATION
03:26  12    BY MR. COHEN:
03:26  13    Q.  Dr. Everett, my name is Michael Cohen.  We have
03:26  14    met before.  I represent defendant U.S. Fire Insurance
03:26  15    Company.
03:26  16         I'm going to apologize in advance; going to jump
03:26  17    around a little bit.  That's what happens when you go
03:26  18    third in order in asking questions after a long day.
03:26  19    A.  I understand, sir.
03:26  20    Q.  With respect to Exhibit 1 your expert report,
03:26  21    was -- was any portion of your expert report written in
03:26  22    whole or in part by Plaintiff's counsel in this case?
03:27  23    A.  There was no part of it written in whole or in
03:27  24    part by the attorneys in this case, sir.
03:27  25    Q.  Were you sent any proposed revisions for you to
```

```
03:27   1   consider?
03:27   2      A.  There were discussions of our opinions but there
03:27   3   was no recommendations to change any of the opinions.
03:27   4      Q.  Did you receive any faxed proposed revisions or
03:27   5   reline of your report with comments or additional
03:27   6   proposed changes to the report from counsel?
03:27   7      A.  Not that I'm aware of.
03:27   8      Q.  Was there any information that you asked of
03:27   9   counsel that you wanted to see that you weren't provided
03:27  10   to assist you in developing your opinions?
03:27  11      A.  I believe that there were a number of document
03:27  12   requests that were made, yes.
03:27  13          MR. BERGER:  He wants to know that you were
03:27  14   not given.
03:28  15          THE WITNESS:  Oh, that with we were not --
03:28  16      Q.  BY MR. COHEN:  Correct.
03:28  17      A.  Forgive me.  No.  Each of the things that we
03:28  18   asked for were provided, yes.
03:28  19      Q.  And you had mentioned, I think, one item that you
03:28  20   wanted to do with respect to developing your opinions
03:28  21   that you weren't able to do.  I think it was the air
03:28  22   particulate analysis; is that right?
03:28  23      A.  That was one.
03:28  24          There were a number of things that one could do
03:28  25   that should have been done that are ARCADIS should be
```

```
03:28   1   doing that I hadn't seen being done.  So do I have
03:28   2   recommendations on what should be done going forward, I
03:28   3   have those recommendations.
03:28   4      Q.  I think I've heard those.
03:28   5      A.  Yeah.
03:28   6      Q.  And your report addresses them.
03:28   7          What I'm really asking is something different.
03:28   8   Something that you wanted to do in preparation for your
03:28   9   opinions in this case that you did not do for one reason
03:28  10   or another?
03:28  11      A.  No, there was nothing like that, sir, no.
03:29  12      Q.  You cite to Mr. Lenz's deposition several times
03:29  13   throughout your report.
03:29  14      A.  Yes.
03:29  15      Q.  Did you read the entire transcript of that
03:29  16   deposition?
03:29  17      A.  I did, sir.
03:29  18      Q.  And you refer to Mr. Schmoller's deposition
03:29  19   several times.
03:29  20          Did you read that entire transcript?
03:29  21      A.  Every word, sir.
03:29  22      Q.  And how many volumes were there?
03:29  23      A.  There were at least two that I recall.
03:29  24      Q.  Okay.  Let's turn, if we can, to page 22 of your
03:29  25   report.
```

```
03:29   1      A.  Yes, sir.
03:29   2      Q.  Ms. Ross was asking you about support for your
03:30   3   opinions, particularly in this first paragraph.  And you
03:30   4   cited to Colten and Colten and Skinner, and I believe
03:30   5   you also mentioned Banks.
03:30   6          Did you specifically do research to support the
03:30   7   opinions that appear in this Opinion 2 for this case, or
03:30   8   did you have any resources or a library of materials
03:30   9   that -- at your office that you were familiar with that
03:30  10   you knew of and plugged into the report?
03:30  11      A.  A combination of the two, yes.
03:30  12      Q.  Okay.  And did you have someone do a literature
03:30  13   search to support --
03:30  14          And I'm just interested --
03:30  15      A.  Yes.
03:30  16      Q.  -- right now in Opinion No. Two.
03:30  17          Did someone on your staff, or yourself, do a
03:30  18   literature search or do some research to support some of
03:30  19   these opinions with respect to what was known at a given
03:30  20   point in time about PCEs or their effect on the
03:30  21   environment or their effect on human health?
03:31  22      A.  We're a modest-sized company, so I don't have
03:31  23   anybody that does literature searches.  So the
03:31  24   literature searches that we do are either done by
03:31  25   Dr. Wells or my senior engineer or Dr. Fogwell, that
```

```
03:31   1   individual that I expected to be onboard here this time.
03:31   2   And we did our own independent evaluation that has
03:31   3   culminated in this representation here.
03:31   4      Q.  Okay.  So for example, the references here on
03:31   5   page 22 that, to Colten, 1991 --
03:31   6          By the way, that's Craig Colten; right?
03:31   7      A.  That's correct, sir.
03:31   8      Q.  Have you met him?
03:31   9      A.  I haven't had the pleasure.
03:31  10      Q.  Do you know what his background is?
03:31  11      A.  I do not.
03:31  12      Q.  And Colten and Skinner, 2006, are those resources
03:31  13   that you found or someone else?
03:31  14      A.  Those are resources that we had come across as
03:32  15   part of other cases.
03:32  16      Q.  That's really what I was asking before.  So these
03:32  17   are things you knew of through your analysis, research,
03:32  18   and in relation to other cases that you knew you could
03:32  19   plug in here?
03:32  20      A.  Part of it, yes, sir.  This is an, one example of
03:32  21   a previous case.
03:32  22          For example, the Banks case was a dry cleaner job
03:32  23   some months ago where the -- the level of understanding
03:32  24   of the threat from PCE was at that.  And so I
03:32  25   personally did a review and found Harvey Banks' paper.
```

03:32  1    This one here, I believe, was found by Dr. Wells,
03:32  2  so there was a team looking for support for our
03:32  3  opinions.
03:32  4    Q.  I think you said the Banks case and then you were
03:32  5  referring to the piece of literature authored by
03:32  6  Mr. Banks.
03:32  7    Did you intend to do that?
03:32  8    A.  It's -- there's only one Banks document.
03:33  9    Q.  Okay.  You referred to a Banks case --
03:33  10    A.  Oh.
03:33  11    Q.  -- that you were working on.
03:33  12    A.  Forgive me.  It was a dry cleaner case where the
03:33  13  Banks paper became an issue.
03:33  14    Q.  And which case was that?
03:33  15    A.  It was a dry cleaner in Southern California.
03:33  16    Q.  And the name of it?
03:33  17    A.  I'm going to say that it's either the
03:33  18  bands -- the Carlsbad Dry Cleaner case.
03:33  19    Q.  And have you issued a written opinion in that
03:33  20  case?
03:33  21    A.  I don't -- I'm not sure.
03:33  22    Q.  Okay.
03:33  23    A.  I could find out, but I'm not sure.
03:33  24    Q.  Would there be other expert reports that you
03:33  25  authored where this last sentence here (as read), In

03:33  1  this context, at the time Madison-Kipp was conducting
03:33  2  dumping, it would have known and should have known that
03:33  3  the practice of dumping industrial chemicals into the
03:33  4  ground could cause serious contamination -- I'm sorry --
03:34  5  serious environmental harm; cite, Colten; Colten and
03:34  6  Skinner.
03:34  7    Are there other reports where you have said the
03:34  8  same thing but used a different facility that you're
03:34  9  talk about or entity that you're referring to?
03:34  10    MR. BERGER:  Objection to the form.
03:34  11    Q.  BY MR. COHEN:  What I'm trying to really get at
03:34  12  is, is this an opinion that you lifted from another
03:34  13  matter that you had already cited Colten or Colten and
03:34  14  Skinner either in sum or substance and used in this
03:34  15  report?
03:34  16    A.  These are references related to the historical
03:34  17  understanding of PCE and TCE in the country that I would
03:34  18  refer to when this issue came up.
03:34  19    Q.  That I got.
03:34  20    A.  Yeah.
03:34  21    Q.  Okay.  My question's a little different.  Is
03:34  22  there another report that you have authored where if you
03:34  23  take the word "Madison-Kipp" out, you've said in sum or
03:34  24  substance the same thing and cited to these types of
03:34  25  resources?

03:34  1    MR. BERGER:  Objection to the form.
03:34  2    THE WITNESS:  There -- there maybe, but I'd
03:34  3  have to go looking for it, sir.
03:35  4    Q.  BY MR. COHEN:  In other words, when you decided,
03:35  5  or whoever in your office, decided to cite to Colten and
03:35  6  Colten and Skinner, did you have a conversation or did
03:35  7  someone say to you in words or in effect:  Let's use
03:35  8  this piece from this other report and we can cite the
03:35  9  Colten and Skinner, or whatever the resources were, in
03:35  10  that report?
03:35  11    A.  No, it didn't come out that way.
03:35  12    Q.  Did you write this paragraph or did someone else
03:35  13  in your office?
03:35  14    A.  We collectively write it.  We have it on our
03:35  15  computers and all three of us are participating in it.
03:35  16    Q.  How does that work?
03:35  17    A.  The document becomes a living document.
03:35  18    Q.  Okay.
03:35  19    A.  So we all have access to it.
03:35  20    Q.  You don't all sit three in a row next to the
03:35  21  computer and one takes turns and the other types a
03:35  22  little bit?
03:35  23    A.  The answer each has their own office; so...
03:35  24    Q.  Okay.  These resources --
03:35  25    By the way, I didn't see Banks cited here.  Is

03:35  1  that a reason why, at least in the text, you didn't cite
03:35  2  Banks?  Maybe it's in the references at the end.  But is
03:36  3  there a reason that you didn't refer to it specifically like
03:36  4  you did for Colten and Colten and Skinner her on
03:36  5  page 22?
03:36  6    A.  There's no reason for it other than this issue
03:36  7  has come up on number of occasions.  And I know these
03:36  8  papers, and I haven't included them all.  But the
03:36  9  Harvey Banks' paper is the one I recall at the moment,
03:36  10  sir.
03:36  11    Q.  Okay.  And if you were to go and try to find or
03:36  12  ask someone to find where you kept these materials, is
03:36  13  that on your computer?
03:36  14    Do you guys have a library in your office?
03:36  15    How does that work?
03:36  16    A.  Depends on when the case was.  We don't keep any
03:36  17  drafts.  We don't keep any e-mails.  So it depends on
03:36  18  the case, sir, and then circumstance.
03:36  19    Q.  Well, for example, let's assume one of your
03:36  20  colleagues referenced Colten here or Colten and Skinner
03:36  21  at the end of this sentence when you were preparing
03:36  22  this, and you wanted to go look and look at that
03:36  23  particular piece of literature --
03:37  24    A.  Yes.
03:37  25    Q.  -- what would you do?

03:37  1          A.  I would go back to the case list that I have and
03:37  2    I would look at whether there was any kind of a file on
03:37  3    record that we had kept, any of the documents, and I
03:37  4    would search that, sir.
03:37  5          Q.  And other than the dry cleaning case that you
03:37  6    told me about, are there any other cases that you think
03:37  7    you used Colten or Colten and Skinner or Banks to refer
03:37  8    to to support your opinions?
03:37  9          A.  Oh, I think there are because of the behavior of
03:37  10   PCE and TCE actually comes up in a lot of my cases.
03:37  11         Q.  Okay.  Can you think of any?
03:37  12         You've got a whole list of cases.  Any that come
03:37  13   to mind that you would have cited to these literature
03:37  14   sources?
03:37  15         A.  Could have been on --
03:37  16         For example, on the Kraft case, sir.
03:37  17         Q.  So if I was to look up your expert report in the
03:37  18   Kraft case, if I could find it, you're thinking that
03:38  19   perhaps you have a citation to Colten, Colten and
03:38  20   Skinner or Banks, you have all three of them?
03:38  21         A.  That's probably yeah.
03:38  22         Q.  Any others?
03:38  23         A.  None that jump out.
03:38  24         Q.  On the bottom of page 23, in the last paragraph,
03:38  25   you were asked about this by Ms. Ross.  You cite to this

---

03:38  1    1956 report from the Manufacturer's Chemists
03:38  2    Association.
03:38  3          Do you see that?
03:38  4          A.  I do, sir.
03:38  5          Q.  Is that the report that provided the basis for
03:38  6    your testimony here today and other areas in your report
03:38  7    where you talked about the behavior of the PCE and
03:38  8    landfills, the experience in landfills?
03:38  9          A.  No, sir.
03:38  10         Q.  Is that something else?
03:38  11         A.  This has to do with degreasers; and that's
03:39  12   something else, yes.
03:39  13         Q.  When you were talking about the behavior of PCE,
03:39  14   the experience of it landfills, were you referring to
03:39  15   resource material piece of literature?
03:39  16         A.  I was referring to Harvey Bank work, Colten's
03:39  17   work, related to disposing of industrial chemicals and
03:39  18   how they have had disastrous effect on the landfills
03:39  19   around the world.
03:39  20         Q.  On the next page, you quote Colten here and you
03:39  21   say -- 23 onto 24 -- Colten concluded that even as early
03:39  22   as 1940, the risk associated with surface discharge the
03:39  23   chemicals was understood...."
03:39  24         And then you have a quote from his 1991 treatise,
03:40  25   right, or book?

---

03:40  1          A.  Yes, sir.
03:40  2          Q.  And he talked about here being -- you see the
03:40  3    reference to (as read), "Legal precedent, though
03:40  4    inconsistent, proved that there was simple awareness of
03:40  5    the physical processes in the financial liabilities
03:40  6    before 1950 to expect careful disposal of liquid waste
03:40  7    to a land surface."
03:40  8          Do you know what he was talking about, legal
03:40  9    precedent inconsistent?
03:40  10         MR. BUSCH:  Object to the form.
03:40  11         THE WITNESS:  I don't know what he had in
03:40  12   his mind no, sir.
03:40  13         Q.  BY MR. COHEN:  Did you review this passage before
03:40  14   you authored this report?
03:40  15         A.  I'm simply using it as a reference.  The I have
03:40  16   not -- the insight into Mr. Colten's understanding of
03:40  17   what legal precedent is.
03:40  18         Q.  My question was, Did you review this passage
03:40  19   before it was --
03:40  20         MR. BERGER:  Did you read it?
03:40  21         Q.  BY MR. COHEN:  -- report?
03:40  22         A.  Yes.  Sure.
03:40  23         Q.  Okay.  So you wouldn't be able to tell me how the
03:40  24   legal precedent was inconsistent on the point that he's
03:41  25   raising here?

---

03:41  1          A.  I wouldn't be able to speak for him on that
03:41  2    issue, no.
03:41  3          Q.  Are you aware of any other sources of material
03:41  4    that support the point here that as early as 1940s, the
03:41  5    risk associated with surface discharge of chemicals was
03:41  6    understood?
03:41  7          A.  Um, well, there's the U.S. Public Health 1943
03:41  8    position that an exposure to PCE causes harmful effects.
03:41  9          There was Harvey Banks paper that since he was in
03:41  10   the business back in those days and saw the, these kind
03:41  11   of discharges cause problems.
03:41  12         Q.  Did the U.S. Health paper talk about surface
03:42  13   discharges in particular?
03:42  14         A.  It is --
03:42  15         MR. BUSCH:  Object to the form.
03:42  16         THE WITNESS:  The U.S. Public Health does
03:42  17   talk in terms of exposure.
03:42  18         Q.  BY MR. COHEN:  Okay.
03:42  19         A.  So whether that's surface discharges or work
03:42  20   remediations.
03:42  21         Q.  Now, can you turn to page 52, please.
03:42  22         A.  Sure.
03:42  23         Q.  It is your opinion in this case that the PAHs
03:42  24   that are present in the Class Area properties, the
03:42  25   source of that is Madison-Kipp; correct?

```
03:42    1        A.  My position is that the PAHs are largely
03:42    2   contributed by Madison-Kipp.  I'm not going to argue
03:43    3   there is a broader of issue of PAHs in the area.  But
03:43    4   I'm indicating that if one looks at the concentrations
03:43    5   close to Madison-Kipp, we get higher concentration.
03:43    6        Q.  Okay.
03:43    7        A.  And that indicates the source.
03:43    8        Q.  In the first full paragraph here, about midway
03:43    9   through, you have a sentence that reads, "If one wanted
03:43   10   to identify the PAHs, there are well known forensic
03:43   11   techniques such as hydrocarbon fingerprinting which
03:43   12   could have provided insight into the source of the
03:43   13   PAHs."
03:43   14        Right?
03:43   15        A.  Yes, sir.
03:43   16        Q.  Before you came to your conclusion that -- and I
03:43   17   don't mean to put words in your mouth -- but the
03:43   18   predominant source of the PAHs are the primary source,
03:43   19   or whatever you said, was that -- was Madison-Kipp.
03:43   20        Did you do this type of analysis?
03:43   21        A.  Did -- did I --
03:43   22        Q.  Yes.
03:43   23        A.  -- do any fingerprinting for this case?
03:43   24        Q.  Correct.
03:43   25        A.  What I did was I would term it forensic
```

---

```
03:44    1   appreciation.
03:44    2        I looked at the fans that were discharging along
03:44    3   Waubesa.  And I then went back and looked at the PAH
03:44    4   numbers relative to those fans.  And I did it on a
03:44    5   concentration basis.  And that result showed that there
03:44    6   was a higher concentration closer to the fans and less
03:44    7   concentration as one got away from the fans.
03:44    8        That, to me, kind of a smoking gun approach which
03:44    9   says that the fans were the cause of the PAHs in that
03:44   10   area.  And then further, the PCBs are within the PAHs.
03:44   11        And we know that along Waubesa, there is a major
03:45   12   excavation program to dig up the backyards of a number
03:45   13   of our clients' homes.
03:45   14        Q.  I understood that from your testimony today.  My
03:45   15   question is a little bit different.
03:45   16        Before you came to the conclusion that the
03:45   17   predominant or primary source, whatever the terminology
03:45   18   you used, of PAHs was Madison-Kipp, you did not do a
03:45   19   hydrocarbon fingerprinting analysis like you refer to
03:45   20   here in your report; correct?
03:45   21        A.  Oh, I did not, sir.
03:45   22        MR. COHEN:  Okay.  Bear with me.  I have a
03:45   23   few more follow-ups.
03:45   24        (Pause in the proceedings.)
03:45   25        Q.  MR. COHEN:  When Ms. Ross was asking you some
```

---

```
03:46    1   questions, you said that the source of your opinions
03:46    2   about Madison-Kipp's practices of dumping and spilling
03:46    3   chemicals were Mr. Lenz and Mr. Schmoller's deposition
03:46    4   transcripts?
03:46    5        A.  Yes.
03:46    6        Q.  Okay.  And what is your understanding of the
03:46    7   basis of Mr. Schmoller's knowledge about those
03:46    8   practices?
03:46    9        A.  My understanding was that he, with some
03:46   10   frequency, interacted with personnel from Madison-Kipp
03:46   11   and through that interaction gained his insights.
03:46   12        Q.  Well, did he testify that he interviewed
03:46   13   Mr. Lenz?
03:46   14        A.  I don't recall that he said that he interviewed
03:46   15   Mr. Lenz.
03:46   16        Q.  Did he testify that at that time that he was
03:46   17   deposed he had seen Mr. Lenz's deposition transcript?
03:46   18        A.  I don't believe that I recall that that was in
03:47   19   there, and that's one of my big criticisms.
03:47   20        My criticism was that Mr. Lenz was probably the
03:47   21   most knowledgeable person and ARCADIS should have went
03:47   22   to him, as well as others, to get a better understanding
03:47   23   of where the source was of this contamination, as best
03:47   24   as he knew and with his little qualifications.  He still
03:47   25   had the historical understanding because he'd been there
```

---

```
03:47    1   for 30 years.
03:47    2        Q.  You saw in Mr. Johnson's report reference to some
03:47    3   interviews that he had with other long term Madison-Kipp
03:47    4   employees; correct?
03:47    5        A.  I did see that.
03:47    6        Q.  All right.  And I take it you know nothing about
03:47    7   what they know other than what Mr. Johnson reported?
03:47    8        A.  I only know what Mr. Johnson represented in his
03:48    9   expert report.
03:48   10        Q.  When Ms. Ross was asking you about the above
03:48   11   ground storage tank, you were offering your observations
03:48   12   that you went over to that area during your site
03:48   13   inspection and you saw a clear slope and you thought
03:48   14   that the drainage system was, using your term, I think,
03:48   15   engineered, the drainage ditch and the way that it
03:48   16   sloped down.  And I think you used the words it was
03:48   17   intentionally designed that way.
03:48   18        Is that fair?
03:48   19        A.  It was -- it was intentionally designed that way,
03:48   20   yes.
03:48   21        Q.  And when is it that you believe that that area
03:48   22   was intentionally designed that way?
03:48   23        MR. BUSCH:  Object to the form.
03:48   24        THE WITNESS:  I don't know the evolution of
03:49   25   that area in term of the drainage for the system.  But
```

03:49  1    it appeared to me that based on the slope that that was
03:49  2    engineered, the drainage was at the bottom of the slope
03:49  3    as you would expect with a drainage system.  And so I
03:49  4    think that it was clearly intentional.
03:49  5         But as to the evolution of that area, you
03:49  6    know, for decades and decades, I don't know what they
03:49  7    did there.
03:49  8         Q.  BY MR. COHEN:  Do you know, for example, whether
03:49  9    the drainage system existed before the above ground
03:49 10    storage tank was moved to that area?
03:49 11         MR. BUSCH:  Object to the form.
03:49 12         THE WITNESS:  I -- I don't know that so I
03:49 13    don't know the timing on when that was designed Cohen.
03:49 14         Q.  BY MR. COHEN:  Do you know when the above ground
03:49 15    storage tank was moved to that area?
03:49 16         A.  That was moved the degreaser was moved up
03:50 17    into the -- the more northern reaches of the facility.
03:50 18         Q.  And do you know what division that was?
03:50 19         A.  It went from the -- I believe from the die cast
03:50 20    to the lubricator area.
03:50 21         Q.  And do you know when that change occurred?
03:50 22         A.  Um, I -- I don't recall the exact date but I did
03:50 23    know it; so...
03:50 24         Q.  Do you know why the change occurred?
03:50 25         A.  I don't know why the degreaser was moved up into

---

03:50  1    that area, no, sir.
03:50  2         Q.  You told Ms. Ross that in your opinion that
03:51  3    Madison-Kipp site was one of the worst sites you had
03:51  4    ever seen, largely because of the DNAPL it moved
03:51  5    offsite.
03:51  6         Am I characterizing that correctly?
03:51  7         A.  There's a combination of things:  One, it sits on
03:51  8    fractured rock.  Fractured rock is relatively close to
03:51  9    the surface.
03:51 10         That it was a DNAPL site with a long history of
03:51 11    dumping of free product -- free phase DNAPL and that the
03:51 12    deep groundwater was moving at the various levels, which
03:51 13    makes it even more complex in fractured rock.
03:51 14         And then further the fact that very high
03:51 15    concentrations had gone offsite in different directions.
03:52 16    One would think that if you have groundwater flowing
03:52 17    from a certain direction, you would get a distribution
03:52 18    of contamination, at least in the dissolve phase,
03:52 19    consistent with that direction.
03:52 20         But here we've got contamination in two different
03:52 21    directions.  And it's hard to think that water is going
03:52 22    in two different directions.
03:52 23         So my position is that they don't understand the
03:52 24    groundwater flow conditions, and the DNAPL is going to
03:52 25    follow the flow paths of the fractures.  And there

---

03:52  1    hasn't been a fracture analysis to understand where the
03:52  2    DNAPL would be.
03:52  3         Q.  Would you agree with me that based on your
03:52  4    experience complex sites like this take a longer period
03:52  5    of time to investigate?
03:52  6         A.  Oh, I think I've spoken to that and I agree with
03:52  7    that yes, I think, sir.
03:52  8         Q.  And would you also agree with me that at least as
03:52  9    of the present moment, the DNR has not agreed with your
03:52 10    position that this is a DNAPL site?
03:53 11         A.  I saw where Mr. --
03:53 12         MR. BERGER:  If you know what their current
03:53 13    position is.
03:53 14         THE WITNESS:  I saw early in Mr. Schmoller's
03:53 15    position asked that question he said he didn't think it
03:53 16    was.
03:53 17         Q.  BY MR. COHEN:  And you disagree with
03:53 18    Mr. Schmoller?
03:53 19         A.  No.  What I disagree with is the 1 percent rule
03:53 20    which says that if you're above 1 percent solubility,
03:53 21    the presumption is that DNAPL's there.  And if the
03:53 22    presumption is there, then you should characterize your
03:53 23    investigation to include looking for DNAPL.
03:53 24         So what happened was the Madison-Kipp team
03:53 25    including ARCADIS, chose to say there's no DNAPL there,

---

03:53  1    even though the presumption there was.  And as a result,
03:53  2    they didn't try to characterize the DNAPL.  And as a
03:53  3    result they got these huge surprises of very high
03:53  4    concentrations right there on the cite.
03:53  5         MR. COHEN:  Those are all the questions I
03:53  6    have.  Thank you.
03:53  7         THE WITNESS:  Thank you.
03:54  8         MR. BUSCH:  Nothing.
03:54  9         MR. BERGER:  I have a couple follow-up
03:54 10    questions.
03:54 11
03:54 12              EXAMINATION
03:54 13    BY MR. BERGER:
03:54 14         Q.  I'm just not sure I understand what your answers
03:54 15    are and want to clarify.
03:54 16         Your opinion as to the conduct is based on all of
03:54 17    data in evidence in the case, including all the
03:54 18    groundwater results, all the soil results, all the
03:54 19    onsite and offsite data generated; is that true?
03:54 20         MR. BUSCH:  Objection to the form.
03:54 21         THE WITNESS:  Yes, it is.
03:54 22         Q.  BY MR. BERGER:  So it's not just Schmoller and
03:54 23    Lenz?
03:54 24         MR. BUSCH:  Object to the form.
03:54 25         THE WITNESS:  Well, certainly not, sir.

```
03:54   1      Q.  BY MR. BERGER:  Okay.  It's all of evidence.
03:54   2      A.  It's all of the evidence including all of the
03:54   3   analysis.
03:54   4      Q.  Okay.  Do you recall Mr. Schmoller testifying
03:54   5   that when he became project manager for DNR, the first
03:54   6   thing he did was review all of the reports and
03:54   7   investigation reports and materials submitted by
03:54   8   Madison-Kipp from the beginning of the project?
03:54   9      A.  I was.
03:54  10          MR. BUSCH:  Object to the form.
03:54  11          THE WITNESS:  That was my understanding,
03:55  12   yes.
03:55  13      Q.  BY MR. BERGER:  And you also reviewed those
03:55  14   reports as well, did you not?
03:55  15      A.  I did.  And the ones I didn't, my team did.
03:55  16          MR. BERGER:  Okay.  I don't have anything
03:55  17   else.
03:55  18          MR. BUSCH:  Thank you.
03:55  19          (Discussion held off the record.)
03:55  20          THE VIDEOGRAPHER:  This is the end of our
03:55  21   deposition today, the end of disk number three, of
03:55  22   volume number three of the deposition Lorne G. Everett,
03:55  23   Ph.D.  on February 14th of the year 2013.  We are
03:55  24   concluding at 3:56 p.m.
03:55  25          THE REPORTER:  Does anyone want a copy of
```

```
03:55   1   this, certified copies?
03:56   2          MS. ROSS:  Of course.
03:57   3          MR. WEISS:  Electronic copy.  You have any
03:57   4   card.
03:57   5          MR. COHEN:  And I want an electronic copy as
03:57   6   well.
03:57   7          MR. BERGER:  I think I'll take an electronic
03:57   8   copy too.
03:57   9          And I'll let you know if I want the video.
       10          (The videotape deposition was concluded
       11          at 3:57 p.m.)
       12
       13
       14
       15
       16
       17
       18
       19
       20
       21
       22
       23
       24
       25
```

```
 1   STATE OF CALIFORNIA      )
                              )
 2   COUNTY OF SANTA BARBARA  )  ss.
 3
 4          I, LORNE G. EVERETT, Ph.D., hereby certify
 5   under penalty of perjury under the laws of the State of
 6   California that the foregoing is true and correct.
 7          Executed this _____ day of
 8   _____, 2013, at _____, California.
 9
10
11
12
13
14
15          _____
16                    LORNE G. EVERETT, Ph.D.
17
18
19                       --oo0oo--
20
21
22
23
24
25
```

```
 1   STATE OF CALIFORNIA       )
                               )
 2   COUNTY OF SANTA BARBARA   )  ss.
 3
 4          I, JOAN L. PARKER, CSR 12912, do hereby
 5   certify:
 6          That prior to being examined, the witness in
 7   the foregoing proceeding was by me duly sworn to testify
 8   to the truth, the whole truth, and nothing but the
 9   truth;
10          That said transcript was taken down by me in
11   shorthand and thereafter reduced to typewriting via
12   computer-aided transcription under my direction and
13   supervision, and is a true and correct transcription of
14   my original stenographic notes.
15          I further certify that I am neither counsel
16   for, nor related to, any party to said action, nor in
17   anywise interested in the outcome thereof.
18          UNDER PENALTY OF PERJURY, I declare that the
19   foregoing is true and correct.
20          Executed this 27th day of February, 2013, at
21   Santa Barbara, California.
22
23
24          _____
25                    JOAN L. PARKER
                      CSR No. 12912
```