# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

---

KATHLEEN McHUGH and
DEANNA SCHNEIDER, Individually
and on behalf of all persons similarly
situated ,

                              Plaintiffs,

    v.

MADISON-KIPP CORPORATION,
CONTINENTAL CASUALTY COMPANY,
COLUMBIA CASUALTY COMPANY,
UNITED STATES FIRE INSURANCE
COMPANY and ABC INSURANCE
COMPANIES 1 – 50,

                              Defendants,

                    --and--

MADISON-KIPP CORPORATION,                    Case No. 11-cv-724-bbc

                    Cross-
                    Claimant,

    v.

CONTINENTAL CASUALTY COMPANY,
COLUMBIA CASUALTY COMPANY and
UNITED STATES FIRE INSURANCE
COMPANY,

                    Cross-Claim Defendants,

                    --and--

CONTINENTAL CASUALTY COMPANY and
COLUMBIA CASUALTY COMPANY,

    Cross-Claimants/Third-Party Plaintiffs,

    v.

---

MADISON-KIPP CORPORATION,

                  Cross-Claim Defendant,

                  and

LUMBERMENS MUTUAL CASUALTY
COMPANY, AMERICAN MOTORISTS
INSURANCE COMPANY, and JOHN DOE
INSURANCE COMPANIES 1-20,

                  Third-Party Defendants.

## DEFENDANT MADISON-KIPP CORPORATION'S MOTION TO EXCLUDE PLAINTIFFS' EXPERT LORNE G. EVERETT

Pursuant to Federal Rules of Civil Procedure 26, the Preliminary Pretrial Conference Order, and Federal Rule of Evidence 702, Defendant Madison-Kipp Corporation respectfully moves for an order excluding testimony of Plaintiffs' liability expert Lorne G. Everett, Ph.D., DS c., as set forth below.

### INTRODUCTION

Dr. Everett offers numerous opinions on a variety of topics.  Some of these opinions are, according to Dr. Everett, beyond his expertise.  Other opinions require specific analyses, which Dr. Everett did not do.  Still other opinions are not based on an adequate factual foundation and, indeed, Dr. Everett offers opinions that are entirely speculative.  For instance, he speculates that particulates must be "going in the windows" of the class members' homes, but has no evidence to support this claim.  Similarly, he claims that the City of Madison is not turning on City Well 8 this summer, but there is no evidence to support this assertion, and that well is not contaminated.

2

Dr. Everett reveals the extent to which he will go when he offers opinions about risk (under RCRA) when faced with test results that are *below* EPA screening levels. Incredibly, he says the test results are "not representative" in order to avoid admitting that the results just don't support the Plaintiffs' claims. In other words, Dr. Everett's opinions here are that a risk exists simply because he says so.

Finally, when questioned about the standards of care that he maintains Madison-Kipp violated, Dr. Everett could only offer vague references to support his assertions. When further confronted, he admitted that the standards were "changing." Without specific and reliable standards, his testimony must be excluded.

Indeed, *Daubert* and its progeny bar such unqualified and unreliable testimony. The Seventh Circuit has repeatedly instructed district courts to exclude such testimony, in exercising its gatekeeper function under both *Daubert* and the Federal Rules of Evidence. Madison-Kipp asks the Court to exclude Dr. Everett's unqualified and unreliable testimony.

## ARGUMENT

### I.    LEGAL STANDARD.

The admissibility of expert testimony is governed by the framework set out in Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). The party seeking to have the expert testimony admitted bears the burden of demonstrating its admissibility by a preponderance of proof. *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). Rule 702 provides:

> A witness who is qualified as an expert by
> knowledge, skill, experience, training, or education may
> testify in the form of an opinion or otherwise if:
>> (a) the expert's scientific, technical or other
> specialized knowledge will help the trier of fact to
> understand the evidence or to determine a fact in issue;
>> (b) the testimony is based upon sufficient facts or
> data;
>> (c) the testimony is the product of reliable principles
> and methods; and
>> (d) the expert has reliably applied the principles and
> methods to the facts of the case.

Fed. R. Evid. 702.

"Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it." *Daubert*, 509 U.S. at 595. In order to ensure that misleading expert testimony is not considered by the trier of fact, the Court must perform the "gatekeeper" role of screening such evidence to ensure that it "is not only relevant, but reliable." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997). In other words, "[t]he court, in its role as gatekeeper, must exclude expert testimony that is not reliable and not specialized, and which invades the province of the jury to find facts and that of the court to make ultimate legal conclusions." *Sundance, Inc. v. DeMonte Fabricating Ltd.*, 550 F.3d 1356, 1364 (Fed. Cir. 2008).

The Seventh Circuit test for admissibility of expert evidence under *Daubert* has three elements. *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007). First, "the witness must be qualified as an expert by knowledge, skill, experience, training, or education." *Id.* Second, "the expert's reasoning or methodology underlying the testimony must be scientifically reliable." *Id.* Finally, "the testimony must assist the

trier of fact to understand the evidence or to determine a fact in issue." *Id.*  In addition, "the suggested scientific testimony must 'fit' the issue to which the expert is testifying." *Chapman v. Maytag Corp.*, 297 F.3d 682, 687 (7th Cir. 2002).  Ultimately, expert opinions must be based upon "the most reliable sources of information," and an expert's "knowledge" must be rooted in "more than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590.

The goal of the *Daubert* analysis "is to ensure the reliability and relevancy of expert testimony." *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 152 (1999).  "The objective of *Daubert*'s gate-keeping requirement is to . . . make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Bourelle v. Crown Equip. Corp.*, 220 F.3d 532, 536 (7th Cir. 2000) (quoting *Kumho Tire*, 526 U.S. at 152).  "Talking off the cuff – deploying neither data nor analysis – is not acceptable methodology." *Id.* at 539 (citation omitted).  Indeed, even if the Court finds that a witness is a "supremely qualified expert," that witness "cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method and are reliable. . . ." *Clark v. Takata Corp.*, 192 F.3d 750, 759 n.5 (7th Cir. 1999).

Consistent with these evidentiary requirements, Rule 26 requires an expert to provide "a complete statement of all opinions the witness will express and the basis and reasons for them."  Fed. R. Civ. P. 26(a)(2)(B); *see also Salgado by Salgado v. General Motors Corp.*, 150 F.3d 735, 741 n.6 (7th Cir. 1998) ("Rule 26(a) expert reports must be detailed

5

and complete [and] include the substance of the testimony which an expert is expected to give on direct examination together with the reasons therefor.") (citations and quotations omitted).  Rule 26 is intended to enhance "the district court's role as gatekeeper, for it permits an early and full evaluation of evidentiary problems in a case and allows the court to make an early pretrial evaluation of issues of admissibility carefully and meticulously."  *Id.* (quotations omitted).  For this reason, "[e]xpert reports must not be sketchy, vague or preliminary in nature [and] must include 'how' and 'why' the expert reached a particular result, not merely the expert's conclusory opinions." *Id.*

## II.    DR. EVERETT IS NOT QUALIFIED AND HIS OPINIONS ARE NOT RELIABLE.

A court must determine that an "expert's reasoning or methodolo[gies] underlying the testimony" are "reliable." *Ervin,* 492 F.3d at 904.  "*Daubert* provided a non-exhaustive list of 'guideposts' for the court to consult in assessing the reliability of expert testimony: (1) whether the theory can be or has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the theory's known or potential error rate when applied; and (4) whether the theory has been generally accepted in the relevant scientific, technical, or professional community."  *Fail-Safe, L.L.C. v. A.O. Smith Corp.,* 744 F. Supp. 2d 870, 886 (E.D. Wis. 2010).  The ultimate object of this reliability inquiry is to "ensure that the opinions expressed by testifying experts 'adhere to the same standards of intellectual rigor that are demanded in their

professional work.'"   *Id.* at 887 (*quoting Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 318 (7th Cir. 1996)).

Where, as here, an expert's opinions do not satisfy these standards – for example, where the expert relies on speculation, unfounded assumptions or untested methods as opposed to established and reliable scientific methodologies – it is appropriate to exclude the proffered testimony as unreliable.  *See Fail-Safe*, 744 F. Supp. 2d at 887-93, 901; *Rosen,* 78 F.3d at 318-20; *see also Autotech Tech. Ltd. P'ship v. Automationdirect.com,* 471 F.3d 745, 749 (7th Cir. 2006) (affirming exclusion of software expert's opinion where he failed to study and test the software that was the subject of his report).

### A.  DR. EVERETT ADMITTED HE IS NOT QUALIFIED ON CERTAIN TOPICS; HIS OPINIONS HERE ARE ALSO NOT RELIABLE.

Dr. Everett considers himself an expert in environmental science, hydrology and hydrogeology.  (Dkt. # 188 at 16 (Depo p. 64:5-9, 64:24-65:17).)  Even accepting those qualifications at face value, Dr. Everett has not limited his opinions to those areas.  Dr. Everett admitted that he is not an expert and / or did not perform certain analyses in arriving at his opinions:

1. He is not an expert in toxicology.  (Dkt. # 188 at 16 (Depo p. 66:16-23).)

2. He is not an expert in chemistry, so he does not know exactly how PCBs are mixed into PAHs.  (*Id.* at 17 (Depo. p. 68:2-9).)

3. He did not have an opinion regarding whether the groundwater above 120 feet was a source of vapor in the subslabs in the class area and he did not know what the concentrations were.  (*Id.* at 17 (Depo. p. 71:4-17).)

4.  He is not an expert in air deposition and he specifically did not do any kind of analysis of air flow from the stacks at Madison-Kipp.  (*Id.* at 18-19, 29 (Depo. p. 75:3-14; p. 76:6-18; p. 117:16-19)).

5.  He did not try to determine if any of the PAH located on class members' properties is from a source other than Madison-Kipp; he stated that he looked at "other sources in the area" but he did not do a quantitative analysis.  (*Id.* at 29 (Depo. p. 119:1-5)).

6.  Though he recommended hydrocarbon fingerprinting in order to determine the source of PAHs, he did not perform that analysis.  (*Id.* at 46 (Depo. p. 184:8-15; p. 185:16-21)).

7.  He believes the site is a DNAPL site and he would recommend a "fracture analysis," but he did not do such an analysis.  (*Id.* at 13 (Depo. p. 52:6-9)).

8.  He admitted that there are other contamination sites in Madison that may contribute cis-1, 2-DCE to City Well 8, but he did not evaluate those sites.  (*Id.* at 32 (Depo. p. 130:21-131:3)).

9.  He did not look at tests for contamination with other city wells.  (*Id.* at 32 (Depo. p. 131:4-6)).

Dr. Everett's opinions on the foregoing topics must be excluded.  His opinions on these topics – without expertise and appropriate analyses – are nothing more than bare conclusions.  *Guining Li & Leyuan Shi v. Citibank USA*, No. 00-C-475, 2001 WL 34379613, at *5 (W.D. Wis. June 4, 2001).  Dr. Everett provides nothing more than a bottom line on these topics, but the Seventh Circuit has held that this type of testimony "supplies

nothing of value to the judicial process." *McMahon v. Bunn-O-Matic Corp.*, 150 F.3d 651, 658 (7th Cir. 1998) (quoting *Mid-State Fertilizer Co. v. Exchange Nat'l Bank*, 877 F.2d 1333, 1339 (7th Cir. 1989)).

Further, Dr. Everett admits he did not perform the proper analyses. With respect to PAHs, he stated that hydrocarbon fingerprinting was the recommended method for determining the source, but he did not perform that analysis. Similarly, with respect to air deposition, he admitted that he merely walked around the Madison-Kipp site but did not do any analysis of air flow from the stacks at Madison-Kipp. He admitted that there could be a "regional contribution" to the PAH levels in the class members' yards, but concluded it could not be a regional problem because 30% of the samples did not detect PAH. (Dkt. # 188 at 19 (Depo. p. 76:2-25).) Thus, though the remaining 70% of the samples that did have a detection for PAH could be a regional problem, Dr. Everett nevertheless concluded that the PAH had to come from Madison-Kipp.

Regarding City Well 8, Dr. Everett had to admit that he did not look to other potential sources of contamination. In essence, he looked at these issues without undertaking the appropriate scientific study. "In determining scientific reliability and validity, the critical question is whether the alleged expert employed scientifically reliable and valid methods." *Werner v. Pittway Corp.*, 90 F. Supp. 2d 1018, 1031 (W.D. Wis. 2000) (citing *Ancho v. Pentek*, 157 F.3d 512, 515 (7th Cir. 1998)); *Wintz by & through Wintz v. Northrop Corp.*, 110 F.3d 508, 512-14 (7th Cir. 1997)). "Courts 'must rule out subjective belief or unsupported speculation.'" *Werner*, 90 F. Supp. 2d at 1031) (quoting *Ancho*, 157 F.3d at 515). Anecdotal observations – such as Dr. Everett's anecdotal tale of

walking around the facility – are not scientifically sound and violate fundamental principles of *Daubert* and Rule 702.

Consequently, the Court should exclude Dr. Everett from offering any opinions regarding: toxicology,[1] chemistry (including how PAHs allegedly mixed with PCBs at the site), whether groundwater above 120 feet was a source of vapor in the subslabs, air deposition including how air flowed from the stacks at Madison-Kipp, the source of PAHs in the area including found on the class members' properties, that the site is a DNAPL site, and the source of cis-1, 2-DCE in City Well 8.

**B.    DR. EVERETT'S OPINIONS ARE BASED ON SPECULATION AND LACK AN ADEQUATE FACTUAL FOUNDATION.**

Dr. Everett's opinions were frequently not opinions, but criticisms of Madison-Kipp and its environmental consultants and experts from Arcadis.  Plaintiffs, however, bear the burden of proving their claims and cannot meet their burden of proof by having Dr. Everett make accusations about Madison-Kipp or Arcadis.  Indeed, some of Dr. Everett's criticisms were based on incomplete data and not final reports of Arcadis.

Dr. Everett's testimony reveals the speculative nature of his opinions:

1.    He opined that the "remediation strategy now must go offsite," but did not provide specifics about where it should go or what it should be, other then it would have "huge implications."  (Dkt. # 188 at 8 (Depo. p. 35:3-14).)

---

[1] With respect to toxicology, Dr. Everett relies exclusively on the opinion of Dr. Ozonoff that PCE is a carcinogen.  Madison-Kipp separately moves to exclude that opinion of Dr. Ozonoff, and Dr. Everett offers no independent basis for that conclusion.  As a result, if Dr. Ozonoff's testimony is excluded, Dr. Everett obviously cannot rely upon Dr. Ozonoff's opinion.

2. He criticized Arcadis for not knowing the direction of the groundwater flow, for not knowing what the sources were, for not having a conceptual model, for not having a plan to clean up the site.  Because Arcadis concluded that there was no risk to the neighbors, he believed their opinions were "unconscionable."  (*Id.* at 9 (Depo. p. 37:12-18).

3. He testified that the PCE contamination at the site was based on "employees dumping PCE by buckets out the door" and this "intentional dumping" was what "caused the problem."  (*Id.* at 12 (Depo. p. 48:7-13).)

4. He opined that Arcadis did not know the direction of the groundwater flow based on an October, 2012 email.  (*Id.* at 12 (Depo. p. 51:19-24).)

5. He opined that contamination had to be coming from fans on the building because they were covered in "tar from this material" and "we need to start looking inside these homes for the particulates" because if they are in the soil, he was "sure" it was "going in the windows."  (*Id.* at 15 (Depo. p. 62:11-14).)

6. He questioned why Arcadis was doing a risk assessment for the neighbors but was not doing a risk assessment inside Madison-Kipp.  (*Id.* at 15 (Depo. p. 63:10-23).)  There is no evidence he performed a risk assessment inside Madison-Kipp.

7. He opined that Arcadis did not know the source of PCE vapor intrusion and that Arcadis, thus, did not define the risk.  (*Id.* at 20-21 (Depo. p. 83:14-20, 84:4-18).)

8. The PCE at "extremely high concentrations is clearly on its way" to City Well 8 and that resource is hugely compromised.  (*Id.* at 22 (Depo. p. 90:1-9).)

9. He opined that the City was not turning on Well 8 "because of risk with this new data" and that the risk would be there for the "foreseeable future."  (*Id.* at 10 (Depo. p. 42:13-16).)

10. He recommended that they figure out where the DNAPL is in the soil and that there had to be DNAPL in the soil though it hadn't been found yet.  (*Id.* at 30 (Depo. p. 122:15-19).)

Dr. Everett's opinions here are based on speculation.  He does not know, for instance, that there is DNAPL in the soil, but assumes it must be there though no one has found it yet.  (*Id.* at 30 (Depo. p. 122:15-19).) He claims that remediation must go off-site but does not provide any specifics other than to assert that the new data has "huge implications."  He also has no basis for speculating that particulates exited fans at Madison-Kipp and entered "windows" of neighboring homes; he is just making things up with no supporting data.  (*Id.* at 15 (Depo. p. 62:11-14).)  *See Daubert*, 509 U.S. at 590 (ruling that testimony cannot simply be "subjective belief or unsupported speculation.")

Dr. Everett's criticisms of Arcadis are factually incorrect.  For instance, he concludes that PCE is clearly on its way to the City Well 8 and that City Well 8 has been "hugely compromised," though there is no evidence of any contamination in the well and only minute amounts of cis-1,2-DCE.  (Dkt. # 145-1 at 33.)  Similarly, he opined that the City was not turning the well on because of new data, but there is no evidence to

support his speculation that the City won't turn on the seasonal Well 8 this summer.

An expert cannot provide opinions where the underlying facts are completely wrong.

This is particularly so where Dr. Everett admits that he did not analyze whether

contaminants from other sources are approaching City Well 8, though the City of

Madison has identified 51 known or potential sources of contamination in the vicinity.

(Dkt. # 145 at 20.)  Expert testimony, such as this, must be excluded where it is

speculative and not factually supported.  *See Beachler v. Amoco Oil Co.*, 112 F.3d 902, 909

n.6 (7th Cir. 1997) (affirming district court's exclusion of expert affidavit which was

speculative because not supported by factual foundation).

Likewise, Dr. Everett's criticisms of Arcadis are not based on fact.  For instance,

he relies upon an October 31, 2012 email to opine that Arcadis does not know certain

things about the site, including the directional flow of groundwater, but he fails to

recognize that Dr. Johnson provided a specific opinion on this topic.  (Dkt. # 145 at 14-

15.)  Similarly, though he criticized "Arcadis" for various items, all the items were

addressed by Madison-Kipp in its expert reports.  (*See* Dkt. # 145 at 19 (stating that the

contamination has been defined); *id.* at 19-20 (setting forth opinions on soil, soil vapor

and groundwater.)  Dr. Everett should not be allowed to offer expert opinion where his

testimony is factually incorrect and without adequate foundational support.  *See*

*Minasian v. Standard Chartered Bank, PLC,* 109 F.3d 1212, 1216 (7th Cir. 1997) (affirming

district court's exclusion of expert affidavit where expert did nothing to substantiate his

opinion).  Moreover, *any* criticism of Arcadis would be an improper rebuttal report, but

this Court bars a third round of expert reports.

Dr. Everett continually refers to deposition testimony from Mr. Lenz regarding alleged dumping activities prior to 1980, but Mr. Lenz did not begin working at Madison-Kipp until 1980.  Moreover, Dr. Everett (and Plaintiffs) never considered testimony from employees who worked at Madison-Kipp at the time at issue.  Instead, Dr. Everett prefers to rely upon completely unreliable hearsay from a former employee who was not there at the time in question.  To make matters worse, Dr. Everett jumps from incomplete and inaccurate evidence to claim that Madison-Kipp acted "intentionally" in dumping chemicals.  This opinion is not only based on an inadequate factual foundation, but also improperly attempts to opine regarding Madison-Kipp's state of mind.  *See In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 192 (S.D.N.Y. 2009) (granting a motion to exclude expert testimony "as to the knowledge, motivations, intent, state of mind, or purposes [of the defendant], its employees, the FDA, or FDA officials").

### C. DR. EVERETT'S OPINIONS IGNORE LOW LEVELS OF CONTAMINANTS.

Faced with low levels of contaminants, Dr. Everett reveals his true colors by arguing that there is nevertheless a risk to human health and the environment despite the fact that many of the test results reveal contaminants below EPA action levels.  His testimony, on its face, is unreliable.

Dr. Everett admits that there are no detectible levels of PCEs in drinking water. (Dkt. # 188 at 20 (Depo. p. 81:4-11).)  Nevertheless, he opined that people could "sink very shallow wells to get water for irrigation …." (*Id.* at 20 (Depo. p. 81:12-15).)  He

admitted that cities typically do not allow people to simply go out and drill their own wells for irrigation and he was not aware of any such wells in the Class Area, but he still maintained that that is "what people do." (*Id.* at 20 (Depo. p. 81:19-82:4).) Similarly, though there is no contamination in City Well 8, he nevertheless opines that City Well 8 has been "hugely compromised." (Dkt. # 188 at 22 (Depo. p. 90:1-9).) Clearly, Dr. Everett was trying to make some type of claim for contamination and impact to the neighbors' properties where none exists. *See Minasian*, 109 F.3d at 1216 (noting that the expert's affidavit was "carefully tailored to support plaintiffs' position but devoid of analysis" and affirming exclusion of that affidavit).

Though Dr. Everett admitted there are no homes within the Class Area that have an indoor air reading in excess of the EPA's action level of 6 parts per billion for PCE, he opined that the data was incorrect. Thus, when confronted with the fact that the test results did not support a claim for risk to human health or the environment, Dr. Everett simply opines that one should ignore the data because it "was not representative of the conditions." (Dkt. # 188 at 20 (Depo. p. 82:5-22; *id.* at 24 (Depo. p. 98:10-25).) In particular, he said the data samples that were taken were not "representative" because they do not reflect impact (if any) on families who "have lived there for generations." (*Id.* at 20 (Depo. p. 82:23-83:3).) Notably, Dr. Everett has never identified any family who has lived there for "generations," nor has he attempted to analyze how long each Class Members has lived at their property, or how that relates in any way to the data or permits him to reject data that has low levels of contaminants. Dr. Everett's opinion here is entirely unreliable as he is not using a methodology that would be considered

reliable and acceptable by reasonable professionals in the field. *See Allgood v. General Motors Corp.*, No. 1:02-cv-1077, 2006 U.S. Dist. LEXIS 70764 (S.D. Ind. Sept. 18, 2006) (finding that expert's reliance upon a Reassessment document was not reliable where document had not been adopted by the EPA as the accepted approach though it had been peer reviewed). Here, Dr. Everett is rejecting data results because he believes they are too low. This is exactly the type of advocacy that courts routinely disallow. *See Minasian*, 109 F.3d at 1216.

Dr. Everett took the same tact with low levels of PCBs; rather than admit that there is no risk or threat to human health, Dr. Everett simply rejected the test results solely because it "defies logic." (*Id.* at 23 (Depo. p. 95:1-5).) To be sure, he testified that he was not aware of any samples that were in excess of action levels, but that it "defies logic to think that Madison-Kipp would then dig up a huge 10 foot swath of soil next to the fence and that none of it got through the fence." (*Id.* at 23 (94:22-95:5).) Thus, according to Dr. Everett's expert opinion, the data itself was not suspect or incorrect, but he believed there *had* to be PCBs on the neighbors' properties (despite what the results show) because Madison-Kipp was excavating some of its own property. This is not "expert" analysis, particularly when the expert starts picking and choosing test results, and discounting all results that rebut his position. "In determining scientific reliability and validity, the critical question is whether the alleged expert employed scientifically reliable and valid methods." *Werner*, 90 F. Supp. 2d at 1031.

**D.   DR. EVERETT'S OPINIONS ARE NOT PROPERLY BASED ON A RELIABLE STANDARDS OF CARE.**

Dr. Everett was wholly evasive when it came to questions regarding the standard of care he applied in this case.  The record shows that he could not specify the standards, but merely alleged that Madison-Kipp's actions did not comply with the "applicable" standard of care.  In fact, he frequently just relied on his "experience" for the standard of care.

For instance, when asked about the standards of conduct regarding disposal of chemicals, he merely testified that the standards related to "industrial chemicals" and that it was "well-known, back in that time frame, that dumping industrial chemicals would cause groundwater contamination."  (Dkt. # 188 at 19 (Depo. p. 77:12-78:10).)  This was despite the fact that an ASTM standard from 1962 provided for the open disposal of certain chemicals.  Further, Dr. Everett had to admit that he was not familiar with material that said it was a common practice to use PCB containing materials as a dust suppressant until the mid-1970s.

Notably, Dr. Everett relied upon Mr. Lenz, the environmental manager at Madison-Kipp for his opinion that using waste oil as a dust suppressant failed to meet the standard of care.  Yet, Dr. Everett also roundly criticized Madison-Kipp for not adequately training Mr. Lenz for his role.  (Dkt. # 185 at 26-27.)  Dr. Everett's position cannot be reconciled:  Mr. Lenz cannot establish the standard of care for waste oil disposal and yet lack sufficient training and experience.  In truth, Dr. Everett admitted that his opinion regarding the disposal of waste oils was really just based on his

17

"feelings" that "industrial hazardous wastes [] should not be disposed this way."  (Dkt.

# 188 at 29 (Depo. p. 116:7-14).)  This testimony is both unreliable and without an

adequate factual foundation.  *See Minasian*, 109 F.3d at 1216; *Beachler*, 112 F.3d at 909 n.6.

When confronted several times with a basic question regarding screening levels,

Dr. Everett could not give a straight answer:

> Q:      Without regard to this site, as a general proposition, if
>         vapor – defensible vapor data falls below a screening
>         level, it does not present an imminent and substantial
>         endangerment to human health, does it?
>
>                                   ***
>
> A:      My last paper on the dynamic behavior of the soil
>         gasses was submitted to the California Department of
>         Toxic Substances Control.  And within the last month,
>         the Department of Toxic Substance Control lead guy
>         … on vapor intrusion took our paper and sent it to
>         every person within the California water resources
>         control board and every person within DTSE saying:
>         This is what you need to consider relevant to soil gas
>         in our screening levels.  You need to understand the
>         dynamic behavior.  And so the dynamic behavior of
>         gasses is not in the regulations as yet.  And the
>         regulations are changing in response to that, sir.
>                 That's why I'm having a problem answering
>         your question.
>
> Q.      So you did not answer my question --
>
> A.      I can't answer your question. I can't – mya nswer is
>         that the regulations at this stage are just catching up
>         to the science.  And I'm a coauthor on the changing
>         science.
>
> Q.      So your answer is no?
>
> A.      With all the caveats that I've indicated earlier, that's
>         my answer.

Q.     And is that -- is that based upon your, um -- well, that's a toxilogical [sic] opinion, isn't it?

A.     No, respectfully, it's not based on toxicology at all.It's based on the defensibility of the actual data that was doing those calculations on.

Q.     Try it one more time. If vapors at a site are adequately characterized and the levels are below the EPA recognized screening levels for PCE and the contaminant of interest is PCE, there is no eminent and substantial endangerment, is there?

                              ***

A.     The answer is no because the regulations are changing. So you can't ask a yes-or-no question on regulations that are changing.

(Dkt. # 188 at 25 (Depo. p. 100:7-102:24).)  According to Dr. Everett, the standards are constantly changing so he could not answer the question.  Given this admission, it is clear that Dr. Everett's standard of care will be a moving target.

When pushed further on this, Dr. Everett said that there was "not enough data over time" to make the decision regarding low screening levels.  (*Id.* at 25-26 (Depo. p. 103:5-104:10).)  Thus, the record shows that Dr. Everett cannot admit that where test results are below EPA screening levels for health, there is no risk to human health or the environment.  The Court cannot permit Dr. Everett to offer opinions regarding risks to human health and / or the environment where the test results and data reflect levels *so* low that the EPA does not consider them actionable.  *Burns Philp Food, Inc. v. Cavalea Continental Freight, Inc.*, 135 F.3d 526, 530-31 (7th Cir. 1998) (affirming exclusion of expert testimony where expert wanted to infer results); *see also Allgood*, 2006 U.S. Dist.

LEXIS 70764, at *27-28.  If Dr. Everett's testimony were permitted, then anyone with a scintilla of any chemical on their property could sue and claim a risk to their health and / or the environment.  *See Burns Philp Food,* 135 F.3d at 530-31 (affirming exclusion of expert testimony where expert wanted to infer results).

Finally, with respect to PCE containment and capture measures, Dr. Everett testified that he believed the standards of care were established by the United States Department of Defense during World War II and through the 1962 ASTM standard. Specifically, during World War II, PCE and TCE were "rationed and strictly controlled to support [the] war effort."  (Dkt. # 188 at 36 (Depo. p. 144:7-14).)  There is no showing, however, that the Department of Defense considered PCE and TCE to be hazardous chemicals.  Indeed, Dr. Everett admitted that rationing of these chemicals was done for purposes of conserving resources in order to support the war effort.  (*Id.*)  Dr. Everett has not explained how containment for purposes of conserving resources during World War II establishes the standard of care for PCE and TCE years later, and his opinion based upon that standard shows that his testimony is not reliable.  *See Minasian*, 109 F.3d at 1216; *Beachler*, 112 F.3d at 909 n.6; *Burns Philp Food,* 135 F.3d at 530-31.

## CONCLUSION

Dr. Everett's testimony is not reliable and he is not qualified to offer opinions on numerous topics.  He cannot speculate or base his opinions on incorrect facts.  Further, when the data does not support his clients' claims, he cannot simply say that the data is incorrect.  Finally, his opinions are not reliable where not based on recognized and

reliable standards of care.  This Court should disregard his opinions and otherwise exclude any testimony on the topics discussed in this brief.

Dated this 4th day of April, 2013.

**MICHAEL BEST & FRIEDRICH LLP**

By:   s/  John C. Scheller
John C. Scheller
Leah H. Ziemba
Albert Bianchi, Jr.
One South Pinckney Street, Suite 700
Madison, WI  53703
Telephone:  (608) 257-3501
Fax:  (608) 283-2275
Email:  jcscheller@michaelbest.com
         lhziemba@michaelbest.com
         abianchi@michaelbest.com

John A. Busch
Lee M. Seese
100 East Wisconsin Avenue, Suite 3300
Milwaukee, WI  53202-4108
Telephone:  (414) 271-6560
Fax:  (414) 277-0656
Email:    jabusch@michaelbest.com
         lmseese@michaelbest.com

*Attorneys for Defendant Madison-Kipp Corporation*